1    **UNITED STATES DISTRICT COURT**
     **FOR THE DISTRICT OF NEW JERSEY**
2

3    ==============================

     PETER PATAKI,                    CIVIL ACTION NUMBER:
4
             Plaintiff,               **16-cv-1109-CPO**
5        v.
                                      **TRIAL**
6    WALMART, et al.
                                      **VOLUME 4**
7        Defendant.                   **(PAGES 475 - 639)**
     _____
8        Mitchell H. Cohen Building & U.S. Courthouse
         4th & Cooper Streets
9        Camden, New Jersey  08101
         Friday, November 15, 2024
10       Commencing at 9:45

11   **B E F O R E:**              THE HONORABLE CHRISTINE P. O'HEARN,
                                   UNITED STATES DISTRICT JUDGE AND JURY
12

13   **A P P E A R A N C E S:**

14       LAW OFFICES OF ROOSEVELT JEAN, LLC
         BY:  ROOSEVELT JEAN, ESQUIRE
15           MAURY WINKLER, ESQUIRE
         400 Tenafly Road, #46
16       Tenafly, NJ 07670
         For the Plaintiff
17
         MCDONNELL & ASSOCIATES, P.C.
18       BY:  PATRICK J. MCDONNELL, ESQUIRE
             ELISA M. BOODY, ESQUIRE
19       METROPOLITAN BUSINESS CENTER
         860 FIRST AVENUE, SUITE 5B
20       KING OF PRUSSIA, PA 19406
         For the Defendant
21
     **ALSO PRESENT:**
22
         Ferdinand Martinez, Walmart Representative
23
             Camille Pedano, Official Court Reporter
24               camille_pedano@njd.uscourts.gov
                     856-576-7015
25
      Proceedings recorded by mechanical stenography; transcript
           produced by computer-aided transcription.

1                              <u>INDEX</u>

2       <u>WITNESS:</u>                                    <u>PAGE:</u>

3

4           CLOSING ARGUMENT BY MR. McDONNELL           498
            CLOSING ARGUMENT BY MR. JEAN                546
            JURY INSTRUCTIONS BY THE COURT              599
5           RULE 50 MOTION BY MR. McDONNELL             630
            VERDICT                                     636
6           POLLING OF THE JURY                         637

7

8                              * * * * *

9

10                            <u>EXHIBITS</u>

11          <u>NUMBER</u>                                <u>IN EVIDENCE</u>

        P-45 through P-75                              491
12      J-1 through J-3                                491
        D-2, D-37, D-50                                491
13      C-1                                            598

14                             * * * * *

15

16

17

18

19

20

21

22

23

24

25

1          (PROCEEDINGS held in open court before The Honorable

2   Christine P. O'Hearn, United States District Judge, at 9:45

3   a.m.)

4          THE COURTROOM DEPUTY:  All rise.

5          THE COURT:  Please be seated.

6          Counsel, thank you for coming in a little later.  I

7   know I was planning to have you in a little earlier.  I had to

8   handle an order to show cause so I just finished that.

9          I did, however, work, and I know Ms. Dominguez emailed

10  to you last night, after I reviewed, the final verdict sheet

11  which I understand we need to take the line off for future

12  medical.  Is there anything else on the verdict sheet that

13  needs to be changed or is everyone in agreement?

14         Mr. Jean?

15         MR. JEAN:  We are in agreement.

16         THE COURT:  Mr. McDonnell?

17         MR. McDONNELL:  Yes, Your Honor.

18         THE COURT:  So Ms. Minix will make that final change

19  and we will have that ready to go.

20         With respect to the jury instructions, I ruled -- I

21  don't want to say I ruled by email, but in the email you

22  received I made a finding after I left yesterday and we did

23  some research.  I am not giving the aggravation charge.  The

24  case law that I cited in that email specifically cited two

25  cases, New Jersey state cases, that set forth that the

1  plaintiff has the burden to establish that there was a

2  pre-existing injury and it can't be done through

3  cross-examination simply by a defendant when the defense is

4  just that it was a pre-existing.  That's not the case here.

5  The facts don't fit it.  I'm not giving it.  I think both of

6  those cases support that.

7         When I went through it, it was very repetitive and

8  actually, I drafted those, here's the changes I made before she

9  sent it to you, and my goal was to condense it somewhat and to

10  not have it be redundant or confusing in light of some of the

11  charges that I agreed to give.  So I don't know how you want to

12  address it.

13         Have you two conferred about them?  Do you have any

14  objections to anything that's in there?  I guess let's start

15  with Mr. Jean.

16         MR. JEAN:  Your Honor, I find it acceptable.  We can

17  work around any issue.

18         THE COURT:  Okay.  Mr. McDonnell, do you have any

19  objections to the charge as I have it?

20         MR. McDONNELL:  Your Honor, I always want to preserve

21  the record, so I am just preserving the objections for the

22  charges that we requested which the Court accepted.  Other than

23  that, Your Honor, we have no objection to the charge that is

24  written, except, Your Honor, I wonder whether or not life

25  expectancy can be charged here because Dr. Vizzone didn't

 1  testify that he was going to have these problems permanently or

 2  for the future.  So there is that kind of question, you know,

 3  which is, he testified, I haven't seen him in two years and

 4  that's kind of it.  So, typically, you would have the doctors

 5  say have you formed an opinion to a reasonable degree of

 6  medical certainty whether or not he's disabled or whether or

 7  not these conditions are going to continue for the future

 8  and/or there was some evidence of a prognosis that was offered,

 9  he is going to need surgery or he is going to have pain.  There

10  just wasn't any medical evidence.  So my concern -- I am not

11  going to belabor this, Your Honor.  I just want to preserve the

12  record.

13       THE COURT:  I understand.  He did say it was permanent

14  and I think that that gives the plaintiff -- although I will

15  say, one thing I was thinking about last night, I didn't hear

16  anybody testify that he needed it.

17       Where is the plaintiff, by the way?

18       MR. JEAN:  Your Honor, I don't have any communication.

19  I don't know.

20       THE COURT:  Okay.

21       MR. JEAN:  I can't tell you.

22       THE COURT:  I didn't recall hearing even that anybody

23  said he needed to use a cane nor did I hear anybody say he was

24  prescribed it, just simply, I think, that he walked into the

25  doctor's office.  So I think there's enough evidence on both

1    sides, quite frankly, that you can argue because he said they

2    were permanent, you can argue he told you he still has pain

3    today, ten years later.  I think that the medical testimony to

4    support that is pretty thin but barebones is enough by saying

5    that they are permanent.  And certainly, Mr. McDonnell, you are

6    free to argue that no one said he is going to be like this for

7    the rest of his life, no one said he needs any further

8    treatment, you know, the total converse of, obviously, what the

9    plaintiff testified to and what plaintiff is going to argue.

10   So I think it's appropriate.  I think your point is well noted

11   but I think it's argument, Mr. McDonnell, and the jury can

12   certainly weigh those factors and decide.  Okay?

13        MR. McDONNELL:  And, Your Honor, the plaintiff hasn't

14   rested but I have a motion for judgment as a matter of law.  Do

15   you want to hear it now or do you want to hear it after they

16   rest?

17        THE COURT:  Here's what I am going to do:  The jury is

18   coming in at 10, right?  It's ten of.  Under the federal rules

19   I can reserve.  My intent, as I said yesterday, would be to

20   reserve.  So what I would like to do, since we have agreement

21   on the instructions and the verdict sheet, which I thank you

22   both for making that easy this morning, I would like to go

23   right into having plaintiff rest, reserving your right to put

24   your motion on the record, and then having you -- did you talk

25   about exhibits?  And then do closings.  Are the exhibits agreed

 1   upon?  Are there any issues?

 2          Mr. Jean?

 3          MR. JEAN:  Your Honor, this is what we have agreed

 4   upon.  We have agreed upon the Exhibits P-43A through P-43O to

 5   be used as demonstrative purposes in closing statements.  They

 6   are still photographs of the video.

 7          I requested to have a stipulation that these still

 8   photos also be admitted into evidence because the jury's going

 9   to have an opportunity to see them.  They are, if I may

10   approach, if Your Honor needs to see, it is direct stamps.

11   However --

12          THE COURT:  Let me see.

13          MR. JEAN:  (Handing.)

14          However, Mr. McDonnell does not agree.  So that's the

15   first -- so we agree on one thing but we don't agree on the

16   second part.

17          THE COURT:  Okay.  So I get that.  With respect to all

18   the exhibits that you intend to offer into evidence, is there

19   any objection to them other than this, Mr. McDonnell?

20          MR. McDONNELL:  Yes, Your Honor.  The video is going

21   back downloaded onto the iPad.

22          THE COURT:  Right, I know.  Other than this.  So

23   putting this aside for a moment, are there other objections to

24   what he wants to offer?  If so, we will just go through them

25   one-by-one and I will have him tell me what he is putting into

1    evidence.

2           MR. McDONNELL:  Sure.  The others, Your Honor, are the

3    MRI scans and all those images the doctors referred to.  I'm

4    not so sure that's appropriate to send back with the jury

5    because I'm not sure we want lay people intro to radiology and

6    deciding to kind of see things.  So that's my only concern,

7    Your Honor, in terms of going back.

8           Other than that, Your Honor, it's clearly -- the MRI

9    images are in evidence and they were shown to the jury.  My

10   concern is it does require some sort of technical knowledge and

11   understanding of them and I would hate to have jurors fighting

12   over what an MRI says.

13          THE COURT:  Do you have anything that says that MRIs

14   or any other medical studies shouldn't go back to a jury?

15          MR. McDONNELL:  Your Honor, other than the long line

16   of cases in New Jersey that the interpretation of an MRI is a

17   complex medical opinion, requires medical foundation, and that

18   generally for that type of evidence, it's not submitted for the

19   jury purposes.  That doesn't mean that he can't show it to the

20   jury during closing; but my concern, Your Honor, is that the

21   jury shouldn't substitute -- if we don't allow chiropractors,

22   other medical people, to give opinions about MRIs unless they

23   are trained for it, that's my concern, Your Honor.

24          THE COURT:  But the jury is being told that they have

25   to rely on the testimony and the evidence that they heard.

1 Your doctors testified about what was or wasn't there.  His

2 doctors testified as to what was or wasn't there.  And I am

3 going to tell them that -- it's been admitted.  They are going

4 to be admitted.  Unless there's some case that says there's

5 some exception that evidence that is an MRI film or an X-ray

6 film shouldn't go back, I think with an appropriate instruction

7 that you are going to get all this evidence, you are not

8 doctors, I have no issue saying -- I don't think Mr. Jean would

9 object to saying these are the exhibits that the doctors

10 referred to and if you need to hear back the testimony that

11 went along with those, certainly -- although I don't know that

12 we would be thrilled to do it -- we can read it back.  And I

13 think that that's the appropriate thing in this case.  They

14 were admitted into evidence.

15          MR. McDONNELL:  Then, Your Honor, with that

16 instruction, that's great and I don't have any objection as

17 long as all the images go back so we don't have select ones.

18          THE COURT:  No.  I think that they should all go back.

19          Do you have any objection to me telling them that,

20 Mr. Jean?

21          MR. JEAN:  No, Your Honor.  Just to be clear for the

22 record, what was proposed was P-45 through P-75, within --

23 there was a P-44 but that's just demonstrative, it's not

24 evidence.  P-44 is just demonstrative.

25          THE COURT:  I don't want to be confused.  I have a

 1   list of exhibits from P-1 through P-76.  So have you told

 2   Mr. McDonnell which of all these you intend to admit and is

 3   there any other dispute and are you in agreement?

 4           MR. JEAN:  Yes, I have advised Mr. McDonnell each

 5   exhibit that I would like to admit and Your Honor's ruled upon

 6   that just now.

 7           THE COURT:  Is there any objections to any of those,

 8   Mr. McDonnell?

 9           MR. McDONNELL:  Yeah.  I just want to make sure that

10   we're clear.  You're not going to send the demonstrative back

11   to the jury, the surgical demonstrative?

12           MR. JEAN:  That's what I just said, which is P-44, I

13   am not doing that and I did not give it on the flash drive.

14           THE COURT:  Right.

15           MR. McDONNELL:  So, Your Honor, the whole set of MRI

16   films, digital copies, is D-37 and we would just, since it's

17   complete and they are all of them, we would just propose

18   substituting D-37, which is that whole list of them.

19           MR. JEAN:  Well, to be clear --

20           THE COURT:  I think that's confusing and here's why:

21   Because the doctors referred to them by the P or the D and I

22   need to match them up, so, quite frankly, they should get them

23   both.  This is why it's so much more helpful when you have

24   joint exhibits because the jury shouldn't get copies but there

25   is no way for them to match it up to the testimony if I read it

1    back, and it may be somewhat confusing to them.  So, I think

2    it's appropriate.  They are going to get defendant's exhibits,

3    they are going to get plaintiff's exhibits.  I am not sure that

4    either of your doctors referred to every single one of those

5    MRIs so I think it's just easier that they all go back.

6         MR. JEAN:  Your Honor, if I may be heard.  The

7    exhibits that I used were the defense exhibits, candidly, then

8    P exhibits were put upon them, but the doctor went through each

9    one and the jury will remember the P-49 through 52 cervical, 53

10   to 57 lumbar, P-45 cervical, P-46 cervical, P-47 lumbar, P-48A

11   and B the lumbar X-ray.  So the doctor put in front of the jury

12   what they reviewed.  So I think that's going to be fresh in

13   their minds.

14        The defense exhibits, I don't think that -- they're

15   the same images.  So if we're giving them both, we're going to

16   confuse them.  And just to be clear, it's one -- they are one

17   set of images that are being submitted.

18        THE COURT:  Here's the problem:  The testimony of the

19   doctors referred to them and the questions asked were phrased

20   as P exhibits or D exhibits.

21        This is what I am going to tell them:  You've heard

22   testimony from both doctors.  The way litigation works is

23   lawyers mark their exhibits separately, as you saw these were

24   videotaped.  To avoid any confusion about what you might

25   remember about the testimony, you are going to get them.

1    They're the same images but they are marked P's and they're

2    marked D's.  That's what I am going to tell them.  I think they

3    can follow instructions.  I don't want them to think that just

4    because there is 40 in the packet that that means there was 40

5    done versus 10 or 20.  I think that that's a fair, balanced

6    instruction.  Otherwise, they shouldn't go back at all, which

7    doesn't make sense.  So, to me, that's the appropriate balance

8    to strike.  So that's what I will tell them before the evidence

9    goes back.

10           Have you given Ms. Minix the flash drives?  And you

11    have all reviewed each others?

12           MR. McDONNELL:  We have, Your Honor.

13           MR. JEAN:  Yes.

14           THE COURT:  So there is no other exhibit issues?

15           MR. McDONNELL:  Only that we are going to add our

16    images on to the flash drive.

17           THE COURT:  The only thing you do need to do, though,

18    each of you, I know although you are in agreement, you need to

19    at least tell me for the record by exhibit number what's going

20    back to the jury.  So can we just do that now while we are

21    waiting for the jury to come up?

22           Mr. Jean, I am getting a little concerned, it's 9:58,

23    the jury is going to be here at 10 and I don't see your client.

24    If he is not here, we're starting.

25           MR. JEAN:  Can I call him?

1          THE COURT:  Why don't you do that.  I will start with

2    Mr. McDonnell.  You can step out.

3          MR. JEAN:  I just want to follow what's going on.

4          THE COURT:  All I am going to ask Mr. McDonnell to do

5    is to go through his exhibit list -- or I was going to start

6    with you -- and just put on the record what's on the flash

7    drive that's going back to the jury.  You have all agreed that

8    they are being admitted subject to the few rulings I made, but

9    we need to officially put on the record what those exhibits are

10   and there is no reason to do that in front of a jury.

11         Is one of you prepared to do that to start?

12         MR. McDONNELL:  I am, Your Honor.

13         THE COURT:  Let me get my list so I have my list.  Go

14   ahead.

15         MR. McDONNELL:  Your Honor, J-1, J-2, J-3, which are

16   the videos.

17         THE COURT:  Okay.

18         MR. McDONNELL:  The excerpts from D-2, which were

19   shown to the jury, and D-50.  And then we are going to add

20   D-37, which is a complete set of digital copies of the images.

21         THE COURT:  Anything else?

22         MR. McDONNELL:  No, Your Honor.

23         THE COURT:  Okay.  Mr. Jean, from your perspective,

24   from your list, which exhibits?

25         MR. JEAN:  Thank you.

 1              The plaintiff introduces into evidence P-45 through

 2    P-75 as exhibits into evidence.

 3              THE COURT:  Okay.

 4              MR. JEAN:  And Your Honor has it in front of her,

 5    the --

 6              THE COURT:  I want to talk about these, the stills.

 7              MR. JEAN:  I want to just call them out.

 8              THE COURT:  P-43A.

 9              MR. JEAN:  P-43A through P-43O.

10              THE COURT:  I don't have a P-43O on the list that I

11    have for you but I will add it.  What's the timestamp on that?

12              MR. JEAN:  Your Honor, P-43O is 8:15:54, if I may

13    approach, Your Honor.

14              THE COURT:  Yes.  Mr. McDonnell, what is your

15    objection to the stills going back?  Is there some question as

16    to authenticity?  They do have a timestamp on them.  You have

17    both gone through the video ad nauseam and stopped it at

18    various points.  So what's the issue?

19              MR. McDONNELL:  Your Honor, a lot of these stills have

20    not been shown to the jury, only the video was shown, and my

21    concern, under the best evidence rule, is that the jury has the

22    video and they should be permitted to stop it or look at it and

23    that showing stills that Mr. Jean hand selected is essentially

24    argument that's going back into the jury room that he thinks is

25    important to his case as opposed to, here's the whole video,

1    remember what you saw.  And I think it unfairly emphasizes the

2    points in the video that Mr. Jean wants to make.

3         THE COURT:  Okay.  Mr. Jean, did you show any of these

4    stills to the jury during the trial?  I recall you using the

5    video and stopping the video.

6         MR. JEAN:  The stills -- well, I am going to answer

7    Your Honor's question.  How was it submitted?  Well, we took

8    the deposition of Ms. Gardner and we laid the foundation when I

9    was saying Mr. Brito (phonetic), who's our law clerk, to stop

10   and take the photographs.  So it's always been known that I

11   was, yes, indeed, making emphasis on certain stops and starts.

12   Unfortunately, during the presentation of Ms. Gardner, the

13   videographer didn't show the video, but to be clear, to be

14   transparent, we know what we're talking about.  So here we're

15   having the -- I think I've answered the question.  I'm going to

16   answer another question here.

17        We have the video.  The jury is going to see the

18   video.  I'm just attempting, yes, to certainly make a point,

19   but there's no dispute, stop, pause, reflect, there's a

20   particular moment of time.  I don't think there's any prejudice

21   to anyone.

22        THE COURT:  No, I don't think that's the issue,

23   though, and I think Mr. McDonnell's correct.  The video is

24   going back.  They can stop it whenever they want.  You stopping

25   it and using snapshots in your closing argument is essentially

1    argument that these are the important parts of the video and

2    that's, I think, for them to determine.  I'm sure, because,

3    quite frankly, from where they were seated, I am not sure how

4    well they could see the video, given that you guys were putting

5    it up on here.  I could see it fairly well because my screen is

6    right here.  And so I think they are going to want to look at

7    the video and I think they probably will look at the video on

8    the iPad.  Again, that's another reason why we like the iPads.

9    I don't want to call them back out and put it on the screen

10   when they say we want to see it better.  I think it's much

11   clearer for them to do that.  I think that's sufficient.

12          I think it's unfair argument to allow selected

13   versions that were not marked and used during the trial as

14   exhibits.  So I don't think there is certainly any prejudice to

15   plaintiff.  You can use them in your closing.  You can tell

16   them these are the parts of the video I think you should go

17   back and look at, and I think that that's sufficient.  Okay?

18          MR. JEAN:  That's fair.  Thank you.

19          THE COURT:  All right.

20          MR. JEAN:  If I --

21          THE COURT:  And they are not on the jump drive,

22   correct?

23          MR. JEAN:  They are on the jump drive.  I guess it

24   would be easier to take them off than to upload them so --

25          THE COURT:  Do you want to give them back their drives

1    and have them -- did you already upload them on the iPads?

2            THE COURTROOM DEPUTY:  No.

3            THE COURT:  Give them back their drives and let them

4    fix what they need to fix.  While we are doing closings, Ms.

5    Minix will have them put on the iPads.

6            Anything else with respect to exhibits that we need to

7    address?  It seems like we've addressed everything.

8            MR. JEAN:  That's it.  Ms. Minix can delete them off,

9    right?

10            THE COURT:  We don't do that.  You are going to do it

11    because God forbid there is a mistake, an exhibit goes back

12    that shouldn't go back, I don't want to be responsible for it.

13    Go ask the prosecution team in Mr. Menendez's case who let nine

14    exhibits go back that the Court ordered be redacted and now

15    they want a new trial.  I don't do that.  I do that in every

16    case.  I say, it's your responsibility, I am not doing it, and

17    it's not hers.

18            (Exhibits P-45 through P-75 received in evidence.)

19            (Exhibits J-1 through J-3 received in evidence.)

20            (Exhibits D-2, D-37, D-50 received in evidence.)

21            THE COURT:  How long do you expect your closing to be,

22    Mr. McDonnell?

23            MR. McDONNELL:  Close to an hour.

24            THE COURT:  Okay.  So what might work is we will take

25    a morning break right after your closing.  I have an 11:00

 1     call.  Off the record.

 2              (Off-the-record discussion.)

 3              THE COURT:  What is the amount of medical expenses?

 4     Did you figure it out?  Because that needs to be put into the

 5     instructions.

 6              MR. McDONNELL:  38,5.

 7              THE COURT:  38,500?  Is that correct, Mr. Jean?

 8              MR. JEAN:  Yes, Your Honor.

 9              THE COURT:  We need to make that change as well.

10              We will make those couple changes and give you the

11     final copy.  And that will be what goes on the docket and then

12     the verdict sheet.  So I will need both of them to read after

13     closing.

14              I will give the time-unit instruction before.

15              So when the jury comes in, I am just going to ask,

16     does plaintiff have any more witnesses?  Plaintiff will say no.

17     I will ask, does defendant have any more witnesses?  You are

18     going to say, no, you rest.  I will give the time-unit

19     instruction, explain we are going to have closings.  We will

20     break briefly after Mr. McDonnell's closing.  Then we will come

21     back and have plaintiff's and if I need to break, I will, and

22     then we will have the charge.

23              I would like to, when they come in, we do give them

24     lunch when they deliberate, so Ms. Minix will give them the

25     form to fill out for what they would like to order for lunch.

1    So if we start at 10, we break for a few minutes, hopefully it

2    will be right around 12:30ish, 12:45ish.  So they can break,

3    have their lunch and start deliberating.

4          I do send the charge back so they will get eight

5    copies of the charge.

6          One thing we did not address -- I have to wait for

7    Mr. Jean to come back in.  Here he is.

8          Mr. Jean, one thing we did not address is the two

9    alternates.  So 7 and 8 are the alternates.  Generally I ask

10   counsel at the end of every case, but it's certainly your

11   prerogative, when you have -- it's not a long case but when you

12   have people sit here and listen to testimony, I always ask

13   counsel if they have an objection to letting all eight

14   deliberate.

15         Is there an objection, Mr. Jean, to having all eight

16   deliberate or do you want the two alternates excused, which

17   would be Juror 7 and Juror 8?

18         MR. JEAN:  Sixty seconds, literally.

19         All jurors, Your Honor.

20         THE COURT:  All?

21         MR. JEAN:  Yes.

22         THE COURT:  Mr. McDonnell, do you have any objection

23   to having all eight deliberate?

24         MR. McDONNELL:  Yes, Your Honor, all eight.

25         THE COURT:  So we will tell them we decided all eight

1    because they have been here for three days, four days, they've

2    paid attention, we are going to have all eight deliberate and

3    the parties agree to that.  I will tell you the last trial I

4    did when jurors were here for literally a month, and we excused

5    four alternates, because it was a criminal trial, they were not

6    happy.  The one woman wanted to leave immediately.  No, you

7    have to wait, that's why, you have to wait.  So I think it's a

8    good thing.  So thank you.

9            THE COURTROOM DEPUTY:  All rise for the jury.

10           (The jury passes through the courtroom.)

11           THE COURT:  You can be seated.

12           MR. McDONNELL:  Your Honor, while they are getting

13   ready, can I just head to the restroom?

14           THE COURT:  Yes, I was going to say we'll take a quick

15   minute break, five minutes, and as soon as they are ready.  So

16   five minutes I will be ready to bring them out.  We will take a

17   five-minute break.  I will be right back.

18           (Brief recess taken from 10:09 a.m. until 10:19 a.m.)

19           THE COURTROOM DEPUTY:  All rise.

20           THE COURT:  All right.  Please be seated.

21           Anything else we need to discuss before I bring the

22   jury out?

23           (No response.)

24           THE COURT:  Okay.  Bring them out.

25           (The jury enters the courtroom at 10:19 a.m.)

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  Please be seated.

3          Good morning, everyone.  Thank you for coming in a

4    little later.  We are going to proceed with a few things but

5    let me ask you first, has anyone heard, read or seen anything

6    about the case that you have not heard in the courtroom?

7          (No response.)

8          By a show of hands and shake of heads, that's a no.

9          Mr. Jean, does the plaintiff have any further

10   witnesses?

11         MR. JEAN:  The plaintiff rests.

12         THE COURT:  Okay.  Mr. McDonnell, do you have any

13   further witnesses?

14         MR. McDONNELL:  No, Your Honor, subject to our

15   understanding.

16         THE COURT:  Yes.

17         So ladies and gentlemen -- you may be seated -- the

18   parties have closed the testimony and the evidence, so let me

19   explain to you what will happen next.

20         First we will have closing arguments.  We will have

21   arguments starting with the defendant.  The defendant goes

22   first, the plaintiff goes last because the plaintiff has the

23   burden of proof.  So it's the reverse of opening statements.

24   Okay?  We will take a break between the two statements for a

25   few moments and then plaintiff will give his closing.  We can

1  take a break if we need to and then I will give you the charge.

2  The charge is the written instructions that is the law that you

3  have to apply to the facts.  You will each have a copy of them

4  and I have to read them to you but we will read them and go

5  through them, and then I will go through the verdict sheet with

6  you and the questions that you will need to answer and how you

7  do that and some of the logistics of deliberation.  So that's

8  how our morning will proceed.

9      I am hoping, based on my conversations with the

10  lawyers, that we should be done right about the time that we

11  would normally break for lunch or slightly thereafter.  So we

12  will have your lunch ready so when you go back to deliberate,

13  that will all be there for you.  Okay?  So that's how we are

14  going to proceed this morning.

15      Just so the record is clear, the lawyers and I have

16  previously gone through all of the exhibits and I received all

17  the evidence and the evidence will go back to the jury room

18  with you on iPads.  Jurors tend to like that, particularly in a

19  case like this where we have videos.  So you can watch that,

20  you can look at it and any of the other evidence that the

21  parties have moved into evidence and Ms. Minix will have an

22  iPad for each of you, and that's how the evidence will go back.

23  Okay?  All right.

24      Anything else before we close, Mr. McDonnell?  I do

25  need to do the one instruction that we discussed.

1          MR. McDONNELL:  No, Your Honor.

2          THE COURT:  Okay.  One of the things I want to tell

3    you, this is an instruction that we give specifically before

4    closing arguments, and that is that counsel is permitted to

5    argue to the jury the appropriateness of what we call a

6    time-unit calculation in determining damages for pain,

7    suffering, disability, impairment or loss of enjoyment of life.

8    Counsel are not permitted to mention specific amounts of money

9    for calculation of such damages.  They are permitted, however,

10   to argue that you may employ what we call a time-unit

11   calculation; that is, to consider an amount of money in

12   relation to an amount of time when determining damages.

13         So I charge you and instruct you that the argument of

14   any counsel during closing arguments with reference to the

15   calculation of damages on a time-unit basis is argument only

16   and it's not to be considered as evidence.  Counsel's

17   statements are simply a suggestion or argument to you as to how

18   you might determine damages for pain, suffering, disability,

19   impairment and loss of enjoyment of life if you find liability

20   in this case.

21         You are free to accept or reject these arguments as

22   you deem appropriate, and you are required to make a

23   determination on the amount of damages, if you find liability,

24   based on the evidence that's presented and the instructions

25   that I will give you before you start to deliberate.

1    Okay?

2    Mr. McDonnell, anything else before we close?

3    MR. McDONNELL:  No, Your Honor.

4    THE COURT:  Okay.  You may proceed.

5    (CLOSING ARGUMENT BY MR. McDONNELL)

6    MR. McDONNELL:  May it please the Court.

7    Good morning.  This is my opportunity to give the

8    closing argument or what I prefer to call summation.  My

9    intention is to try to sum up the evidence so that when you get

10   the verdict sheet and you hear the Court's instructions, you

11   are going to be able to get answers to those questions proper

12   and render a true verdict.

13   Jury service is the last service that we have where

14   the government doesn't demand your money in taxes but it

15   demands your time and it's mandatory.  We don't have a draft

16   anymore but this is really the last service where the

17   government says this is so important that we're going to enlist

18   our citizens to participate in a process to try to reach the

19   truth and to try to achieve justice.  You took an oath to

20   follow the Court's instructions and to follow the evidence and

21   to follow the law, and I'm confident that your verdict will be

22   based upon those particular issues.

23   In a civil case, the plaintiff has the burden of

24   proof.  Typically the way we kind of symbolize it or give you

25   that picture is that when you weigh the evidence on both sides,

1    if the scales are equally tipped, the plaintiff loses.

2    Plaintiff has to produce enough evidence that in your mind it

3    says to you this is more probably true than not true.  And the

4    Court will give you all these instructions.  We did get them in

5    advance and I tried to make them as accurate as possible but at

6    the end, the Court will give the instructions and you will have

7    them in the jury room and that's what you have to rely upon.

8    This is my guide.  I don't want to misstate something so I want

9    to make sure that I am as faithful as possible to it.

10           I told you in the beginning what I called the four

11   C's.  This is when you talk about liability or fault for this

12   particular incident.  And the four C's, as I told you, is

13   credibility, who's telling the truth.  Is there credible

14   evidence?  Because if you don't get past that part, if you

15   don't find credible evidence, there's not much further you can

16   really go after that.

17           The next C is care.  When we talk about care, we're

18   talking about what is the duty of care?  What is the

19   responsibility of Walmart and what is the responsibility of

20   Mr. Pataki and what's the standard you're supposed to use to

21   test that conduct?  And before I forgot to introduce Mr.

22   Martinez, he is the store manager.  He wasn't here on the first

23   day but this case is important to him and he trusts also that

24   you'll follow your oath.  So that's the second C is care.

25   What's the care, what's the test for care?

1          The third C is causation and the fourth C is

2    comparative.  And you are going to get a verdict form and

3    instead of saying care, the question is, was this party

4    negligent or was the other party negligent?  And what

5    negligence means is did that person follow the standard of care

6    that the law requires that we all follow and we all have our

7    own standard.

8          This is the instruction for credibility and there's a

9    couple things that I think are important to highlight.  And the

10   one question you are allowed to look at is whether a witness or

11   a party has an outcome in the case.  In other words, do they

12   have an interest in this case?  That's one of the issues you

13   can consider in determining if this person is credible or not

14   credible.  In other words, when they testify, does it matter to

15   the result?  Do they have skin in the game is another way of

16   terming it.  But these are all the factors you can use in

17   determining credibility.  But at the end of the day, it comes

18   down to the same tools that you use every day in your ordinary

19   life.  Does what this person say sound true?  Does it make

20   sense to me?  All that is part of the first C, a part of

21   credibility.

22         The next thing you promised to do is that you would

23   give equal treatment to both parties.  No bias, no sympathy, no

24   prejudice whatsoever, and that's really important in this

25   particular case.  And I will tell you why.  Because it's

1    natural for all of us to be sympathetic, particularly when one

2    party is a company, I understand the company is made up of all

3    the people who work in the store, including Mr. Martinez and

4    his staff, but it's natural to hear if somebody's gone through

5    something to have that sympathy towards that person and, in

6    fact, project our own feelings of maybe what happened in our

7    life onto that person.  And in this case, it's important that

8    you set that aside when you decide this case and you promised

9    in the beginning that you would decide this case based upon

10   reasoned jurors on the facts of the case and not sympathy, not

11   prejudice, or anything else.

12           An individual in a civil case does not get the benefit

13   of the doubt.  It's still the same burden of proof that you

14   have to weigh.  There is no higher standard.  If you recall

15   during voir dire you were asked about that.  Does anybody

16   believe that Walmart or any other company should be held to a

17   higher standard?  In this courtroom, all parties are treated

18   equally, including Walmart.

19           So here's the big question in this case:  Who is

20   Mr. Pataki?  We know that he has an interest in the outcome of

21   the case.  Parties always have an interest in the outcome of

22   the case.  And, generally -- and, again, this is what you use

23   in your common sense and your common world -- people have

24   presence on social media, they have cell phone pictures, they

25   have partners, they have spouses, family, co-workers,

1    neighbors, roommates, girlfriends, all of these group of people

2    that together and collectively identifies us.  And in this

3    case, you heard absolutely no evidence of any of that, the

4    things that you typically use to weigh who a person is.

5    There's not a single witness or a single document that is from

6    before the incident.  There's absolutely nothing.  You've heard

7    no explanation as to why there's nothing from then.  Not a

8    picture of him playing tennis, not a social media post showing

9    him doing any sort of activity, nothing.  We walk around now,

10   certainly at least since 2010, with almost our lifetime

11   available to us to show people, no, really, this is who I was,

12   this is what I was doing.  And you haven't heard any of that

13   evidence.

14         Who was he with that night?  Who drove him home at a

15   quarter of two in the morning?  Who was he living with?  You

16   haven't heard any evidence of that.  It's as if this gentleman

17   just spawned spontaneously at a Walmart on June 7, 2015.  And

18   in your common experience, does that make sense?

19         Mr. Pataki's introduction, I took the opportunity to

20   speak to our court reporter and have her transcribe his

21   testimony from the Court so that I would make sure that it

22   would be accurate for you when I talked about it.  And this is

23   his trial testimony.  This was his introduction to tell you who

24   this person is and what he's about.

25         The question is:  "Mr. Pataki, where do you live?

1          "In Brooklyn.

2          "How long have you lived there?

3          "In the last three years, I lived in Brooklyn.

4          "Mr. Pataki, how much do you weigh?"

5          No How did you grow up?  What's your education?

6     What's your background?  All the things that you would have if

7     you were sitting at a table or you were at a church gathering

8     or a civic gathering and you started to have a conversation,

9     and one of the things you would ask a person and one of the

10    things you would share with a person to let them know who you

11    are and where your position is or whatever your place is in

12    society.  You have been given no evidence whatsoever about this

13    gentleman, nothing.  Everything begins on June 2015.

14          So when asked, "Who were you living with," this,

15    again, is trial testimony -- "Were you living with other

16    people?"

17          "Yes.

18          "So there were other people who knew what your

19    activities were, correct?

20          "Well, not necessarily, no."

21          So in this case, there's just nothing.  He's presented

22    to you no evidence.  This case or this claim has been involved

23    almost ten years.  There's not a single person who came in and

24    said, oh, I know Peter, this is who he was, I was living with

25    him at the time.  There was an intentional decision by the

1    plaintiff not to share any of that with you, and to start it

2    off with, how much do I weigh.

3        When asked initially, he said he's a painter, that's

4    what he said, on my cross-examination, well, that's what I do.

5    If you remember what he said to Dr. Vizzone, and it's in his

6    records, and, in fact, Dr. Vizzone pointed that out to me, no,

7    look, I put construction.  And that's the same note that is in

8    another doctor's note from that time.

9        So in this particular case, you have a situation where

10   there's evidence that he was doing heavy work and heavy labor

11   but there's nobody that's come in to tell you about that or to

12   share with you and say, hey, I can do that.  It's their case.

13   They had a choice of what witnesses they wanted to put on and

14   they've said we're not going to share anything.

15       He agreed he's working 60, 70 hours a week but

16   painting is not hard construction work.  And if you remember to

17   his doctors he didn't say he was a painter.  He said I do

18   construction.  That was his training.  He was trained in HVAC

19   work.  The gentlemen pull out heavy air conditioners and put in

20   heavy heating units, install ductwork, that's his training, and

21   that's what he told his doctors, that's what I do.  And I also,

22   on the side, I do things where I lift people and I work that

23   way.  And he said, oh, no, no, no I use a lift.  And that

24   raises the question.  If he uses a lift and it's not heavy

25   work, well, that's the type of things that he could continue to

1    do.  But he shared none of that evidence with you.  He made a

2    conscious choice to say, I'm going to show you just right here.

3    That's what this case is about, is you have to decide a case

4    that says, here's a person, a human being, all the things that

5    make us up, and the question is, I'm going to show you nothing

6    other than what happened and what you see in the courtroom.

7          You see him using a cane.  And I was expecting

8    Dr. Vizzone to come in and explain to you why he needs a cane.

9    He has weakness in his leg, he has a gait problem.  There were

10   hours of questions of the defense doctors.  You're not the

11   treating doctor, you don't know this guy, you don't know this.

12   That was the treating doctor they chose to bring in.  Did he

13   say one word that his condition requires him to use a cane or

14   one word that he's going to have disability forever?  Nothing.

15   He didn't even tell you what his prognosis would be.  He said,

16   I haven't seen this man in a couple years.  That's the person

17   he chose to present to you.  Again, just, I'm only going to

18   show you a tiny bit and I'm not going to show you the rest.

19   There are consequences to that.  Because when you go back there

20   and you have to put the things on a scale on the plaintiff's

21   side, you don't have anything to put in except what someone

22   showed you in a courtroom that you know nothing about.

23         You're allowed, and the Court give you this

24   instruction, you're allowed to consider what we call

25   circumstantial evidence.  You're allowed to consider common

1    sense.  In other words, you're allowed to consider where the

2    store is, where he lived, how he got back and forth, how he

3    supports himself in Brooklyn, a place that doesn't even have a

4    Walmart or a cheap place to shop.  Not just for the past ten

5    years, but for the time before.  You're allowed to ask those

6    questions, and say what do I put in that scale to help me

7    render a verdict to him?  You have nothing.  And it's not

8    because of Walmart.  He chose not to give you any evidence.

9         There's been no evidence -- the Court's going to

10   charge you that you can consider the interests of a person, but

11   there's no evidence of any disinterested person on the part of

12   the plaintiff that doesn't have a financial interest in the

13   outcome of the case.

14        He mentioned Florida.  He mentioned training as a

15   construction worker.  He didn't mention any volunteer or civic

16   organization.  There is no mention of any family.  I think he

17   might have said his mom gave him a flu something, but other

18   than that, there's no, here's my cousins, here's my friends.

19   Folks, this is not ordinary human discourse because this is

20   what we talk about, this is where we live.  And the purpose of

21   this case is to tell you, this is who I was, and this is how

22   this accident affected me, and this is why you should believe

23   me.

24        There is absolutely no evidence of what this gentleman

25   has been doing in the past ten years.  Where's he living?  He

1    says Brooklyn.  Brooklyn is a big place.  How's he supporting

2    himself?  Where groceries certainly cost so much that he goes

3    to New Jersey to buy them.  How's he getting around?  How does

4    he spend his time?  And there's that old line or the movie, I

5    get by on the kindness of strangers.  Who are these people?

6    There's just nothing.  He appeared at the store, he appeared in

7    the courtroom, he appeared at doctors' offices, that's all you

8    know.

9            Let's talk about the trip to Walmart.  Basic stuff.

10   Who dropped him off?  Was he with someone else?  What was he

11   doing in New Jersey?  He mentioned something about getting

12   something for cats or chicken and he was going to bring his

13   groceries back to Brooklyn.  Who picked him up from the ER at

14   quarter to two in the morning?  What about the next day, who

15   took him from Brooklyn, then the emergency room, and then

16   allegedly over to New Jersey?  Folks, we live in the

17   Philadelphia metro area so we may not have direct experience of

18   what it's like to get from Brooklyn, which is on the bottom

19   south end of Long Island, go through Brooklyn, one of the most

20   congested places in the country, go over the bridge to

21   Manhattan, and either take a tunnel through Manhattan or go

22   over a bridge.  That's what he's telling you he did to go to

23   medical appointments.  Wouldn't you like to hear from these

24   people?  Who was he with the next day?  To come in and tell

25   you, oh, that night, Peter was really, really, really hurting,

1    he was really hurting.  Nothing.  Again, it's people that the

2    lawyers hired that had an interest in the outcome of the case.

3          When you talk about the lawyer's team, he admitted it.

4    What do we know?  In hours -- he left the ER at 1:42.  The

5    lawyer, Dr. Vizzone, also has a direct interest in the case.

6    Then within days there's an investigator that goes out to Ms.

7    Gardner to take a statement, but he doesn't take a statement.

8    He writes something up and has her sign it.  Then she says,

9    well, maybe I don't know about this, and maybe I don't know

10   about that.  I don't blame Ms. Gardner and I feel bad because

11   it looks like I'm bullying or picking on an elderly woman, but

12   that's their witness.  And the fact of the matter is within

13   days, they were out at this woman's house.  So there had to be

14   a lawyer hired, a phone call made, a trip there, and if you're

15   going to go to somebody to take a statement from them, don't

16   you take a statement from them?  You don't write something up

17   and say, here, sign the second page.  And this is true, right?

18   And you sign it.  And the first page isn't even initialed.

19   And, in fact, even that statement wasn't even presented to you

20   for you to see or you could evaluate.  And it certainly didn't

21   reflect what happened at the store that night, and I will show

22   you in the video in a bit when we get to that.

23         There are absolutely no disinterested providers.

24         I asked him about this.  And if this self-referral

25   deal was no big deal, when you take an oath to tell the truth

1    in front of a jury, you don't take an oath to say things that

2    are technically true.  You say, I'm going to tell the truth,

3    and the whole truth.  And if the whole truth is all these

4    providers you are going to hear from that you are going to

5    think are really different businesses, they're actually all me

6    and my two friends.  We are business partners.  The MRI center

7    is his partner Mercadante.  The rehab center is his other

8    partner.  The surgery center, that's him and another person.

9    Everybody here is interested, everybody's involved with the

10   lawyer, everybody has an interest in the outcome of the case.

11   That's the evidence that you have been presented with.  This is

12   Dr. Vizzone, this is what he testified.

13           And if you have to disclose self-referral to anybody,

14   these are companies affiliated with so-and-so, that's the way

15   you have to do it to be straightforward.  Why didn't he tell

16   you that?  Mr. Pataki treated with my office, at an MRI center

17   that my partner runs.  Why was it hidden?  Why was he

18   extremely -- you saw the way he was when I asked.  Well, I was

19   just an investor, I was just this.  But the reality is the same

20   three people were involved in all the treatment and were

21   involved with all the lawyers.

22           Then we heard about courtesy vans.  And, again, we're

23   not in the New York metro area but, literally, evidence is the

24   lawyer sent vans over to Brooklyn, from New Jersey, back again,

25   and back again.  Did he say that in his deposition?  No.  That

1    came out reluctantly.  And you are allowed to consider that not

2    only did these providers have interest but they're actually

3    going out in the community and grabbing people.  Folks, there

4    are very good medical centers in the New York metropolitan

5    area, including in Brooklyn.  The only place that you can get

6    treatment is not Montclair, New Jersey, miles and an incredible

7    hassle away.  And do you remember what Dr. Vizzone first said,

8    well, I did this as a courtesy?  He didn't have a courtesy.  He

9    had an Urgent Care center.  So this gentleman, when he went for

10   treatment for clearance, he didn't even go to an interested

11   party.  He went to another one of Vizzone, Mercadante and

12   Gangemi -- I apologize, I still can't pronounce his name

13   properly -- but that's the group.  Everybody's involved and

14   there's vans plucking people from the community to do that as

15   opposed to an attorney.  We have a lot of resources.  If

16   somebody needs help getting medical treatment, the answer isn't

17   courtesy vans and this type of stuff where they don't even tell

18   you what's going on and they don't even disclose this type of

19   issue.

20         And when finally he admitted, first, the story was the

21   girlfriend but each and every time -- in other words -- this is

22   from the trial transcript -- each and every time that he went

23   from Brooklyn to the office, he ultimately admitted, yeah, I

24   got in the courtesy van, that's who I got.  There is absolutely

25   no treatment, no evaluation, no consultation from outside this

1    team.  And I am reluctant to call it a ring but that's a fair

2    description.  This is a ring of people involved in all these

3    activities.

4         I think I went over this but, by the way, where's

5    everybody else that's part of this ring?  Where are the

6    chiropractors?  Where are the physical therapists?  Where's the

7    rehab doctor?  Where's this Dr. Koppel?  The only doctor that

8    came in was Dr. Vizzone.  I at least have to give him credit

9    for at least showing up and being subject to cross-examination.

10   But, again, the plaintiff says, I went through all this

11   treatment, I went through all this ordeal, and didn't present a

12   single person, hey, I'm Bob the physical therapist.  I worked

13   with Peter three days a week during this time and I'm telling

14   you he gave his all.  That would be important testimony for you

15   to hear.  When you're talking about in a normal clinical

16   situation, people trying to get people better, they have these

17   therapists and nurses and people like that, they are the

18   biggest cheerleaders to see these people get better.  Where are

19   they?  We have Dr. Vizzone who really kind of seemed

20   disinterested; he walked out of my office, I haven't seen him

21   in two years.

22        This, again, is from the trial testimony.  This is

23   Mr. Pataki:

24        "Why did you stop seeing Dr. Koppel?

25        "I was told by my lawyer that I need to see

1    Dr. Vizzone because he's a certified orthopedic surgeon.

2          "So is the reason why you switched from Koppel because

3    your lawyer said no more Koppel, go to Vizzone, correct?

4          "Correct, I didn't choose him.  I didn't call him or

5    select him."

6          Everybody's within this ring, which is supplied by

7    courtesy vans and financial -- backdoor financial arrangements

8    and no disclosure whatsoever about really what's going on.

9          So in the question -- this is again from trial, this

10   is what you heard -- "So in this particular case, what's

11   happening is your attorney is directing you to these various

12   doctors, correct?

13         "Yeah, I follow his rules."

14         That's scary.  Because that's not what's supposed to

15   happen.  Folks, doctors are supposed to try to get you better.

16   That's the purpose of it.  The purpose isn't there's rules, you

17   see this guy, you see this guy, you see this guy.  Who's

18   directing the care here?

19         And this is the transportation.  This is the

20   courtesy -- I don't want to beat a dead horse and I apologize

21   if during this trial I beat a dead horse.  Sometimes I don't

22   know whether people are listening and, you know, you might want

23   to just throw something at me and say, please, stop it, I've

24   heard enough of this type of stuff.  So I apologize on behalf

25   of my client.

1          One of the unusual things about being an attorney, as

2    opposed to being a school teacher or some other way of

3    communication, is you can say, hey, any questions, and move on.

4    So I apologize on behalf of my client if there was some dead

5    horse beating.  But the courtesy vans is something that only

6    came out at trial.  Because he was asked in his deposition -- I

7    wonder if this is another one that's going to be difficult to

8    see.

9          So he said in his deposition -- remember, there is no

10   such thing as an oath for trial and an oath for deposition and

11   an oath you sign for an affidavit.  An oath is an oath.  And

12   what's crazy about our society in a good way is 300 years ago,

13   200 years ago, people would determine credibility the same way

14   we do today.  There's no magic light that goes on in the jury

15   box that tells you whether someone's telling the truth or not.

16   There's no expert that can come in and tell you who's telling

17   the truth.  It's normal people from the community coming out

18   and saying, did this gentleman take his oath seriously?

19   Remember, he is the only witness.  He was asked at his

20   deposition, when Mr. DeZao was representing him, because it's a

21   natural, common-sense question, how are you getting from

22   Brooklyn to Montclair, New Jersey, for an hour therapy session

23   and then coming back?  Oh, my girlfriend or this person took

24   me.  That wasn't true.  It just wasn't true.  That's what he

25   testified to under oath in preparation for this case.  And that

1    was a reasonable question for the attorney to ask.  He didn't

2    tell the truth.

3          I want to move on to the second C.  We've talked a

4    little bit about credibility.  That's the first question on the

5    verdict form.  Do you find by a preponderance of the evidence

6    that Walmart was negligent?

7          That C that I talked about when I first stood up in

8    opening is care.  And the standard, the test that has to be

9    applied is reasonable care.  And what we talk about is a

10   reasonably prudent person.  Who is this person?  It's like the

11   proverbial undecided voter; apparently they exist but we never

12   meet them.  But the reasonable person, that's a person who's

13   not the most cautious and not the most bold but a person who

14   exercises reasonable ordinary prudence in their affairs.  And

15   the same standard gets applied to Walmart.  This isn't the most

16   cautious, it's not the most bold.  On a Sunday night, New York

17   City metro area, you saw some of the video, both the front and

18   around those registers, it's a busy store.  Folks shop on

19   Sunday night.  But even at 8:00 you have employees all over

20   that store trying to service those customers.  And the question

21   you have to say is, is this reasonable?  Did you hear any

22   evidence that something was unreasonable?  I call it the circle

23   of reason, which is if your behavior is inside that standard of

24   reason, you're not liable.  If you stand outside the circle,

25   you say that doesn't seem reasonable, that seems out of the

1  ordinary, that's the standard that gets applied to this case.

2  It's not the proverbial if I was put in charge of the store, if

3  I took Mr. Martinez's job, what would I do in hindsight, but

4  that's not the standard.  The standard is what would a

5  reasonably prudent manager do?

6       The Court's going to tell you, what's the duty of care

7  for a retailer, any retailer.  Again, nothing special for

8  Walmart, nothing for anyone else.  You have the right to expect

9  reasonable care when you walk into 7-Eleven right next door or

10  anywhere or a corner store.  Reasonably safe condition, that's

11  the test.

12       And then the question is, when does a retailer break

13  that care?  They break that care if they subject a person to an

14  unreasonable risk of harm.  Not a risk of harm.  Life involves

15  risks.  You go to a supermarket, people drop things around you,

16  things happen, that's a risk.  You have to find that that risk,

17  the hazard was unreasonable.  That's the test.  That was that

18  second C.

19       And the problem we have with it is you've got to focus

20  on the condition.  We sat through a three-day trial and there's

21  no evidence of what this was.  Is it like a produce bag?  Is it

22  shrink wrap?  Because usually when you have shrink wrap, that's

23  sticky.  Is it a Ziploc?  Is it, as Ms. Gardner suggested, one

24  of those plastic tabs that you break from a package.  The only

25  evidence, as Mr. Pataki said, was he said 7 by 4 but I'm

1    assuming he meant 7 by 14 like a piece of paper.  Is it like a

2    thick heavy plastic?  We have no idea.  As part of the

3    case-in-chief, they didn't tell you this is why this piece of

4    plastic, because it would slip on the floor or do something

5    else like that, was an unreasonable risk of harm.  When I show

6    you the video, you are going to see there's scores of people

7    walking through this and they're not slipping and sliding

8    anywhere on a piece of plastic if he even knew where the

9    plastic was.  Again, what do you put in that pan for the

10   plaintiff?  You say, what did he fall on?  What's this plastic

11   piece?  You can't speculate.  You can't say to yourself, I'm

12   going to try to do the job plaintiff should have done, and I'm

13   going to think about all the things in the store that could be

14   plastic.  Ten years almost and the plaintiff can't tell you

15   what it is he slipped on.  And it's not like he got carted away

16   in an ambulance the way they tried to get Ms. Gardner to say or

17   he never got up or he was dazed.  You saw the video.  He comes

18   back and he looks at it, kicks it.  He's got his cell phone on

19   him.  He's then walking around and gathering witnesses and he

20   can't tell you, this is the condition that I am saying to you

21   if it's on the floor, it's an unreasonable risk of harm.

22   Because there's lots of things that could be on the floor that

23   are not an unreasonable risk of harm.  A shopping list, a piece

24   of paper, things that just normally customers drop, a child

25   dropped something.  We don't know.

1      And if, the next standard of care, if you had evidence

2   that you can put in that pan and say, hold on a second, let's

3   give an example, corn oil on the floor, now, that's an

4   unreasonable risk of harm.  It's difficult to walk through corn

5   oil without falling.  Even if you found that he proved this

6   piece of plastic was an unreasonable risk of harm, do you know

7   what you have to determine next?  How long was it on the floor?

8   Because we understand that in a store people are dropping

9   things all the time.  They are putting things in their cart,

10   you have kids over there.  No one expects any grocer to walk

11   around and follow everybody in the store and pick up after them

12   the second something goes down.  They are entitled to a

13   reasonable period of time to discover it and a reasonable time

14   to pick it up.  So there has to be evidence of how long this

15   was on the floor and there's none.

16      We have surveillance video and it's, admittedly, not

17   the highest quality surveillance video on the planet.  And you

18   can't speculate is there other video because the plaintiff had

19   literally hours of the surveillance.  He's got the right to see

20   any cameras and make that request, say, hold on to this video,

21   here's where my client was.  There just isn't any evidence.

22   This was in 2015, it's clearly an older system with a fixed

23   camera, not one of those super-secret.  So when you go back

24   there, we have what we have, and there is no evidence that

25   Walmart changed it or anything else like that.  They grabbed a

1    view or there is some other view, there just isn't any

2    evidence.  We certainly have cameras in the store.  This is the

3    meat aisle and paper plates aisle and most of these cameras are

4    for security that people are not sticking chicken under their

5    jacket, generally, and walking out of the store.  So you have a

6    view of the main aisle and that's what you see.

7           They have the right -- there's a judge here -- well

8    before this:  Your Honor, I want to speak to the people who

9    were working that night.  Produce the time cards of all the

10   workers in this department.  I want to depose them.  I want to

11   do this information.  None of that do you have.  It's not

12   Walmart's job to do anything in this case other than to say

13   what's your evidence?  It's the plaintiff's job to go out and

14   provide you with the tools you need and the facts you need to

15   reach a verdict.  You know that Walmart has time cards.  You

16   know that Walmart keeps track of everybody working in the

17   store.  There is not a single witness from Walmart being

18   called.  And if he stands up after the case and says, well, why

19   didn't Walmart call anybody?  It's because nobody was presented

20   at all.

21          So in this particular situation, I'm going to go

22   through this video and I'm happy because I think this is a

23   little more -- this is kind of a crazy system that I -- it goes

24   blank when I'm in the office, so I apologize if I have my back

25   to you.

1              (Video played.)

2              MR. McDONNELL:  We are around 7:30.  So let's go to

3     where the action happens.

4              So let's look at what's happening in the store.

5     Around 8:00.  You should know by now where the accident area

6     here is in the foreground.  I am not going to blow it up like

7     that because it just looks like color blobs so I'm going to try

8     to keep it in regular visual.  There is an iPad back there you

9     can play around with.  But you see the date and time.  This is

10    7:59.  There are people walking continuously, and I will move

11    it through, in the area where the plaintiff fell.  Do you see

12    all those people walking in the same area, coming in, moving

13    around?  And we move forward.  I think we start to see

14    Mr. Pataki right here at 8:03, yes.

15             Okay.  Here's Mr. Pataki.  He comes in the scene.  He

16    is behind the flag now.  See him walking in past the coolers on

17    the bunker?  I have a little -- my videographer was nice --

18    that's Mr. Pataki.  Again, you have continuously people that

19    are walking in the area where the accident happened.

20             We are at 8:05:46, he is out by the chicken area.

21    There's Mr. Pataki.  And remember also, you're looking at this

22    from a high level with all this glare from the skylights and

23    the fluorescent lights and you can see there's sections of the

24    floor that just kind of look shiny.

25             So there's Mr. Pataki and here's Ms. Gardner.  And

*United States District Court*
*District of New Jersey*

1  there he falls.  He gets right up.  And there's Ms. Gardner --

2  Gardner.  I'm sorry, I apologize if I am mispronouncing her

3  name.  And she doesn't run over and say, oh, my gosh, I gotta

4  get this guy.  She does look.  And then she walks in the

5  opposite direction.

6       Then Mr. Pataki is out of view, and he comes into the

7  next sequence.  And there's Mr. Pataki again.  So I am going to

8  just run it from 8:14.  I will use my handy-dandy laser

9  pointer.  He's going to be coming from here.  This is the area

10 of the incident.  And he walks right by it.  He doesn't look at

11 anything, he is not looking down, and he walks past this area.

12 These are just regular aisles.  And it looks like there's

13 something like either a glare or something on the ground which,

14 again, has never been identified but I am going to back up to

15 the fall again and you'll see, this area doesn't even look like

16 it's moving in response to his fall.  There's Mr. Pataki again.

17 And then he seems to kick it but it doesn't look like anything

18 moves.

19      He comes back to the chicken area.  At this point it's

20 8:09.  The accident is at 8:06:30.  Mr. Pataki is by the

21 chicken cooler.  He says at this point he's checking for

22 electric wires or something.

23      Here's Mr. Pataki.  And, again, does this gentleman

24 look like he's taking out his cell phone.  He's looking down,

25 he's looking around.  Then he walks out of view.

 1          Okay.  This is almost three-and-a-half -- well, let's

 2  see, 8:10 -- about three-and-a-half minutes after the accident

 3  and there was just no commotion around here, like somebody has

 4  fallen or an object being on the ground or anything else like

 5  that.  And all this, you gotta call the manager and whatever

 6  Ms. Gardner was doing, like she doesn't appear -- this is

 7  Ms. Gardner's daughter in the green sweater.  There's a little

 8  kid running around.

 9          So if we can just go back to the fall.

10          If we can go back to the fall.  What's interesting is

11  -- I'm using my finger to slide this but it moves by itself.

12  Here's Mr. Pataki walking out.  He walks forward.  Gets up.  It

13  doesn't look like anything's moved.  So whatever that is, that

14  spot, he's walking towards something, he falls, and there just

15  isn't any evidence that there's anything --  and, by the way,

16  people continue to walk into this area.  There's a group.

17  There's no evidence of anything moving or changing.  And then

18  we have the other part, at the register, gives you a sense of

19  how busy the store is and what Mr. Martinez's job is.

20          I thought this was an ambulance driver but I have to

21  make sure I clarify that.  I think this might be somebody from

22  Walmart who's walking with Mr. Pataki.

23          Here's Mr. Pataki coming around the corner.  He's

24  walking, he's chatting with this gentleman.  And it's not the

25  story that Ms. Gardner was told to say when he fell, he sat on

1    pallets, the ambulance came and wheeled him out of the store.

2            So the question is -- again, I apologize for the

3    lightness of this.  So this is Mr. Pataki's testimony.  I put

4    the pages, Page 86 and Page 89.

5            "Okay.  You were the first one -- after this fall you

6    claim this plastic is what caused you to fall, correct?"

7            This is his trial testimony.  This is what you heard.

8    I'm just reminding you.

9            "At that time I was investigating if it's, like, water

10   underneath it, you know, but what -- I didn't see any water."

11           So at the time right after he fell he wasn't sure what

12   he fell on.

13           I said:  If you look at where the chicken is, do you

14   see where -- that you're looking at the area, looking at the

15   chicken, between the flag, you have the pole?

16           Not the chicken, the cooler.  He's looking to see if

17   it's water coming from the cooler or, in particular, I was

18   looking for some kind of electrical issues, electric which

19   caused me to shock.  You saw where that chicken department was.

20   It's nowhere near the accident.

21           The evidence is from the stand that Mr. Pataki still

22   is unsure what exactly caused him to fall.

23           "You weren't investigating the scene when you went

24   back to the chicken area, correct?

25           "Well, at the chicken area, I investigated in

 1  particular the cooler itself, not the chicken.

 2          "So are you saying at the time of the accident you

 3  thought perhaps something in that cooler, at least 40 feet away

 4  from that area, is what caused you to fall?

 5          "Well, not 40 feet away.  The cooler is, like, six

 6  feet away from the plastic."

 7          Well, that's clearly not true.

 8          "I was looking for loose electrical cable to identify

 9  why I have shock."

10          So is Mr. Pataki claiming that he got shocked in the

11  chicken place but didn't feel it until he walked towards the

12  corner of the area and then he had a shock and he fell?  None

13  of this makes sense.  You're allowed to use your common sense

14  and what you saw on the video.  Again, he repeats it.

15          "You walk away from the accident 8:08 and that's the

16  point where you walk -- and then we see you come back and you

17  kick the plastic.  Then you claim you're walking back to the

18  chicken aisle to see if there was an electronic problem?

19          "Yes, loose electrical cable or loose water coming

20  from the cooler."

21          This is where he says it's six feet away.

22          "Again, I wasn't looking at my cell phone.  I was

23  looking for a cooler, particularly if it had any loose water

24  would transmit electricity."  Is he saying he got water on his

25  shoe near the cooler and slipped there?  It's really not clear.

1    Once he is off script from the direct and he's got to explain

2    what he did in there, he's throwing stuff up.  And every one of

3    us in our daily life has had experience with that when you talk

4    to someone, you ask them something, and you can tell they're

5    kind of like, oh, maybe it's this or maybe it's that.  That's

6    what you saw on the stand.  There's no evidence of an

7    electrical problem or anything else like that.

8            Then we have this whole -- the manager and what really

9    happened.  I think this is significant.

10           There was -- he says it sounds like he called 911.

11   Called 911, the police comes to the store.  So there should be

12   a police report.  That would be helpful for you to see.  That

13   EMS report, that would be helpful to see.  Other disinterested

14   people who could tell you this is what this gentleman was

15   telling me at the time.  You don't have any of that.

16           This is the next day.  I just want to go real quickly

17   just to kind of help you clear up some stuff with Ms. Gardner

18   and about where this whole white coat stuff came from.

19           Okay.  So several minutes after the accident, this is

20   8:17, do you see the lady with the bright green sweater?

21   That's her daughter and that's Ms. Gardner.  So all this stuff

22   about the white jackets and the pallets, here's the Gardner

23   group, that's Mrs. Gardner, she's passing by a man in a white

24   jacket doing that.  But it has nothing to do with an accident

25   that happened at this point ten minutes ago over here.

1    And then you're going to see Mr. Pataki come in the

2    scene in here.  Again, this is 11 minutes after the accident

3    and Mr. Pataki's walking around the store.  He says, well, I

4    wasn't thinking about a claim or anything else like that.  But

5    what does he do?  He then walks over to the Gardners.  And then

6    there's some investigator that comes to her house several days

7    later and she clearly remembers stuff with the white coat, it

8    just doesn't have anything to do with the accident.  He has a

9    conversation, puts her number in his cell phone.  That's the

10   first time in any picture we see any motion of anything after

11   the accident, there is no rubbing his neck, there's no back,

12   there's nothing like that.  So that's the Gardner stuff.

13   Unfortunately, it wasn't my video but that's what was going on

14   in the video, when you were, like, what's going on, I see a

15   woman on her cell phone and she's being asked about a video.

16        So then after getting out of the emergency room at

17   1:42 in the morning, he goes back to Brooklyn, supposedly, at a

18   place you have no idea where it is, with people you have no

19   idea who he was living with, brought by someone you have no

20   idea who brought him there.  The next day he goes back to some

21   Brooklyn emergency room.  Then he says, well, I'm going to have

22   to wait six hours here and he drives, again, all the way over

23   to Jersey.  I think the emergency room note from that is like

24   1:00 in the afternoon.  So he drives through -- over the

25   bridge, into Manhattan, the cost of the tunnel, to go to

1   Clara Maass.

2          I want to talk about the third C.  This is causation,

3   proximate cause.  Sometimes people may say it's approximate but

4   it's actually proximate cause, close cause, something that is

5   closely connected with the event.  It has to be in a natural

6   and continuous sequence.  This caused that.  And you have to

7   find but for.  But for anything that happened at Walmart, he

8   wouldn't have these conditions on his MRI or anything else like

9   that.

10          Now, accident causation, plaintiff never really

11   testified about how he slipped on the plastic.  He never looked

12   down at anything after he fell.  Then he's walking around

13   looking for water?  You know, based on the evidence that you

14   have, how do we know the plastic had anything to do with the

15   fall?  It just was something that was nearby and he fell for

16   some other reason, told the folks in the emergency room

17   initially my leg gave out.

18          Then he claims he's walking with dripping chicken.  He

19   came back later and kicked it.  We just don't know.  And then

20   the electrical shock.  Folks, this is not evidence of someone

21   for nine or ten years that has had this incident pending, this,

22   once he was confronted a little bit, it's like a teenage kid, I

23   wasn't smoking, I wasn't drinking, and you hear the different

24   stories.

25          Injury causations.  Key pictures.  The first picture

1    you see the store surveillance video where you see him walking

2    comfortably around the store.

3            So those are objective.  Okay?  Nobody can change that

4    video.  Walmart can't go back and say, well, it would be nice

5    if this wasn't there, Mr. Pataki.  You saw that.  And the other

6    part of that thing is you see a gentleman that's walking around

7    the store, it doesn't look like he's in a lot of discomfort.

8            The second pictures are the X-rays, the MRIs, the CT

9    scan.  That's the only thing objective.  Everything else is

10   what's going on with these doctors and lawyers and courtesy

11   vans and whatever's happening.  Those pictures, surveillance

12   video, the MRI films, they are not subjective.  They are not

13   dependent upon his say so.  They are not credibility dependent.

14   They are what they are.

15           Dr. Brooks, the neuroradiologist, he explained to you

16   what all his qualifications are.  What he says is, disc bulging

17   is also part of the wear-and-tear process, degenerative process

18   of the spine.  I know it's not an acute thing, it's not a disc

19   herniation, it's not a glob of dark -- it is not.  That glob of

20   dark disc material, what's sticking out behind the bones, it'd

21   be a light color.  We saw that in the MRIs because the healthy

22   discs were like white.  It would squeeze out and you get that

23   white, it would absorb the water, and you would see this area

24   of white impinging the area, not a black dried-out area.

25           He talks about the bones and he says:  Was this caused

1    by the accident?  Not at all.  This is the wear-and-tear

2    process of the spine that begins in our teens, continues

3    through our lifetime.  Let's concentrate now on that C5-C6

4    level where the bone spurs are.  This area had been so long, it

5    started to grow bone spurs.

6          Folks, that MRI center that Dr. Vizzone's partners in,

7    nobody came in, a radiologist, and said, no, Dr. Brooks is

8    wrong.  Remember, it's great what these orthopedic surgeons

9    say, but their name doesn't go on the report.  Radiologists are

10   experts in reading these films.  You haven't heard anybody who

11   took the stand for the plaintiff and said, no, no, no, let me

12   tell you why Dr. Brooks is wrong.  Let me tell you, you heard

13   one radiologist subjected to cross-examination over and over

14   and over again about what a neurologist does.  That's the only

15   evidence and it was unrebutted.  It's nice that Dr. Vizzone

16   thinks that he can read MRI films as well as a neuro-

17   radiologist, but that's not the way the medical system works.

18   Dr. Brooks can't sign an orthopedic report either.

19         Again, I'm sure you remember this, you may have felt

20   at some point you were in some sort of, like, how to read an

21   MRI film, where you have these images.  He pointed out why

22   these pictures definitively and objectively showed you

23   everything that was old and there was no new stuff on top of

24   the old.  Think.  You didn't hear anything from anybody else

25   that said it.  Dr. Vizzone candidly said, well, he told me he

1    didn't have pain before so I'm assuming it's related.  That's

2    not evidence.  That's entirely credibility dependent.

3            Again, this is Dr. Brooks, he talks about the L5-S1,

4    which is even more pronounced.  That's the flat area, it's

5    black, degenerative.  There is none of that white signal in

6    there.  And you have Dr. DeFalco, there's nothing from this

7    guy.  The MRIs are not causally related.  The doctor that does

8    the Eagles and NFL Combines looked at the MRI films and said

9    they're not related.  He actually, the idea of, like,

10   controlling his opinion, Dr. DeFalco said, hey, this L4-5, this

11   looks like at least a herniation but it's degenerative.  So

12   there is that difference.  But the guy whose job it is to read

13   MRI films says the opposite.  Dr. Brooks got paid to read the

14   images.  It's not contingent upon what he's doing.

15           Dr. Vizzone on day one had to say the MRI showed new

16   trauma or he wasn't going to get paid and he sent him to the

17   MRI center that was related to him.  And the same as with the

18   rest of the team.  Again, I might be getting into dead-horse

19   beating so I want to make sure I move on.

20           The fourth C, comparative negligence, this is the only

21   burden that Walmart has in the case, the only burden, C.  So if

22   they get past all these hurdles, what I'm going to suggest is

23   you have to decide if the evidence doesn't show that he gets

24   over the first hurdle.  Then you have comparative negligence

25   because Mr. Pataki has a duty, too.  He has to act like a

1    reasonably prudent customer.  And if he claims there was some

2    piece of plastic that everyone should have seen at Walmart,

3    then why didn't he see it?  He is walking straight for it.  And

4    you have to compare that.

5         There is a fifth C in this case, and that's what we

6    talk about compensation.  This case, the only damages claimed

7    are what we call compensatory damages.  They are limited and

8    they are based upon what the Court is going to tell you in her

9    instructions.  You can't speculate or guess or add anything

10   else to it.

11        The fact that there's an instruction on it, the fact

12   that I reference it doesn't mean you have to get to this point,

13   but I have to talk to you about the damages in this case

14   because you heard evidence about it.

15        Mr. Pataki chose not to present certain evidence.  He

16   presented no evidence so that he would have an economic claim

17   for lost wages.  Here's what I was making before, here's my

18   payroll records, here's what I do.  I was making X, Y, Z before

19   the accident, I'm making X minus Y now.  It's the easiest thing

20   to prove if you allege you can't work.  He chose not to do it.

21   You can't speculate and say, well, I'm going to add this on or

22   add that on.  They chose not to present that evidence to you.

23   He presented no evidence that anything Walmart did affected his

24   earnings in the future, where someone came in and said, well,

25   this is what someone could earn; this is what he could earn in

1    the future.

2            THE COURT:  Mr. McDonnell, there is no wage loss

3    claim.  It's irrelevant.  Please move on.

4            MR. McDONNELL:  Okay.

5            THE COURT:  I am just going to instruct you there is

6    no wage loss claim in this case.  I am going to ask counsel to

7    move on.

8            MR. McDONNELL:  Sure.

9            What they are claiming is medical bills past.  You

10   heard about all that treatment.  The problem is the only

11   gentleman that came in was Dr. Vizzone.  The amount of medical

12   bills, admissible amount of medical bills that you can consider

13   is $38,500.  I'm sorry, there is a typo.  That's it.  Because

14   these other people, they didn't come into you, they weren't

15   subjected to cross-examination to explain why they did or when

16   they did it.  $38,000, that's the sum total of his economic

17   claim in this case.  Despite all the courtesy vans and driving

18   back and forth, that's it.  That's the most you can give for

19   medical bills.  This is what the team was supposed to prove.

20   That number should tell you a lot of what the actual value of

21   those services and surgeries were in the real world.  Because

22   in a real world, you come into court and you have your

23   schedules and you do it and you explain what you did, why you

24   did it, and how much the value is.  None of that was done.  In

25   fact, Dr. Vizzone really said, you know, I not only can't tell

1  you what my fee schedule is, I can't even tell you what I'm

2  charging to leave Montclair, New Jersey, drive down here to

3  Camden and spend a day in the courtroom.  I'm not going to tell

4  you.  Oh, in my deposition I said it's $15,000 a day but I

5  don't know, as if some office manager or secretary is telling

6  him what he should charge for a day of his time.  You have to

7  decide is that credible?

8       So this is a case for compensatory damages for

9  noneconomic damages, in other words, damages that can't be

10  proven objectively.  They have to be proven subjectively.

11  Damages in a case like this are not based upon the size of

12  Walmart.  You don't get more money if you fall in Walmart than

13  you fall on your neighbor's step or a little store.  You have

14  to look at Mr. Pataki.  And that's why all that stuff who he is

15  is important because those are the things you evaluate if

16  you're going to reach the level of compensatory damages.

17       You heard Dr. DeFalco, when he walked into me, I

18  watched him.  How's he walking?  How's he ambulating?  What I

19  report, he was ambulating normally.  He climbed on and off the

20  examination table without difficulty.  He was alert and

21  oriented and cooperative.  While in the room, he didn't have

22  any braces, none of that.  Dr. DeFalco, the reason he was

23  chosen was he's an IME doctor.  Should I go back to work?

24  Should I go here, should I go there?  NFL, what do you think of

25  this guy?  He evaluated this gentleman by the same standard.

1    He doesn't have an outcome in it.  This is what he charges for

2    anybody that wants his opinion.  And, yes, he also appears in

3    court for his own patients.  So when they say 99 percent of an

4    IME, the plaintiff never asked for an IME.  An IME is because

5    we didn't treat him, we have to go out and find an independent

6    doctor who can do this examination.  Again, when he steps out

7    of that realm or that team, this is what they see.  They don't

8    see what you saw in the courtroom, a cane or anything else like

9    that.  Then he gives that Jmart apparatus, that's kind of hard

10   to understand, but it's essentially a tool that's designed to

11   be objective because it has three different settings.  So if

12   you're kind of faking it, it should be -- the weight should be

13   certain levels.  If you get a score on one side and then you

14   get a different score on the other, that doesn't make any

15   sense.  You should get the highest score where it's easier to

16   bow your head, it's supposed to be like right here or they also

17   make you stretch out.  So that's what he was talking about.

18   It's hard to understand but it's an objective tool that's given

19   to people to try to see are they really giving the best effort

20   or are they not giving the best effort.  And he failed it.

21        Then he was asked to demonstrate range of motion and

22   his range of motion didn't make any sense because you know

23   what?  Dr. Vizzone didn't get up here and say he has no range

24   of motion.  He said I did a disc replacement surgery instead of

25   a fusion so he could have range of motion of his neck.

 1          These are the guidelines.  This is why all of that is

 2     so important.

 3          The question is, what a reasonable person -- that term

 4     is all over this case -- would consider to be adequate and just

 5     as to make the plaintiff whole for his injury and consequent

 6     disability and impairment.  Folks, the only doctor you heard

 7     from the plaintiff didn't talk about disability and impairment,

 8     didn't tell you he's disabled, didn't really tell you he's

 9     impaired.  A person that endures a natural consequence of the

10     injury.  These are the guidelines.  These are the factors you

11     may take into account:  Age, usual activities, occupation,

12     family responsibilities and similar relevant facts in

13     evaluating the probable consequences of any injury you find he

14     has suffered.  You've been presented with no evidence of any of

15     that.  He told you he weighed 230 pounds before.  The ER record

16     says he's 200.  He says 185.  He says, okay, I play tennis.

17     That's the only evidence you have.  There is no schedule, there

18     is no formula.  You have to say I know what money's worth.  And

19     based on what he's telling me -- I used to play with my kids, I

20     used to do this at the thing -- he's given you nothing that he

21     can make any sort of claim for noneconomic damages other than

22     he lost some weight since the time.  And tennis and biking,

23     nobody can tell you, yeah, I played tennis with Mr. Pataki,

24     he's a really good player.

25          I want to talk briefly about an argument the

1    plaintiff's lawyer is going to make.  It's called a time-unit

2    argument.  I call it the rent-a-center argument.  You folks

3    remember they used to have these stores rent-a-centers.  They

4    would operate when people needed furniture, you could go in and

5    you could rent furniture.  And it sounds like a good deal.

6    Well, look, this is, like, you know, this couch is only $3 a

7    week.  $3 a week for a nice couch.  All of a sudden you add it

8    up and it's not just $3 a week.  I don't want to age myself but

9    when I was in college, people didn't have color TVs in their

10   room.  Now they have computers and things like that.  So every

11   year on campus they would say, if you want to rent a color TV,

12   you can watch all the football games and basketball games and

13   you have a color TV in your room.  There was always a come-on,

14   it's like a dollar a day, you and your roommates, $2 a day.

15   And if you're paying for your TV per day, it's $50 used TV,

16   you're paying $2 a day, by the time you're done, you've paid

17   for that television five or six times.  Or the car salesman

18   says to you, well, I'm not okay with the price of the car, how

19   much can you afford a month or a day or anything else like

20   that.  That's what Mr. Jean is going to do.  Mr. Pataki here is

21   not seeking a dollar a week or a dollar an hour or anything

22   like that.  He's seeking a lump sum payment.  You know the

23   value of getting your money up front.  You buy a house, you

24   know the price of the house, but it takes you years to pay it

25   off over time.  In this case, he's not asking for all those

1    payments.  He's saying, I want a lump sum payment.  And, again,

2    you know what things cost.  And plaintiff's attorney is going

3    to come up to you and suggest to you, well, now, this is what

4    it is.  He's permitted to do it.  Just because lawyers are

5    allowed to do something doesn't mean that it's anything other

6    than argument.

7            So what is it?  Here's the pitch:  His life expectancy

8    is 33.2 years.  By the way, Dr. Vizzone didn't testify that he

9    is going to have problems for 33.2 years.  He didn't say it.

10   In fact, he didn't say he needed a cane.  You take that figure,

11   you multiply it by 365, the days in a year, and divide by 24

12   hours a day.  Sometimes they give it a per diem, but if you

13   really want to push it, you go per hour.  And that gives the

14   total hours for his life expectancy 290,832 hours.  And then

15   what a lot of lawyers do, I don't know, I get to stand up after

16   him, what they do is, hey, I'm being reasonable.  You spend a

17   third of your time asleep.  Well, let's deduct that.  So I'm

18   only seeking compensation for 191,000 hours.  Then he'll say,

19   what's a fair figure per hour.  Again, he's not asking for

20   something for the hour.  I have a time-unit argument.  Folks

21   work every day.  They leave their home, they leave their

22   family, they commute, and at the end of the week, at the end of

23   the year, what do you have left over for working 2000 some

24   hours a year?  He wants that lump sum.  The other thing the

25   Court's going to tell you, this personal injury money, it's

1    tax-free.  So you can't consider any sort of taxes or add

2    anything else like that or any expenses.  It's all about this

3    charge.  This lawyer is going to try to convince you that

4    somehow you should attribute money based upon the hour.  When

5    you go to buy a house or something kind of like, again, a

6    permanent thing, can you imagine if the real estate realtor

7    said to you, well, I'm going to tell you the price of the

8    house.  How many hours are you going to spend in this house?

9    What's a fair amount of money are you going to spend per hour

10   to live in this house?  People would walk away from that, say

11   that's absurd.  What's the value of the house?  In this case,

12   that's what he's asking for, the lump sum up front.  Then what

13   happens in an hour?  Suppose you have a good hour or bad hour?

14   How could you possibly weigh this?

15         Folks, I'm asking you to ignore a gimmicky argument

16   and listen to what the Court's going to tell you.  Consider

17   those factors, his lifestyle, his occupation, his age, his

18   family responsibilities, and he hasn't told you any of that.

19   No amount of like fuzzy math changes this case.

20         I'm asking you please to follow the law the judge

21   gives you, use your sound judgment, without sympathy and

22   prejudice like you swore your oath to do.  You don't even have

23   any evidence of what he does for a single hour today.  He

24   hasn't told you.  I think he might have made mention he watches

25   television and plays video games.  He doesn't tell you, I wake

1    up in the morning, I have to do this, I have to do that, I do

2    my chores, none of that evidence.  Folks, that was his only

3    claim for noneconomic damages.  He didn't say anything other

4    than that.

5            Final thing, and this is where I am going to sit down

6    soon, plaintiff gets the last word.  So I can't stand up

7    afterwards and say, hold on a second, that didn't happen.  So

8    I'm asking you to consider these things as you hear the

9    plaintiff's argument.  Walmart's only burden here was

10   comparative negligence.  That's it.  What sometimes you hear

11   from plaintiffs' lawyers, well, why didn't Walmart call the

12   manager, why didn't Walmart call this person, why didn't

13   Walmart call that person?  The reason is because it's the

14   plaintiff's burden to show negligence.  They can subpoena him,

15   they can depose him.  So if you hear that kind of stuff, what

16   they're saying is I haven't met my burden of proof.  I don't

17   want you to consider evidence outside the courtroom.  I don't

18   want you to speculate about what somebody said.  You swore on

19   your oath you wouldn't do that.  I expect you and I fully am

20   confident you will follow that oath.  Every time hear, like,

21   oh, what about this, why didn't they show more video, why

22   didn't they show this, all that's speculation.  If there was

23   missing video or a missing witness or somebody that wasn't

24   there, you would be told about it, there'd be evidence of that

25   and there would be rules to follow so you can make that

*539*

1  argument.  And there would be instruction that says, hey, this

2  was asked for, it wasn't turned over, they hid it, they

3  destroyed it, they could have gotten camera diagrams if they

4  thought there was more video, they could have talked to our AP

5  people and say why is this camera so fuzzy.  None of that.  So

6  if he stands up here without hearing any evidence in the

7  courtroom and says what about this that isn't here, what about

8  this that isn't here, what he's saying is I can't meet my

9  burden of proof.  Payroll records, anything, folks, Walmart is

10  an open book.  Everything we do is documented.  Nobody works

11  ten minutes there without it being on a time card.  You didn't

12  hear any evidence of it.  Walmart does not have any obligation

13  to present any evidence other than, how does a reasonable

14  customer walk in the aisle and what do they see?  That's the

15  case.  That's the only thing we have.  And I take that burden

16  seriously in the same way I expect you to take the burden,

17  which is the plaintiff hasn't proven their case.  We are not

18  going to try to disprove something that hasn't been proven.  We

19  presented medical witnesses because they presented Dr. Vizzone.

20  I assumed they were going to present a doctor who was going to

21  say, oh, I read the films and this is what they said.  So we

22  were prepared to present medical evidence of that.  And that's

23  not something that generally Walmart could do without going out

24  and getting specialized people to do it.  But in this case

25  plaintiff did not prove that there was an unreasonable risk of

 1    harm, it was there long enough that a reasonable employee would

 2    have seen it and picked it up.

 3              Here's the verdict.  Remember I said there's a test

 4    and there's questions?  This is what it is:

 5              Question 1:  Do you find the Plaintiff Peter Pataki

 6    has proven by a preponderance of the evidence that Walmart was

 7    negligent on June 7, 2015?  That's care, that's the first C.

 8              Second C:  Do you find that plaintiff has proven that

 9    Walmart's negligence was a proximate cause?  The Court's going

10    to give you an instruction, you have the evidence, you can't

11    speculate about what you don't have, and you have to follow

12    your oath.

13              In this case, despite ten years, the plaintiff hasn't

14    even told you what it is or took a cell phone picture or at

15    least even describe it, or why was it slippery, what's the

16    floor like?  There's been no expert to say I tested the floor,

17    I tested the different types of plastic, this is what I think

18    it was.  There's no evidence of any writing or the plastic or

19    what it even was.  If you've got to speculate, the only answer

20    is to say the party with the burden of proof hasn't met it and

21    you check no.

22              The next is, this is the burden, you see the way it's

23    written:  Did Walmart prove that Plaintiff Peter Pataki was

24    negligent?  That's the only burden on this case.

25              Do you find that it was a proximate cause, the second

1    C?  So these two C's, care and causation, are applicable to

2    both parties.

3           Then you have that other C, comparative, that's where

4    you weigh.

5           And the last damage is, these are the only damages you

6    can consider, noneconomic damages and past medicals.  You can't

7    speculate about anything else.  Something you heard in another

8    case, well, I heard somebody did this and did this, you have to

9    focus on the facts in this case, the evidence in this case and

10   the instructions the Court gives you.  There's nothing else to

11   be added if you don't have an instruction for it.  I don't like

12   what Walmart did here, I want to add some more.  That's not in

13   the case.  I like this lawyer, I don't like this lawyer, I want

14   to add this.  This case is about what's on the test and the

15   instructions the Court is going to give you.  We are confident,

16   after paying the type of attention you did, particularly to

17   neuroradiology, it's not a subject you took in junior high,

18   that you will reach a fair verdict consistent with the evidence

19   and the instructions that the Court will give you.

20          Thank you very much.

21          THE COURT:  Okay.  Thank you, Counsel.

22          Ladies and gentlemen, we are going to take a quick

23   ten, 15-minute break.  It's our normal morning break time.

24   When we come back, you will hear closing argument from the

25   plaintiff and then I will give you the instructions and you

```
 1  will start to deliberate.  Okay?

 2          Please don't talk about the case amongst yourselves or

 3  anyone else.  We are at a critical point in the case.  You have

 4  only heard one of the closing arguments and I want to make sure

 5  you keep an open mind until you hear everything and I give you

 6  the instructions.  Okay?

 7          THE COURTROOM DEPUTY:  All rise.

 8          (The jury leaves the courtroom at 11:38 a.m.)

 9          THE COURT:  Please be seated.

10          Mr. McDonnell, I interrupted you because I think you

11  became dangerously close to asking this jury to speculate about

12  why there is no wage loss claim.  There is no wage loss claim.

13  I think it's entirely inappropriate to suggest why don't we

14  know how much he was working.  I think those questions about

15  what he was doing are fine.  When you, in my opinion, sort of

16  crossed the line, which prompted me to stop you, is when you

17  said, well, what was he making before and what's he making now.

18  We all know why we don't know that information because he is

19  not legally permitted to work here.  So I wanted to stop you

20  before you went what I thought was too far.  And I am going to

21  tell them again when I read the damages instruction that there

22  is no wage loss claim and they should not consider that or

23  those comments in any way.  I think that that's a sufficient

24  curative instruction for what I thought was becoming very close

25  to being inappropriate, which is why I stopped you.
```

1          MR. McDONNELL:  Your Honor, my concern though is if

2     the jury doesn't hear it, they think, well, how do we do lost

3     wages because it says occupation, but I understand what you --

4          THE COURT:  Well, then you could have asked me to

5     remove the reference to occupation in that, but I think it

6     makes sense here because you are talking about him having

7     allegedly done heavy work or not, number one.  You could have

8     asked me to qualify it or change the language or add a

9     statement that there is no claim for lost wages here.  So I

10    wish you would have addressed it earlier.  Nevertheless, I sort

11    of stopped it as soon as I saw where I thought you were going

12    and I think I gave an instruction at the time that was

13    sufficient and I will give it again --

14         MR. McDONNELL:  I understand, Your Honor.

15         THE COURT:  -- when I give the final instruction.

16         Anything else, Mr. Jean?

17         MR. JEAN:  Your Honor, I share Your Honor's

18    observations.  I do not like objecting during closing

19    statements.  Mr. McDonnell is doing his job but I just ask that

20    I be given -- and I will not cross any line -- just given a

21    full and fair opportunity to rebut.  I did not want to

22    interrupt his flow.  He was doing his thing.  Can I just be

23    allowed to be given the leeway to give a response?

24         THE COURT:  I think that's fair.  Do you have any

25    objection to me giving the curative instruction again when I do

 1   the --

 2            MR. JEAN:  No, no.

 3            THE COURT:  What I think is fair is you may comment

 4   that -- I am going to tell them that they should disregard any

 5   comments about what his wages were or what they are because

 6   that's not part of this case.  There is no claim for lost wages

 7   and, you know, the defendant's argument as to what he did and

 8   how that affected whether this was traumatic or chronic is a

 9   valid argument.  When I heard the word "wages" and "what he

10   made or didn't make" that's why I stopped him.  So I agree that

11   you should be able to say that and I see nothing wrong with

12   that.

13            Do you have any objection to that, Mr. McDonnell.

14            MR. McDONNELL:  No, Your Honor, as long as it doesn't

15   seem punitive or I did anything wrong because I don't think I

16   crossed the line.

17            THE COURT:  No.  That's why I think it's fair to let

18   Mr. Jean address it and indicate that's why you didn't hear any

19   of that information.  He can say the Court doesn't allow us to

20   put on information that's not relevant.

21            Again, I stopped you because I didn't want to have a

22   situation where then I have a request for a mistrial.

23            MR. McDONNELL:  I understand, Your Honor.

24            THE COURT:  And I thought that that was the

25   appropriate place to stop you.  And, yes, counsel is often

1  reluctant to object during closings but I think it's part of my

2  job to make sure that they don't hear something they shouldn't

3  hear.  And I will not make it punitive.  So the fact that he

4  addresses it as well will make it balanced and I will address

5  it in the final charge just as a matter of course.

6          MR. McDONNELL:  I understand, Your Honor.

7          THE COURT:  Obviously, it's not going to be written in

8  there because I am going to do it on the fly.

9          Do we have the final copies?  We will bring them down.

10 As soon as he is done, we will pass out, unless they need a

11 break, the verdict sheet and the jury instructions and I will

12 give the charge.

13         I will be back in ten minutes.

14         THE COURTROOM DEPUTY:  All rise.

15         (Brief recess taken from 11:42 a.m. until 12:01 p.m.)

16         THE COURTROOM DEPUTY:  All rise.

17         THE COURT:  Please be seated.

18         Mr. Jean, do you know how long you are going to be?

19 Just approximately.

20         MR. JEAN:  Less than an hour.

21         THE COURT:  Okay.  So then that should work.  I will

22 have to ask them if they want to take their lunch break before

23 I charge.  It will be 1:00 at that point.  My guess is they are

24 going to say no.  I read pretty fast.  It will probably take me

25 20, 30 minutes to do the charge.  Okay?

1           All right, bring the jury in.

2           THE COURTROOM DEPUTY:  All rise.

3           (The jury enters the courtroom at 12:02 p.m.)

4           THE COURT:  Please be seated.

5           We are going to conclude the lawyers' part of the case

6    with the closing argument of plaintiff's counsel, after which,

7    we are running a little bit behind, but I will give you the

8    option of having me go right in and charge you, which I think

9    will take about 20, 25 minutes and go over the verdict sheet

10   and you can then go back and deliberate, have your lunch, or if

11   you want to take a lunch break and come back and have me charge

12   you.  So you can think about that.  When he is done, we will

13   see what time it is, and I will ask you what the group would

14   like to do.  Okay?

15           Mr. Jean.

16           MR. JEAN:  Thank you very much, Your Honor.  May it

17   please the Court.

18           THE COURT:  Do you want the lights dimmed?  Are you

19   showing something or are you okay?  Let Ms. Minix know if you

20   need it done.

21           MR. JEAN:  I appreciate the Court's assistance.  I

22   don't want to make them my staff.

23           THE COURT:  Okay.

24           MR. JEAN:  If everyone is ready to proceed, I am.

25           (CLOSING ARGUMENT BY MR. JEAN)

 1          MR. JEAN:  May it please the Court.  Counsel,

 2    Your Honor, members of the jury, good morning again.

 3          Before I begin in the argument, this is the closing

 4    argument section, the judge will instruct you that what I do is

 5    argument, as a lawyer.  I put an S on my chest, I try, and I

 6    try to advocate for my client.  So it is argument.  But what's

 7    most important is the common sense that you bring to this

 8    courtroom.  But before I get to that, I know this has been some

 9    time out of your busy schedules, you have families, you have

10    work, you have things to do, but in our system of justice, and

11    I love when I come into federal court and I see the seal

12    because this is -- I am kind of corny with that -- this is the

13    arbiter.  This is how a civilized society finds resolution when

14    we have disputes.  We don't duke it out.  We duke it out with

15    lawyers.  We use some fancy words.  I'm going to try not to use

16    fancy words because fancy words are not what this case

17    requires.  Number one, thank you for your service and thank you

18    for your time.

19          What is this case about?  It's been ten years,

20    approximately, June 7th of 2015.  What is this case about?

21          Members of the jury, the evidence and the facts that

22    you have heard over the past few days is a story of Mr. Peter

23    Pataki, a real-life David versus Defendant Goliath, Walmart.

24    And I use that to illustrate a point that we have seen over and

25    over and over again.

```
 1            I sat through Mr. McDonnell's closing statement.  I

 2   listened and I feverishly wrote down notes so I wouldn't forget

 3   the things that I would like to impress upon you.  And I speak

 4   slowly intentionally because my heart races when there's things

 5   I am in disagreement with.  But, essentially, what we heard

 6   here today, we heard blame the victim.  That's what we heard.

 7   We heard blame the victim for having a lawyer with the S on his

 8   chest who stands before the jury and gives fancy words, who

 9   speaks the King's English to explain the indignity that has

10   occurred here for the past ten years, approximately ten years.

11   Blame the victim.

12            I am going to attempt, to the best of my ability, to

13   keep this simple.  Why do I say David versus Goliath?

14            Well, members of the jury, you're wondering what are

15   you going to do next.  The judge will instruct you as to what

16   you are going to do next.  I am not going to use fancy charts

17   about the theories.  I am going to get straight to this case.

18   This case is simple.  The judge will instruct you at the

19   conclusion of the trial.  You are going to get a jury verdict

20   form.  You're going to get a jury verdict form which will be

21   the end of this approximately ten-year battle with David and

22   Goliath.

23            The first question will be:  Do you find that

24   Plaintiff Peter Pataki has proven by a preponderance of the

25   evidence that the Defendant Walmart, all 50 states, also out of
```

 1  this country, that the defendant was negligent on June 7, 2015?

 2  I wrote in my notes, I checked off -- you are going to do

 3  whatever you are going to do, but in my notes I said yes.  I am

 4  going to tell you why.

 5       If your answer to the question is no, then do not go

 6  any further.  But if your answer is yes, proceed to Question 2.

 7  I submit that you are going to go to Number 2.  What does

 8  Number 2 say?  It says:  Do you find that Plaintiff Peter

 9  Pataki has proven by a preponderance of the evidence that

10  Walmart's negligence, which we are going to prove or we have

11  proven already, was a proximate cause of the harm?  I checked

12  off yes.  That's what I did.  You do what is in your definition

13  of common sense.

14       If your answer is yes, proceed to Question 3.  Do you

15  find that Defendant Walmart has proven by a preponderance of

16  the evidence that Peter Pataki was negligent?  I said no, but I

17  submit you are going to go to Number 3 and answer no.

18       Question 4:  Do you find that Walmart has proven by a

19  preponderance of the evidence that Peter Pataki's negligence

20  was a proximate cause of the harm?  I wrote no.  They haven't

21  done that.

22       Question Number 5:  Taking the combined negligence

23  that was a proximate cause of any harm to the plaintiff as 100

24  percent, what percentage of causal negligence was attributable

25  to each of the parties that you found causally negligent?

1    That's going to be the jury charge that you read.  I wrote, my

2    argument, I wrote a hundred percent Walmart.  But you are going

3    to do what your common sense dictates.

4         Question Number 6:  State the amount of damages, if

5    any, that would reasonably and fairly compensate Peter Pataki

6    for any injuries you find were proximately caused by the

7    incident.

8         The first question is pain, suffering, disability,

9    impairment, loss of enjoyment of life, and then next to it

10   there is a dollar sign, and then you will use your common sense

11   to figure it out.

12        Past medical expenses, the judge will instruct you

13   upon a stipulation, this is a dollar sign, you will fill it in

14   yourselves.  You have tremendous power.

15        Then third, future medical expenses, that's what it

16   says on the jury verdict form.

17        Well, let's go through the story.

18        What did we hear?  Why do I say this is David versus

19   Goliath?  Because, members of the jury, when you woke up this

20   morning with something that you've been blessed with, it's been

21   nurtured and as you've aged, it's gotten better like wine, it's

22   common sense.  It's nothing fancy.  It's the decision whether

23   or not I should walk down a particular place at a particular

24   time in a particular place in the country.  It's the decision

25   whether or not I should choose this college or that college.

1    It's the decision whether I should take this job or that job.

2    It's your common sense, it's the thing.  Common sense is genius

3    and you have genius.  It's the ability to make that decision.

4    And I am going to show you through your common sense why the

5    verdict form should be filled out in the way that I did.

6          What evidence did we hear in this case?  Not fancy

7    charts.  Let's talk about what we heard.  What evidence did we

8    show?

9          I remember when I was in grade school there was a

10   teacher that always used to say show me your work.  Show me

11   your work.  Don't just give me your answer because I don't know

12   how you got the answer, show me your work.  So I gave an

13   argument but I want you to question me.  Whenever I say

14   something, ask yourself, why is Mr. Jean saying that?  Is he

15   showing you the work?  How does one plus one equal two?  Force

16   me to show my work.  We have shown our work.

17         First thing that we did in this case, first evidence,

18   this is a little grainy, you will have your iPads, but for

19   demonstrative purposes, indulge me.

20         June 7, 2015, it's a Sunday.  Use your common sense.

21   What do people do Sunday evening at approximately 8:00:35?

22   What's happening?  That's significant.  Why is that

23   significant?  8:00, P-43A, right, this, what I'm showing you,

24   is exactly the same thing, just for your illustrative purposes.

25   There's a thing.  Momma's common sense.  There's a thing.

1    You'll make the determination what that thing is.  But there's

2    a thing in P-43A, it's also on this more grainy image but

3    you'll have your iPads, it will be in crisp resolution.

4          P-43B, 50 seconds.  P-43C, P-43C, this is where we

5    are.  P-43C.  What's significant about P-43C?  8:00, 8:04:41.

6    We have 8:00:35.  Let's go to the videotape.  You will have an

7    opportunity to see a better image in your iPads but I'm going

8    to go to P-43C.  What is that?  Why is that significant?  Has

9    Mr. Jean shown his work?  Force him to show his work.  Force me

10   to show my work.

11         (Video played.)

12         MR. JEAN:  8:04:41.  We talked about credibility, we

13   talked about common sense.  Please bear with me.  The reason I

14   take my time is because Peter has been waiting for ten years

15   and that's why I thank you.  Just indulge me.

16         P-43C.  Common sense, credibility.  8:04:41, what do

17   you see?  Credibility, consistency, common sense.  What do we

18   see?  Is Mr. Jean showing you his work?  And I'm not going to

19   use the language beating the horse because I don't like that,

20   it's just beating whatever that was, that was just -- it's not

21   language I choose to use.

22         Who are these people?  What are they carrying?

23   Credibility, consistency, common sense.  What are they

24   carrying?  They have garbage bags.  The common sense that we

25   all woke up with in the morning.  What is the purpose of

 1    garbage bags?  What duty does Walmart, with its tremendous

 2    amount of employees and resources, what duty do they have to

 3    individuals like Mr. Peter Pataki who walks into a Walmart

 4    store to get some chicken?  Bombarded by signs of 99 cents

 5    here, buy this, buy that.  What duty does Walmart have?  Use

 6    your common sense.  Who are these individuals?  What do they

 7    do?  It's rhetorical, of course.  We know what they do.  You'll

 8    have an opportunity to use your iPads, you'll have crisp

 9    versions of what's going on up here.  I didn't dim the lights

10    because I don't want to go back and forth but there's a thing

11    right there.  You're going to see it.  You're going to see it.

12    You're going to see it on your iPads.  Do not let Walmart tell

13    you do not trust your eyes.  You saw what you saw.  Don't let a

14    corporation tell you you didn't see what you saw.  You saw what

15    you saw.

16            Mrs. Gardner told you what she saw.  Did she speak the

17    perfect King's English?  No.  Did she tell you what she saw?

18    She says she was in the meat department.  To use her language,

19    "I was in the meats."  They tried to -- you saw how they

20    handled her.  She wasn't getting paid to be here.  She was on

21    her phone at home doing whatever she was doing to mind her

22    business.  She volunteered because our office sent her a letter

23    and we said, Mrs. Gardner, we'd like to know what you know.

24    Please tell us what you know.  My direct examination was short.

25    What happened?  Who are you?  Shabazz High School, born in

1    Orange, you know.  She wasn't -- candidly, she wasn't in a

2    suit.  She was just home minding her business.  She told you

3    the truth.  Judge her credibility.  You're going to see her in

4    this video.

5            But I pause here at 8:04:39 because we know -- what do

6    we know?  We know that Peter Pataki is going to fall here at

7    8:06:33.  Why?  I have watched this video many, many times,

8    many, many times, trying to make it make sense to me.  Walmart,

9    please, make it make sense to us.  What duty do you have?  Who

10   are these individuals?  Well, these individuals, we're going to

11   see what they are going to be doing.

12           Let's go to the videotape, if you will.

13           (Video played.)

14           MR. JEAN:  They got garbage cans.  We got this thing

15   over here, the thing that's going to cause Mr. Pataki to fall.

16   They have clear opportunity, clear opportunity, clear

17   opportunity.  Granted, this is a grainy video.  The one that

18   you're going to see on your iPad is even better.  Let me see if

19   my image here is even better.

20           P-43D, 8:04:51, 8:04:52, credibility, consistency,

21   common sense.  Credibility, consistency, common sense.  And if

22   anything I say differs from what your recollection is, forget

23   what I say.  What did you recall?  What did you recall?  Let's

24   not twist things.

25           Where did they go?  Where did they go?  What's their

1    duty?  I'm going to pause for a moment.

2          Mr. McDonnell mentioned it, I didn't.  He talked about

3    we had a Walmart manager.  The Walmart manager didn't testify,

4    did he?  I'm sure that Walmart manager was responsible to know

5    what these individuals are supposed to do.  He could have told

6    us what they do.  But do we really need them to tell us what

7    individuals with garbage bags walking through a store, what's

8    their responsibility?  I'm going to tell you what their

9    responsibility was because at this point it's sounding so

10   ridiculous.  Their responsibility, members of the jury, is to

11   clean.  It's an honorable profession.  You sign up to make sure

12   that the area is safe for customers.  That's their job.  It's

13   an honorable job.  But if you're going to assume the

14   responsibility for a job, you need to do it reasonably, you

15   need to do it carefully.  That's what you're supposed to do.

16   It's not complicated with fancy charts.  You're just supposed

17   to do your job.  Everyone has a job.  You have one job,

18   respectfully, it's an honorable job, but you should do it.  And

19   if you don't do the thing, don't tell us that we didn't see

20   what we saw.  It is insulting.  It's diabolical.  You blame

21   Peter Pataki when -- did Mr. McDonnell spend a moment, a

22   moment, to talk about these individuals?  And I state here --

23   and I am not using that language that he chose to use -- who

24   are these people?  What's their responsibility?  Their

25   responsibility is to pick up trash.  We have trash.  Why do we

1    know that?  We know because Mrs. Gardner tells you.  She told

2    you that she saw Mr. Pataki's feet get caught up in plastic.

3    She told you.  Did you find her credible?  I submit that you

4    will find her credible with her simple words.  She was "in the

5    meats."  That's her language.  This is the meat department.  "I

6    saw what I saw, Mr. McDonnell.  You're not gonna try to twist

7    my words, Mr. McDonnell.  I'm here on my own time.  I'm not

8    getting paid for this."  Yes, she was a little sassy, she was.

9    But she's home, she's trying to give the truth.  She has no

10   vested interest in this case.  She doesn't know Mr. Pataki.

11   There's no relationship.  They're not going to the club

12   together.  They're not going to some social club together.

13   Their worlds could not be further apart.  Mr. Pataki, who lives

14   in Brooklyn, who happens to go to Pathmark, and Mr. McDonnell

15   wants to know why are you in Pathmark -- I apologize --

16   Walmart, Walmart, why are you in Walmart?  I'm here to shop.

17   I'm here to catch the deals.  I'm here to be among the meats,

18   that's why I'm here.  This is ridiculous.  They blame the

19   victim.

20          8:04:52.  Why is that important?  That's important

21   because when you read the jury charge, and the judge instructs

22   you upon the law as to what is -- how do we prove negligence?

23   We prove negligence when we have actual or constructive notice.

24   Actual or constructive notice.  What does that mean?  Actual

25   notice means I saw it.  I saw it.  Members of the jury, you see

1     it.  You see it.  You see it.

2          I apologize for being a bit amped this morning but

3     this has been ten years, ten years, and all we had to do was

4     use some common sense but we deflect, we deny, we twist things,

5     we make -- we try to tell people they didn't see what they saw.

6     It's ridiculous.  And we have members of the jury who are

7     sitting here patiently listening to this, but it's important to

8     us.  It's important to Mr. Peter Pataki who sits here.  Common

9     sense, members of the jury, I know, I know, I know, I keep

10    talking about the same point.  It's 8:04:52, they have a

11    responsibility and they failed in their responsibility.  They

12    had a job, they had a job, but do they do their job?  No.  You

13    are going to see it on the iPads, there is going to be a clear

14    view, but they leave the area, they leave the area.  They don't

15    come back.  What did we just prove?

16         Mr. McDonnell had a thing, a refrain.  They've got

17    nothing.  They've got nothing.  Well, we have a lot of

18    something.  We have what we call in the law actual notice,

19    actual notice.  And in the event, there's -- I know I'm a

20    little dogmatic, but I'll leave a little room for some -- I'll

21    leave a little room for an alternative position but I do think

22    that we have actual notice here.  They ignored it.  They saw

23    it, they ignored it.  Or constructive notice, the judge will

24    instruct you what constructive notice means.  I submit to you

25    both actual and constructive notice has been proven.  They had

1   a full and fair opportunity to see the thing that would cause

2   Mr. Pataki to fall and they ignored it.

3          So when they walk -- when Walmart comes and tells us

4   we don't see what we see, members of the jury, you saw it with

5   your own eyes.  That's important because that's -- the reason I

6   spend so much time on this, it's fundamental to what you do

7   later on.  It really is.  It really is.  I'm amped about it but

8   it's common sense.  You're going to see on your iPads.  They

9   saw it, they ignored it.  They breached the standard of care.

10         We're going to move to 8:06.  What's important about

11  8:05, the thing is there, they had an opportunity.  They failed

12  in their duty and disregarded it.

13         Let's continue to look at the tape.

14         (Video played.)

15         MR. JEAN:  You're going to see on your iPads, this,

16  it's not a glare.  It's a piece of plastic.  You're going to

17  see Mr. Pataki come into our screen.

18         We're going to go to 8:06.  8:06.  Members of the

19  jury, we're still talking about liability.  We're going to talk

20  about damages in a moment, but we must talk about liability,

21  got to talk about it.  8:06.  I had 8:06 in P-43 only because

22  when you open your iPads you're going to clearly see, you're

23  going to clearly see plastic on the ground.  Very simple.  It's

24  been ten years but for some reason we have been unable to see

25  what I believe that you have to see.  8:06:23, 8:06:23, my

1    photo is a little better than this image but you'll have your

2    iPads.  The reason I walk through this timeline very carefully,

3    it's very important.  It's very important because we know

4    what's going to happen.

5         I am going to go to 8:06:28.  8:06:28.  8:06:28, you

6    are going to see Mr. Pataki.  I am going to pause here,

7    8:06:26, 27, boom.  Hold on.  Okay.

8         So what does Walmart do?  Walmart advertises to people

9    in big signs, 98 cents here, 2.89 here, 1.89 here.  What are

10   most people doing when they go shopping?  They're counting

11   their coins.  They're getting ready for Sunday dinner, buying

12   chicken.

13        What did Mr. Pataki tell us?  He was buying chicken.

14   He's a simple man.  He has chicken in his hands.  Well, what's

15   interesting is that Walmart has the audacity to say, well,

16   you're responsible, Peter.  We have no duty.  We don't have to

17   prove anything here.  We don't have to put any witnesses on, we

18   don't have to prove anything, we don't have to have incident

19   reports.  We're just going to sit here and let you prove your

20   case.  Well, that's why you have a lawyer.  Hopefully, I can do

21   a good job to represent my client.  But when you take on

22   Goliath, you need a lawyer.  You need someone to speak the

23   King's English, to take the little pieces of the puzzle and put

24   it together so we can be in federal court so that we can answer

25   something which is so clear but they deny and they deflect.

1           8:06:28, Mr. Peter Pataki, his life is going to

2    change.  They want to blame him for it.  Interesting argument.

3    Mr. Pataki, you are responsible, too.  It's like two kids who

4    are arguing:  Mom:  What happened?  Dad:  Well, he hit me.  He

5    hit me, too.  Really?  Is that what we're doing?  So what I

6    heard you say is that you hit your sister.  Yeah, but he hit

7    me, too.  Okay.  So you admit that you hit your sister, yes?

8    Oh, well, yeah.

9           Walmart, you admit that the people that we saw go

10   through the area failed to pick up the plastic, which was their

11   job.  You admit that that's what they were supposed to do.  You

12   admit that you had actual notice, constructive notice, you

13   admit that.  You admit that you were negligent.

14          We stepped on a cord.  Did we go out?  My laptop.  We

15   are back up.  Thank you, sir.

16          8:06:28, boom.  You just saw it with your own eyes.

17   Mr. McDonnell didn't spend any time denying that Mr. Pataki

18   fell.  He fell hard.  You saw it with your own eyes.  Walmart,

19   despite their fancy words, cannot deny it.  It is a fact.  It

20   is true.  There's no alternative ways of looking at it.  The

21   man fell.  We had a dispute as to whether or not he was 200

22   pounds, 230 pounds, people fluctuate in weight, but what we

23   know is at least 200 pounds, six-foot-three of man, big man,

24   big burly man, over 200 pounds, bam, on the ground.  Do you

25   think that felt good?  Credibility, consistency, common sense.

1    I am not trying to -- we talked about -- what was the word that

2    Mr. McDonnell used -- a ring?  I don't even know what that is

3    but -- I don't know what that is.  I don't know what that is,

4    but what I do know is facts.  200 pounds, let's give him 200

5    pounds, smashing down on the ground.  Do you think it tickled?

6    Did it feel good?  Does that meet your definition of common

7    sense?  No, it doesn't.  And then now Goliath wants to say,

8    well, what's the proper way of behaving after you are walking

9    in Walmart in the meats department and you fall?  What's the

10   proper way?  What's the proper way to react?  Is there some

11   textbook way of how a human being who is trying to count his

12   coins to get some chicken, is there a standard way for them to

13   behave?  You fault him for going -- and, candidly, he's on the

14   stand, he's trying to explain this, make sense.  It's been ten

15   years.  He's trying to explain, he does go back into the meat

16   department.  He's, like, walking around, he's kind of, like,

17   with the phone, what happened to me?  I was a healthy person.

18   I just fell.  Now they want to blame him.  You didn't act in an

19   appropriate way.  He goes back to the scene, he tries to figure

20   out what happened.

21          Mrs. Gardner, this is Mrs. Gardner.  This is Mrs.

22   Gardner.  8:06:34, she saw him fall.

23          Now I am going to take a moment, consistent with this

24   way of treating people, it's been consistent, the past ten

25   years, even in this courtroom.  They manhandled Mrs. Gardner

1  who was just telling you what she saw.  She saw him.  What did

2  she say?  Use your recollection, not mine.  She said something

3  to the effect of, he fell and fell hard.  His feet went up.  It

4  hurt me.  It was -- it was -- she told you it was hard.  But

5  why am I still on this point?  I'm like on the point.  And I

6  hope -- you're probably wondering, why is Mr. Jean just telling

7  us over and over, it's just common sense?  Because it's been

8  ten years and we're in federal court and we're trying to make

9  it make sense.  So I'm here trying to make it make sense.  It's

10  so obvious.  The man falls.  It hurts.  It didn't tickle.  He

11  falls.  He gets right back up.  Why?  Because at that point

12  Mr. Pataki had never -- let's take a moment here.  Let's take a

13  moment and breathe, just breathe.

14          According to Walmart, according to Walmart,

15  Mr. Pataki, who was, what, 39 or so, use your recollection, was

16  some unhealthy man with a degenerative spine.  He told you why

17  he was able to pop right back up.  He told you.  He goes to

18  Easton Parkway, he rides his bike, he believes in stretching.

19  He has good physical fitness.  Of course, that tells you

20  something.  What does it tell you?  That tells you what his

21  life was like, that he can suffer slamming down on the ground

22  and get back up.  That was what he was used to.  That is his

23  instinct.  That is how he lives.

24          The ring that Mr. McDonnell -- I don't even know what

25  that means.  What does that mean, a ring?  A ring?  It's not a

1    ring.  I don't know what that is.  I think I know what he's

2    trying to say but I'm not even gonna go there.

3        He falls.  It hurts.  The fact that he gets up tells

4    us a lot about his credibility, that he was indeed a virile

5    man, that he was indeed a strong man.  He was a man -- and I'm

6    going to take a moment.  I'm watching a sign.  When you go to

7    lunch, you're going to see a sign by the elevator.  The sign

8    says something to the fact of be healthy, be happy, take the

9    steps, something like that.  I guess it's encouraging physical

10   fitness.  Maybe you saw it, maybe you didn't.  When you leave

11   the courtroom for lunch, you'll have an opportunity to see it.

12       Well, Mr. Pataki, before June 7, 2015, would have done

13   that.  He was a virile man.  He was a man that could pop up

14   after he falls down.  He would have taken the steps if he

15   wasn't here in federal court for whatever reason.  He would

16   have taken the steps.  You saw him.  He uses a cane and they

17   mock him.  They mock him.

18       The man walks with a cane.  The man has a spine fused

19   and they mock him.  You know how else they mock him?  Did your

20   girlfriend -- didn't you have a girlfriend?  You had a

21   girlfriend, didn't you?  Again, consistent with the fact that

22   he was indeed a virile man.  He was a man.  Walmart took his

23   manhood away, they did.  Didn't your lady take you backwards

24   and forwards from medical appointments?  We would all hope,

25   one, human beings would all hope that they would have a partner

1    who will take care of them in their moment of need.  But how do

2    you think that made Mr. Pataki feel?  Do you think he felt

3    manly about it?  You mock him for his lady, his then lady --

4    his lady is not here.  We didn't introduce evidence why the

5    lady is not here, we will not go there, but let's just talk

6    about that.  He was a virile man, his lady is not here.  That

7    hurt him.  Walmart hurts him when they deny what is plainly

8    obvious, but the fact that he had his lady who had to travel

9    back and forth from doctors, that hurt him.  We're going to

10   talk about that when we talk about damages.  But, again, he

11   gets right back up, he wanders throughout the store.  That is

12   evidence that he was indeed a virile man but he's not a virile

13   man anymore.  We're going to get to damages in a minute.

14       When you compare who was Peter Pataki -- because

15   that's what Mr. McDonnell says:  Who is this guy?  Who is this

16   guy?  Well, we know he was a guy who had a lady, he had a

17   girlfriend, right?  He had some person who cared about him in

18   his life.  We knew the fact that he was able to pop up, we knew

19   he was virile.  Who is he?  Who is he?  Who is Peter Pataki?

20   Peter Pataki is an honest man.  He's a simple man.  I am not

21   going to use that language of beating anything.  I don't want

22   to beat.  What I want to do is present evidence so you can take

23   it back to the jury box and make a fair decision.

24       That's Mrs. Gardner who travels.

25       I'm going to switch to, let's see -- bear with me.

```
 1   Bear with me, ladies and gentlemen.  It's important.  I'm
 2   attempting to go to the video, the second video.  Bear with me,
 3   please.  Well, technology will fail so I'm going to do what I
 4   can do.  It's simple, we don't need that.
 5           What do we know?  Remember, what time were we?  We are
 6   at, P-43H, 8:06:30, right?  You're going to have your iPads but
 7   I would like for you to take note of the time, P-43I, 8:06:33
 8   Peter falls, 8:06:33, he falls, he falls.  I didn't use that.
 9           What do we also know?  What do we also know what
10   happens next?  8:15, 8:15, 8:15, I wish I could pull that up
11   but I don't want to waste your time.  8:15:47, that's P-9, and
12   8:15:54.  Let's go to P-9, 8:15:47.  Why is that important?  My
13   adversary chose to breeze past this but why is this important?
14   8:15:47, what did Peter tell us?  By the way, we apologize,
15   Peter has waited some time to tell his story and certainly he
16   couldn't follow my questions.  He was a little nervous.  He
17   wanted to tell you, tell you, he wanted to tell you, he didn't
18   want to distract you, he wanted to give you as much information
19   to the point where he was -- actually during my questioning he
20   wanted to speak to you.  That's how important it is.  But this
21   is important.  I spoke to him last night about this, very, very
22   important, 8:15:47, that's Peter, Peter, he's talking to
23   somebody.  Do you remember what he told you?  Do you remember
24   what he told you?  Next, P-43O, 8:15:54, please, please,
25   please, promise me, when you get your iPads, I know you don't
```

1   have anything to write on, take a mental note, 8:15:54,

2   8:15:54, 8:15:54.  What's happening?  Someone's bending down.

3   Credibility, consistency, common sense.  Someone's bending down

4   picking up a thing.  We know what the thing is.  It's the thing

5   that changed Mr. Pataki's life.  Go back to the video and use

6   your common sense.

7        I am going to have -- I will have more of a

8   conversation with you so we don't have monitors, they're

9   distracting.

10       8:17:20, that's P-43L, what do we know about that?

11  That's Peter talking to Mr. -- rather that's Peter speaking

12  with Ms. Betty Gardner.  Mrs. Betty Gardner who told you the

13  truth, who got handled to tell you the truth, you know, a

14  cross-exam that went over an hour, two hours.  She is just

15  there to say that she saw a man fall, she saw a man fall.  But

16  more importantly, what did she tell you?  What did she tell

17  you?  What did she tell you?  She told you the man's foot was

18  caught up in plastic.  It's been over ten years.  This is so

19  common sense.  She tells you she saw his foot in plastic.  The

20  plastic is not supposed to be there.

21       You know, what's important, P-43C, what do we know

22  about that?  These are the individuals who are hired to find

23  this particular plastic.  Pick it up.  We all have common

24  sense.  We throw in our common sense daily.  We go home, we go

25  to work, even if it's not our responsibility at work, we see a

1    thing, we pick up a thing.  You go home, I didn't do it, the

2    kids left it, well, you pick it up anyway, the dirty laundry,

3    you pick it up.  The dog did some business.  What do you do?

4    Well, you bend down, you take a piece of tissue and you clean

5    it.  You don't say, well, it's his responsibility; it's not

6    mine.  That's essentially what Mr. McDonnell did.  It's not our

7    responsibility.  We don't have to bring in a manager to prove

8    anything.  We don't have to prove anything.  We're just going

9    to sit here, nope, we didn't do anything.  Common sense, you

10    see a thing, you do the thing.  You're responsible.

11          You're going to learn the language of invitee.  What

12    is the duty when you have an invitee, when you invite someone

13    to your store to purchase your products?  You have a basic

14    responsibility to take care of them.  You want them to purchase

15    your product, it's a give-and-take.  They purchase your

16    product; you keep your store in a reasonably safe environment.

17    And I submit to you that it shouldn't meet your definition of

18    common sense that you invite your people into your store, you

19    have people with garbage bags, they just go, they do nothing.

20    They do nothing.  They said we did nothing; they did nothing.

21    I'm going to leave that point.  You get it.  I do not, do not

22    -- I respect your time.  I do not want to -- i respect your

23    time I don't want to keep -- I respect your time.

24          P-43M, P-43M, look at the time.  The time is 8:23.  So

25    what do we know?  We know Mr. Pataki saw plastic and after he

1    fell.  We know that he then gets escorted, gets escorted, to

2    the management office at 8:23.  What did he tell you?  He goes

3    and speaks to a manager.  He says he knocked at a door.  He

4    described the woman with great specificity.  We didn't hear

5    her, did we?  She didn't come in.  We have a manager who's been

6    sitting here.  Did we hear him?  No.  Why is that?

7    Credibility, consistency, common sense.  You have it.  You have

8    the genius.

9         He says he sits in the office -- take your time,

10   Roosevelt.  He tells you he sits in the office and he fills out

11   an accident form.  We all know what accident forms are, whether

12   it's a child who breaks a tooth at camp or falls down or had a

13   fever.  An incident occurred so what do we do?  Members of the

14   jury, common sense, it's been ten years, I don't know why we

15   can't figure this out.  Incident report.  Where's this incident

16   report?  Wouldn't it have been nice?  Members of the jury,

17   wouldn't it have been nice?  We're almost ten years after a

18   slip and fall, it's not like they can say that it didn't

19   happen.  You see people bending down, picking up the thing.  We

20   have Mrs. Gardner who sees the thing.  They had an opportunity

21   to ask Ms. Gardner, Ms. Gardner, did you see what happened?

22   Nobody asked Mrs. Gardner anything.  Walmart has all the

23   resources in the world but they want to blame little David.

24   Little David, you didn't do an investigation.  You didn't pull

25   out a cell phone.  My goodness, you have a camera.  I'm so

1  sorry but this is, like, so just -- it's mind-boggling.  You

2  have a camera.  You're able to zoom in, see the entire store

3  but you want to blame Mr. Peter Pataki because he didn't pull

4  out his cell phone?  He didn't act appropriately after hitting

5  the ground?  It's insane.  It's been ten years of insanity.

6  And hopefully with your common sense, we can put an end to it

7  to tell Walmart, you have a responsibility.  When someone comes

8  into your store, you have a responsibility.  You don't get to

9  shift the blame to little David.  You wanted David to come and

10 buy your meats but you don't want to take responsibility for

11 him.  How irresponsible is that?  That is not how a responsible

12 corporation acts.  This is so simple.  You saw it with your own

13 eyes but they deflect and they distract.

14        Mr. Pataki, at 8:23:24, he walks and he, knock, knock,

15 he fills out an incident form.  Where's the incident form?

16 Where is it?  They want to blame Mr. Pataki for not having it.

17 You got the Walmart manager sitting right there.  Where is the

18 incident form?  Do we care about what happened?  Do we want to

19 know?  Why don't we want to know?  Why do we want to hide

20 things?  Well, use your common sense.  What does it mean?  What

21 does it mean when a human being hides?

22        You know, when everyone was a child, nope, not me,

23 Dad.  Tell a little fib.  Not me, uh-uh.  What's you got there

24 behind your hand there?  Nothing.  Are you sure?  No.  I don't

25 -- I don't have anything.  Well, maybe I got something little.

1           Members of the jury, it's a bit comical.  I hope you

2    see it.  There's no incident report because Walmart doesn't

3    want you to know.  Doesn't want you to know.  They have all the

4    resources to give you this information but they want to blame

5    Mr. Pataki.  Mr. Pataki, you didn't take a picture, did you,

6    sir?  You didn't take pictures?  You didn't pull someone in the

7    white coat.  Well, my goodness, I was walking with someone

8    straight to the manager's office.  I did my part.  I did my

9    part.  I told you what happened.  I told you what happened.

10   You just don't want to hear it.  You don't want to hear it.

11   That's why we don't have anyone testifying from Walmart, they

12   don't want to tell you.  That's why we don't have the incident

13   report, they don't want to tell you.  They blame us for not

14   having it.  Mr. Pataki of meager means.  And that's why I'm

15   glad to put the S on my chest because I can get past the stuff.

16   I love taking little pieces of the puzzle together, put the S

17   on my chest and be an advocate for my client.  Because who's

18   going to speak for him when they mock him?  They mock little

19   David.  They mock him.  Not on my watch, they ain't mocking

20   him.

21           What else do we know?  What else do we know?  I think

22   we've proven the issue of liability.  In law school we learned

23   duty, breach, causation, damages.  First year of law school,

24   duty, breach, causation, damages.

25           Did Walmart have a duty to keep Mr. Pataki safe and

 1   use reasonable care?  Yes, they did.  Check.

 2           Breach:  Did they breach the duty?  What does that

 3   mean?  Did they fall below the standard of care of what you

 4   would have expected Goliath, Walmart, to do?  I submit to you

 5   that we have proven it.  They say we have nothing but, oh,

 6   we've got lots of something.  Breach.

 7           Causation:  200 pounds or more slamming down onto the

 8   pavement.  Causation.  They caused him to fall.

 9           Now members of the jury, we're going to walk through

10   the issue of damages.  I submit we have proven duty, breach,

11   causation, damages.  They knew about it.  We saw it.  We saw it

12   with our own eyes.  Duty, breach, causation, damages.  We have

13   met our burden.  That is the law and we have supplied you with

14   the facts to meet each and every element of liability.

15   Liability.

16           Now members of the jury, we move on to the issue of

17   damages.

18           Did Walmart cause Mr. Pataki to suffer damages?  Oh,

19   yes, they did.  They did.  Now, I hate when -- I don't like the

20   language "hate."  I strongly dislike when an individual

21   purports to know what Roosevelt Jean, Esquire, is going to say.

22   I don't like that.  It doesn't make me feel good.

23           There was a claim -- oh, what I was going to tell you

24   about time-unit rule.  No one puts words in my mouth.  I say

25   what I mean, I mean what I say.

1          The judge is going to instruct you upon the law.

2   Listen to her.  Do not listen to me.  Do not listen to

3   Mr. McDonnell.  Listen to the judge.  Here's my argument.  You

4   are free to deny it, accept it.  Listen to the judge.  Listen

5   to the judge.  She's the boss here.

6          We have a thing called the time-unit rule.  That

7   allows me to present argument after I've proven the issue of

8   liability, and I think I've met that burden.  I can use that

9   language that Mr. McDonnell did.  Now let's talk about damages.

10          How do you assess damages?  How do you assess damages?

11          Well, I'm going to ask you to break up the damages

12   into several categories.  In fact, that's what the jury verdict

13   form says.  There is a question which talks about past medical

14   expenses.  Let's do the easy part first, and I am going to try

15   not to bore you, just to keep you really engaged.  There's a

16   certain number, the judge is going to tell you, plug in the

17   number.  We've met liability, we have economic -- we have the

18   economic damages.  I don't want to misquote but listen to the

19   judge.  Listen to the judge.  She's the boss.

20          Now, let's talk about this thing called the time-unit

21   rule.  What does it mean?  It means that I'm allowed to say if

22   you find liability against Walmart, this is how you can -- this

23   is one method of assessing damages.  Pick a unit of time that

24   makes sense to you.  I'm not going to lecture you.  I kind of

25   do that sometimes, I'm so sorry.  But pick a unit of time that

1  makes sense to you.  It can be a day, it can be a minute, it

2  can be a week, it can be a year.  Let's say, for example, you

3  chose to use a year as a unit of time.  Let's say you did that,

4  for example.  In a year's time, we've had about nine years,

5  let's say in a single year, what is the value of the pain and

6  the suffering and the loss of enjoyment of life that Mr. Pataki

7  had?  I want to pause that.

8          What did we hear about his care?  We heard that the

9  first care that he had was Clara Maass hospital and indeed he

10  was on a stretcher.  After he got transported and he spoke to

11  the manager and he told the manager what happened and the

12  manager never created any type of report, that's fact.  I'm

13  sure the manager -- whatever.  We didn't hear about anything.

14          But after that he then goes on a stretcher.

15  Ms. Gardner did see him on a stretcher.  Because you're going

16  to have part of the medical records and he's going to tell you

17  that he was coming in on a stretcher in the ambulance.  It says

18  what it says, right?  Trust your knowledge.  Trust your eyes

19  when you are reading.  Assess the damages, bear with me, bear

20  with me.  It's ten years.  Ten years of facts I've been trying

21  to cram into my head and articulate to you.

22          First he goes to Clara Maass.  He gets treatment.

23  It's an emergency room.  He gets some basic treatment.  He's

24  given some pain medication.  They send him on his way.  They

25  take X-rays.  The X-rays show what they show.  He then comes

1   back.  He then comes back.  He goes to Clara Maass, he has some

2   more workup.

3        Mr. McDonnell spoke about his team, his ring.  We

4   learned about Mr. DeZao.  I am not Mr. DeZao.  I'm Roosevelt

5   Jean.  A ring.  He got some direction by a lawyer regarding

6   care.  Okay.  Who knows what to do when you're involved in an

7   accident and you have a corporation, I call them Goliath, who

8   won't document a single incident report or bend down or kick

9   around plastic that is obviously on the ground.  It's never

10  preserved.  It's not preserved by a photograph.  It's not

11  preserved by picking it up and putting it in an envelope.  You

12  are already behind the eight ball.  You are up against this

13  corporation that has fancy charts and fancy lawyers and fancy

14  presentations.  You're already behind.  If Mr. Pataki didn't

15  have lawyers -- that's what lawyers do.  We're here to advocate

16  for clients.  They blame him.

17       We know he goes to Clara Maass.  We know that he goes

18  to get injections with -- actually, before that time he goes to

19  see Dr. Gaccione, you heard that.  He gets some physical

20  therapy, seven months.  He tells you he's doing -- again,

21  credibility, consistency.  He tells you he's getting a little

22  better but then he comes right back and he's not feeling well.

23  He's not feigning.  He's not feigning an injury.  He didn't

24  feign an injury when he was on the ground and saying, oh, my

25  back.  You've seen those commercials.  If he really wanted to

1    create a fraud -- let's just say the word, right?  When we talk

2    about ring and all that other, you know, circular language,

3    what are we trying to say about Mr. Pataki?  What are we saying

4    about my client?  Say what you say.  Don't use some fancy word.

5    What are you saying about him?  That he was not allowed to buy

6    a chicken?  Don't play around with words.  Let's be direct.  I

7    like being direct with people.  Look into a man's eyes, tell

8    him what you -- or a woman.  No disrespect.  Look into an

9    adult's eyes.  Tell them what you want to tell them.  Don't use

10   fancy talk.  He falls down, he gets injured.  He has seven

11   months of chiropractic care.  He goes to see Dr. Koppel.  He

12   repeatedly has epidural injections in his neck and his back.

13           He goes to see Dr. Vizzone.  You heard Dr. Vizzone.

14           I'm going to get to the time-unit rule.  I hope you're

15   following, I hope you're following, I hope you're following.  I

16   hope I'm being direct to represent my client.  We are going to

17   get to time-unit rule in a minute.  Direct damages.

18           Dr. Vizzone.  Dr. Vizzone's testimony is going to help

19   us before we get to the issue of the time-unit rule.  He was

20   his patient.  Dr. Vizzone is special in this case.  Why?

21   Because he's examined Mr. Peter Pataki at least, at least, 50

22   times, and he told us about his expert opinion.  And you saw

23   how I worked through his expert opinion?  I asked him, what was

24   the basis for your decision that -- what was the basis of your

25   conclusion?  And he told us.  And what did he tell us?  We're

1    going to get to the time-unit rule in a minute.

2            We're going to talk about -- and at this point I will

3    hit the lights.

4            So what do we know?  What do we know about damages?

5            I'm going to start by -- we're going to start by -- I

6    apologize.  Before we get there.  I told Mr. -- I told Dr. -- I

7    told Dr. Vizzone -- bear with me.  So sorry.  It's been a long

8    week.  I know it's been a long week for you as well -- what was

9    the basis for your opinion?  What was the basis for your

10   opinion?  Don't just tell me, show me.  And you're free to --

11   he told us -- before we get -- he told us.  He told us that

12   Mr. Pataki has a herniated disc at C4-C5.  He also tells us

13   that Mr. Pataki told him by medical history, which is

14   important, the subjective information, that he had no prior

15   history.  Again, let's stop right there.

16           Walmart had ten years to figure out -- like they say

17   they have nothing to prove but what evidence do you hear?  The

18   first medical evidence that you hear is the Clara Maass medical

19   records.  That's what exists.  We don't want you to go

20   speculate.  The first medical record that exists in this case

21   is Clara Maass.  You will have an opportunity to hear about it.

22   We learned that Mr. Pataki has a C4-C5 herniated disc.

23   Dr. Vizzone saw it on the imaging.  He is a board certified

24   orthopedic surgeon.  He does -- not only does he review films

25   but he does surgery.  He is the only -- he is the only expert

1   that you heard in this case that has the ability to perform

2   spine surgery proficiently.

3        We heard from Dr. DeMarco.  And since we're here, Dr.

4   DeMarco, very interesting, Dr. DeMarco, he said he reviewed the

5   films, but he says he hasn't performed surgery in 20 years,

6   that's a fact, since 2003, 2003.  He hasn't performed a spine

7   surgery since that time.  Is he a spine expert?  No.  There's

8   other experts in his office that are qualified.  He does elbows

9   and some other body parts.  He hasn't done a spine surgery in

10  over 20 years when he was a resident versus a doctor who's a

11  board certified orthopedic surgeon who sees MRI films on a

12  daily basis.  Not only does he see MRI films on a daily basis,

13  but he actually operates on people.  He is the only person who

14  was actually a surgeon.  He is the only person who actually,

15  with his own eyes, saw the disc material.  Let that breathe for

16  a minute.  He saw the disc material with his own eyes.  He was

17  in surgery.  He saw the disc.  He is the only expert that has

18  testified that actually saw the disc with his eyes.  He saw the

19  disc.  He saw it on the MRI, he called it a herniated disc.  He

20  extracted it.  We're going to see it in a presentation of how

21  he removed the disc because he believes the disc was causing

22  impingement.  P-45 was evidence.  Again, I'm showing you my

23  work.  I'm showing you Dr. Vizzone's work.

24        We also see P-46 and P-47.  P-46, P-47.  P-46 this is

25  a December 7, 2016, MRI.  Here we have P-47 is a June 20, 2016,

1    MRI.  Let's stay with the cervical spine.

2         So we saw the herniated disc.  He calls it a herniated

3    disc.  He sees it, he identifies it.  He says it's a proximate

4    cause from the accident.  Here it is.  He showed it to you.  He

5    showed it to you.  Not only did he see it but he saw it when he

6    operated.  He's the only person in the case who's actually seen

7    the disc with his own eyes.

8         Let's go to the lumbar spine.

9         We are going to talk about pain and suffering, loss of

10   enjoyment of life.

11        There's a herniated disc.  Dr. Vizzone sees the

12   herniated disc.  He sees it.  He sees it.  He gives injections

13   because it's causing Mr. Pataki pain.  He sees it not only on

14   the MRI but he sees it when he opens the guy up.  He slices his

15   body and he sees it; but, yet, Walmart doesn't want to talk

16   about that.  They want to talk about other stuff, rings and

17   whatnot.  I still don't know what that means.

18        P-48A and P-48B, what is that?  That's Mr. Pataki's

19   spine.  He's the bionic man.  That's metal.  That's not how he

20   was born.  That's not how God made him but that's how he's

21   going to die with that in him.

22        Now, the other evidence, P-49 through -- and I'm going

23   to go through it very quickly -- 49, 50, 51, 52, 53, 54, 55,

24   56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71,

25   72, 73, 74, 75, right?  I am not going to go through them

1   individually.  I'm not a medical doctor, I don't purport to be

2   one.  But what did we learn?  We learned a little bit about --

3   I know a little bit about medicine, right?  What do we know

4   about the discs?  We know that the discs are a gelatinous

5   material called the nucleus pulposis, right?  And surrounding

6   the nucleus pulposis is an annulus fibrosus.  We had an

7   explanation of a jelly doughnut that when you squeeze on that

8   jelly doughnut and the disc material doesn't come out, it's a

9   bulge.  But when the disc material pops out, it's a herniated

10  disc.  And that jelly, we may have had that incident where it

11  falls on our favorite tie, if that jelly touches a nerve root,

12  it can cause impingement.  It's like when you have wires going

13  from point one to point two, you step on the wire, you get

14  what?  You get that radiating pain.  You get that little funny

15  feeling.  That's call radiculopathy.  Well, he had

16  radiculopathy.  How do we know?  We know that because

17  Dr. Vizzone examined him.  He's the only individual that

18  examined him for radiculopathy.

19          We have these two doctors -- and I want to comment

20  upon the doctors for a moment.

21          When we talk with credibility, consistency, and common

22  sense, Dr. DeFalco, he doesn't do spinal surgeries.  He says he

23  is an independent medical examiner.  Members of the jury, 99 --

24  he says it himself, 99.9 percent of his work is for defendants.

25  Does he have an interest?  Mr. McDonnell talked about whether

1    people have an interest in the case.  You don't think he has an

2    interest in sustaining his livelihood?  That's how he eats.

3    That's how he makes his money, in addition to the other work

4    that he does.  I don't fault him for what he does for his

5    patients.  He does what he does.  He's a doctor who does what

6    he needs to do.  But you mean to tell me you don't have an

7    interest but Dr. Vizzone has an interest?  Ninety-nine --

8    that's how your bread is buttered.  That's how you make your

9    money and you don't have an interest?  Use your credibility,

10   use your common sense.

11           He also said something yesterday which was just really

12   baffling.  I don't know if you caught it.  He said it really

13   quickly, I wrote it down.  He said, Mr. Pataki -- in fact, I

14   was watching the game last night and the Eagles are playing and

15   I'm thinking, well, maybe Mr. Pataki should have been on that

16   field.  Maybe he could have helped out the Eagles a little bit

17   better and maybe they would have won by more points.  Maybe

18   Mr. Pataki should have been on the other team.  Right?  Maybe

19   he could have helped them win.  Why do I say that?  It's kind

20   of odd for Roosevelt to say.  Well, he said it himself.  He

21   said a person with an L5-S1 single-level fusion, it's not

22   incompatible with him being in the NFL.  What does that mean?

23   Why would you say that?  Again, Walmart mocking Mr. Pataki.

24   It's not credible.  It's not inconsistent.  It should not meet

25   your definition of common sense.

1        I'm showing you what has been previously marked for

2   identification, it is the image of Mr. Pataki.  It's an

3   illustration.  It's an illustration.  It's an illustration of

4   what happened to him.  We learned that he had an incision made

5   in his neck.  It's a fact.  We learned that at C5-C6 the disc

6   was removed, was sliced.  That's a fact.  But Walmart doesn't

7   want to talk about that.  But I submit to you that is pain,

8   that is suffering, that is loss of enjoyment of life.  We see

9   in Section C after they slice him, a discectomy is performed.

10  They pulled the disc out.  Walmart doesn't want to talk about

11  that.  That is pain, that is suffering, that is loss of

12  enjoyment of life.  The end plates were prepared for

13  instrumentation.  I'm sure there's a fancy little machine,

14  sucking out the disc.  They don't want to talk about it.  But

15  that is pain, that is suffering, that is loss of enjoyment of

16  life.  A Mobi-C was placed into the interbody space.  He has a

17  new disc.  That's not how he was born.  That is pain, that is

18  suffering, that is loss of enjoyment of life.  The fact that he

19  has to live with cages fusing his lumbar spine, that is pain,

20  that is suffering, that is loss of enjoyment of life.

21        Members of the jury, I am going to try to get to it.

22  You have been sitting here and I don't want you to be in pain.

23  I am going to turn the lights on.

24        Now I'm going to talk to you about the time-unit rule.

25  Mr. McDonnell is correct, I did intend to talk about the

1    time-unit rule.  He's correct in that regard.  But it's not

2    what he said I said.  It's not what I said.  It's not what it

3    is.

4            So you heard about Mr. Pataki's treatment for the past

5    nine years.  It's a fact.  He's had these injuries for nine

6    years.  He walks with a cane.  That's a fact.  We didn't

7    belabor the point.  It's obvious.  The man has a fused spine,

8    he has a cane, common sense.  We have a funny way in the law

9    there's a grid that talks about how many more years we have.

10   Nobody knows how many more years we have.  Hopefully we have

11   years way into our adulthood or we're able to see grandkids and

12   great-grandkids and we're old and gray and brittle and we have

13   made our contribution to the world and then we leave the world.

14   But according to this standard, Mr. Pataki has 33 -- it's sad

15   to think about -- 33.2 years to live.  That's just a standard,

16   right?  And we know that he's had nine years of pain,

17   suffering, loss of enjoyment of life.  Having numerous

18   injections, having an implant in his cervical spine, having an

19   implant in the lumbar spine.  That is pain, that is suffering,

20   that is loss of enjoyment of life.  The fact that he used to

21   have a girlfriend, he doesn't have a girlfriend any longer, the

22   fact that he can't do the things that he wants to do, the fact

23   that he can't just go up the steps when he wants to, the fact

24   that he has to wake up every single day and feel the pain, the

25   fact that he feels the rain before it comes, he's his own

1    weatherman.  He knows when the rain is going to come.  He feels

2    it in his body.  That is pain, that is suffering, that is loss

3    of enjoyment of life.

4         So now we get to the time-unit rule, the big to-do,

5    the big time-unit rule.  Pick a unit of time.  Every year of

6    the past nine years.  If Mr. Pataki didn't have the injuries

7    which were caused by Walmart, what could he have done with his

8    life?  Every man has a full value of his life.  Every woman has

9    the value of their life.  Every adult has a value of their

10   life.  What do they contribute to the world?  What do they

11   contribute?  What can't Mr. Pataki do any longer?  Those are

12   just facts.  We don't have to belabor the point.

13        The emotional toll of having to live with this for the

14   rest of your life, of having these permanent fixtures in your

15   body, that is pain, that is suffering, that is loss of

16   enjoyment of life, it is.  The fact that he can't do the

17   biking, he can't do the jogging, he can't play pickup

18   basketball, the fact that he can't do simple things that most

19   human beings take for granted, taking the steps for better

20   health, the fact that he went from either 230 to 200 to now 180

21   pounds, he's a shell of the man that he used to be.  These are

22   facts.  For Walmart to mock him and say that, well, he could be

23   in the NFL, oh my goodness, that is just -- I don't know how

24   else to explain it.  You mock a man when he's down, you kick

25   him when he's down, that is loss of enjoyment of life.

1           So you can take a year.  What is the value of that

2   year?  What is that worth?  You know what -- you know the value

3   of a dollar through your common sense.  In a year, what is that

4   worth?  What is that worth?  And if you take that and you

5   multiply it a year, what was that worth?  The second year, what

6   is that worth?  The third year, what is that worth, up to the

7   ninth year.  What is the value of this man's life?  Although

8   Walmart wants to diminish him.  We don't know who he is.  Allow

9   me to introduce you to Mr. Peter Pataki, a man who never asked

10  anyone for anything.  A man who was self-sufficient.  He didn't

11  want to have a team of people, his lady transporting him.  He

12  wanted to be a man, take care of himself.  What is that worth?

13  His inability to do the things that made him happy in that

14  one -- first year of 2015, just bear with me please, 2015,

15  2016, 2017, 2018, '19, '20, '21, '22, '23, we are now in '24,

16  we're going into '25.  If you add each one of those years, you

17  know the value of a life.  You heard him testify.  What is the

18  value of each of those years?  I submit to you that you should

19  add them up, year one, plus year two, plus year three, plus

20  year four, plus year five, plus year six, plus year seven, plus

21  year eight, plus year nine, and you get the refrain, the law

22  says he likely has, hopefully he has much -- many more years,

23  but you are allowed the same thing that you did in those first

24  nine years you do in the next 33.2 years, what is that worth?

25  I submit to you that you should have a column and you add each

1    of those years.  What is the value for this man's life?  And

2    that is how, I submit to you, you should come to your

3    conclusion as to what is the value of Mr. Pataki's pain, his

4    suffering, and his loss of enjoyment of life.

5            Look, Mr. Pataki didn't ask for this fight, he didn't.

6    It wasn't his plan to walk into a Walmart and to slip.  Oh,

7    I've fallen and I can't get up.  I'm being funny of course.

8    That wasn't his plan.  The man wanted to get some chicken, go

9    in the aisle, Pathmark saw a condition, they should have

10   cleaned it, they didn't clean it, now they mock him.  I submit

11   to you that's how you should come to your conclusion of loss of

12   enjoyment of life.

13           Now, I am going to conclude.  I want to thank you for

14   being patient with me.  I hope that you were seeing me think as

15   I went on to try to give you the information, just be plain

16   with you, no fancy words, no fancy words.  Walmart had a duty,

17   they breached that duty, now my client is injured, and it's up

18   to you.  Again, this has been ten years, approximately ten

19   years, nine years to bring this to a conclusion.  If I have

20   said anything which is incorrect, use your memory.  If I have

21   said anything that offends you, I apologize.  My goal as an

22   advocate is to make sure that the water does not get muddy,

23   that I present the facts to you in an organized, succinct way

24   that doesn't hide anything, that just gives it to you.  I hope

25   that I've given it to you.  I hope that I've shown my work.  I

 1  ask that for your patience for just a little bit longer because

 2  Mr. Pataki has been waiting for over nine years.  I ask for

 3  your patience once more.  Certainly listen to what I say,

 4  listen to what Mr. McDonnell says, listen to the judge who will

 5  instruct you on the law, and I submit to you that after

 6  listening to all of the facts and all the evidence, you will

 7  reach the only conclusion which is just based upon the law,

 8  based upon the facts that we presented to you, and based upon

 9  your own given common sense, and that is, Walmart, the Goliath,

10  is negligent.  We've proven that to you.  And that my client,

11  Peter Pataki, born October 1975, put some respect to his name,

12  don't just call him we don't know who he is.  He's a man.  I

13  submit to you that the evidence that we have heard is

14  sufficient for you to render a verdict for him based upon the

15  law, the facts and your common sense.

16          Members of the jury, thank you for your time, thank

17  you for your service.  I am going to sit down now.

18          THE COURT:  Thank you, Counsel.  Anything, Counsel, we

19  need to address before we move forward?

20          MR. McDONNELL:  Yes, Your Honor.

21          THE COURT:  Ladies and gentlemen, we have gone a

22  little bit longer than I anticipated.  It's 1:20.  Do you want

23  to break and have your lunch and then come back and charge or

24  do you want me to charge you?  It will probably take me about

25  30 minutes.  You guys talk about it amongst yourselves.  We can

 1    take a 20 or 30-minute break so you can eat.

 2            You want to go right through?  Give me one second to

 3    talk to the lawyers.

 4            Do you want a five-minute comfort break?  Okay.  We

 5    will take a five-minute comfort break.  Don't talk about the

 6    case, don't think about anything yet until I give you the

 7    instructions on the law and that will be the final piece you

 8    need before you can start to deliberate.  Okay?

 9            THE COURTROOM DEPUTY:  All rise.

10            (The jury leaves the courtroom at 1:21 p.m.)

11            THE COURT:  Counsel, what's the issue?

12            MR. McDONNELL:  Your Honor --

13            THE COURT:  Hold on.  There's too much noise.  I can't

14    hear.  I'm sorry.  Go ahead.

15            MR. McDONNELL:  I emailed the proposed curative

16    instructions to counsel and Haley.  We would ask for a curative

17    instruction that there is no future medical bills and he

18    cannot --

19            THE COURT:  That was my concern.  You put a verdict

20    sheet up and you said there is a line for future medical bills.

21    I made a note of it.

22            MR. JEAN:  I am incorrect.  I thought that was the

23    one -- the final one that was presented.

24            THE COURT:  It's not.

25            MR. JEAN:  So I am wrong, I am wrong, I am wrong.

 1   And, in fact, when I caught it, I oofed and I didn't say

 2   anything else.  So whatever curative instruction Mr. McDonnell

 3   requests or the Court believes is appropriate, I agree.  I

 4   agree.

 5            THE COURT:  I will look at the instruction.  I am

 6   going to do two things.  When I go over the verdict sheet, I am

 7   going to stress that this is the correct sheet.  There's always

 8   drafts and no blame on either side but there are drafts and we

 9   made some changes this morning and it was a mistake of all,

10   none of us caught it.  I just want to mention these are the

11   only two lines of which you can give damages.  So that will

12   take care -- I want to specifically reference it when I go over

13   the verdict sheet because he discussed it.

14            Can you send me whatever -- did you get something from

15   Mr. McDonnell, Haley?

16            THE COURTROOM DEPUTY:  Yes.

17            THE COURT:  Let me take a look at it.

18            Any other issues, Mr. McDonnell?

19            MR. McDONNELL:  Yes, Your Honor.  Mr. Jean argued for

20   spoliation and we request the Court charge the jury there has

21   been no spoliation.

22            I would ask for this charge:  Plaintiff has the burden

23   of proof.  There's been no evidence that Walmart hid evidence

24   or witnesses.  You can draw no adverse inference in Walmart not

25   presenting evidence.  As part of this litigation, plaintiff has

1    the opportunity to discover, present any evidence from Walmart

2    that he believes supports his claim.  Plaintiff cannot meet his

3    burden of proof by arguing or suggesting you can draw an

4    adverse inference because Walmart has not presented certain

5    evidence.

6          The other instruction [sic] is, repeatedly David and

7    Goliath, stressing the size of Walmart, the resources of

8    Walmart, the resources of counsel, and I would request a charge

9    that says, I'll instruct you you cannot consider the size and

10   resources of the defendant in the verdict.

11         There was also mention by Mr. Jean --

12         THE COURT:  Let me do one at a time because you are

13   going a little bit too fast.

14         The only thing that you emailed me that I have right

15   now is the spoliation issue and just no future medical bills.

16   So here's what I suggest that we do.  Okay.

17         We resolved the first issue with respect to the

18   medical bills.

19         I am concerned, only because it was mentioned multiple

20   times, and the defendant does not have a burden of proof and

21   you did not ask for an adverse inference charge, and you

22   essentially argued spoliation of evidence and adverse inference

23   charge.  I think he was entitled to reference it.  He said he

24   filled it out.  No one's ever seen it.  That's fair.  I think

25   you went far beyond that.

1          My other concern is when you say, the Walmart manager

2   is here and you didn't hear him testify.  He doesn't have an

3   obligation.  You have equal access to all witnesses.  You could

4   have called him.  In fact, I said, when I precluded your

5   expert, I expect you might want to call an expert and put in

6   the Walmart handbook.  So I think that's my concern.

7          With respect to the resources -- let's just deal with

8   them one at a time.  So I will give the instruction on future

9   medical.  That resolves that.

10         I added in -- where did I add in Walmart -- I took it

11  out as a separate instruction but I added it in about it being

12  a corporation, they get a fair -- where is that?  Does anybody

13  recall where I added it?  Mr. McDonnell, do you recall?

14         MR. McDONNELL:  I know where it was in the original

15  one, Judge, but I have to look --

16         THE COURT:  I'm looking.

17         MR. McDONNELL:  -- at what we got last night.

18         THE COURT:  I gave it in Charge Number 7.  And so I

19  suggest after that first paragraph we heard so -- I would say

20  so you should disregard any argument otherwise, such as

21  references to the resources of a corporation versus an

22  individual.  I think, in general, again, he can say if it was

23  in the context of they have 800 employees that work there on

24  this shift from five to 12 and this sat on the floor for five

25  minutes and they should have seen it, that's different but

1    that's not what you argued.  You argued in general that, you

2    know, I think there is -- there is a place for David and

3    Goliath but I think you -- just as I thought Mr. McDonnell went

4    too far, I think you went dangerously close to suggesting just

5    because Walmart's bigger, I mean, you actually said it, and has

6    more money, that they should have somehow produced more

7    evidence or done something, which is unfairly shifting the

8    burden of proof to the defendant.

9        MR. JEAN:  Your Honor, respectfully, I was merely, on

10   average, weighing what Mr. McDonnell referenced.  He put a

11   burden, which we do have a burden, of Mr. Pataki, he had a cell

12   phone, he didn't take any photographs.  But when we look at the

13   evidence that did come in, my client does say, and I don't

14   think Walmart -- Walmart does not deny that he came into their

15   office and he advised them of the fall and yet we hear -- we

16   don't hear that information.

17       THE COURT:  That is all fine.  I think that is all

18   fine.  You didn't ask for a spoliation charge, you didn't file

19   a spoliation motion.  I have no idea what happened in

20   discovery, if it was asked for, if Walmart said it doesn't

21   exist, if Walmart said he never filled one out, I have no idea.

22   That ship has long sailed in this ten-year-old case or

23   eight-year-old case.

24       So I am going to tell them at the end of Paragraph 1,

25   in Charge Number 7, I'm simply going to emphasize a little bit

1   more what we were already going to tell them, to disregard any

2   argument otherwise such as references to resources of a

3   corporation versus an individual.  That suggests that somehow

4   they have better access to lawyers and, therefore, they have

5   more money and they could have figured out what the plastic

6   was.  You both argued that ad nauseam.  But when you start

7   referring to the resources, that's exactly what we're not

8   supposed to be doing and it's already in the charge.  So all I

9   am going to do is add that sentence.

10          Is that sufficient, Mr. McDonnell?

11          MR. McDONNELL:  For the resources, Your Honor.  But I

12   don't think that alleviates the spoliation because --

13          THE COURT:  I am just dealing with one thing at a

14   time.  So that's that.

15          MR. McDONNELL:  Yes, Your Honor.

16          THE COURT:  Now, with respect to evidence, I would

17   suggest to address that issue it would be added at the end of

18   the charge, Charge Number 3 on Page 4 where I talk about

19   evidence that was struck and they should disregard.  I would

20   suggest I add a paragraph that "Plaintiff has the burden of

21   proof.  There is no evidence that Walmart hid evidence or

22   witnesses.  You can draw no adverse inference from Walmart not

23   presenting evidence as part of this litigation.  Plaintiff had

24   the opportunity to discover and present any evidence from

25   Walmart that he believes supports his claim.  Plaintiff cannot

1    meet his burden of proof by arguing or suggesting you can draw

2    an adverse inference because Walmart has presented certain

3    evidence."  I would just simply suggest to that because he

4    specifically referenced and pointed out Mr. Martinez -- is that

5    your name, I'm sorry, yes -- that everyone has full access to

6    witnesses and you certainly could have called him.  Again, if

7    you are going to comment, I think the rules are very clear, if

8    you're going to comment about someone not calling a witness,

9    you are supposed to ask permission first and get an adverse

10   inference charge.  And I think that it's inappropriate to do it

11   but I will hear you, Mr. Jean.

12            MR. JEAN:  I have nothing to add, only that

13   Mr. McDonnell referenced my client and what evidence he

14   supplied and did not supply.  What is good for Mr. McDonnell is

15   what I was attempting to do by having some balance to talk

16   about -- well, actually, to answer Your Honor's question, the

17   plaintiff has a counterclaim, if I'm not mistaken, in their

18   complaint.  So they have a duty here --

19            THE COURT:  They have a counterclaim?

20            MR. JEAN:  Well, I was reading their defense.  They

21   make certain claims against my client that he didn't use

22   reasonable care and they make a bunch of other claims.  I was

23   just attempting to balance the assertion that the defense was

24   making.  So there is an obligation for them to produce evidence

25   in discovery.  We didn't have any incident report.

```
 1          THE COURT:  Again, I think it's fair for you to
 2  comment generally on the fact that your client testified he
 3  filled out a form and, apparently, there was testimony he went
 4  to an office.  That's all fair.  Where I think you crossed the
 5  line is saying, and they didn't call Mr. Martinez to come up
 6  and tell you about where that incident report is -- I'm
 7  paraphrasing -- and they didn't call him to come up and tell
 8  you X, Y, Z.  I didn't approve of an adverse inference charge
 9  and I would have never allowed it.  I think it's not
10  appropriate.  You were attempting to shift the burden of proof
11  beyond simply mentioning things in general, such as, how many
12  employees were working that night?  Well, you know, we don't
13  know that.  There's been no evidence.  They want to argue that
14  my client's comparatively negligent, in that context, they
15  haven't put on any facts.  My guy is one guy walking through
16  the store.  They have 40 people on this shift or something like
17  that.  That's all fair.  But to say they didn't call someone I
18  think crosses the line.
19          MR. JEAN:  Your Honor, the defense -- the defense
20  mentioned the witnesses that Mr. Pataki failed to call.  You
21  didn't hear about his friends who watch him play tennis or the
22  woman, if I'm not mistaken, if I'm wrong, I'm wrong, but the
23  person who drove him.
24          THE COURT:  Yes.
25          MR. JEAN:  They made commentary about witnesses that
```

1    the plaintiff failed to present.

2         THE COURT:  That goes to your client's credibility.

3    That goes to whether or not your client is credible, that's how

4    I understood that, and whether or not his claims that this

5    occurred and that this was Walmart's fault and he suffered

6    injuries.  The comments were, they haven't called anyone who

7    talked about what he was like before and what he is like now.

8    So we have no information about that nor did Mr. Pataki,

9    himself, tell us about that other than some general

10   information.  And you do have the burden of proof.  So I think

11   that that's the difference.

12        My concern is you suggested that Walmart has a burden

13   of proof; and other than proving comparative negligence, they

14   don't and that's what I am going to tell them.

15        MR. JEAN:  That's fair.

16        THE COURT:  So I am going to add that at the bottom of

17   Page 3.  And when I talk about burden of proof on Charge Number

18   6, I am just going to add that Walmart only has the burden as

19   to comparative negligence.

20        Does that address your issues, Mr. McDonnell?

21        MR. McDONNELL:  Well, Your Honor, he essentially asked

22   to draw an adverse inference.

23        THE COURT:  I'm going to give what you asked me to at

24   the end of Charge 3.

25        MR. McDONNELL:  Okay, great.

1          THE COURT:  What I am saying is I am going to repeat,

2     under Charge 6, Walmart only has the burden as to comparative

3     negligence, to be perfectly clear, and they don't have a burden

4     to show anything else.  And that's consistent with the charges

5     we are already giving.  What else?

6          MR. McDONNELL:  That's satisfactory, Your Honor.

7          The last issue we just raised is Mr. Jean, it's ten

8     years, it suggests that somehow Walmart caused the delay.

9     Maybe just a generic charge that, you know --

10         THE COURT:  I don't think that's necessary.  It's a

11    ten-year-old case.  I don't know why, quite frankly, it's been

12    ten years to try it.  All I know is I got it approximately nine

13    months ago and I've tried my best to try it.  We've had a lot

14    of unfortunate instances.  We are at the end, I am not saying a

15    word about that.

16         MR. McDONNELL:  Your Honor, if I can just take a

17    break.

18         THE COURT:  Take a two-minute break and then I'm going

19    to bring them back because they are not having their lunch.

20         Counsel, I am going to tell them when I add a few

21    things, they are not going to be written in the charge that I

22    give them, but I will add that and read it to them because we

23    don't have time to revise it at the moment.

24         Do you want to put a copy of the charge and the

25    verdict sheet on each chair, please?

1              Off the record.

2              (Off the record discussion.)

3              THE COURTROOM DEPUTY:  All rise.

4              (Brief recess taken from 1:35 p.m. until 1:38 p.m.)

5              THE COURTROOM DEPUTY:  All rise.

6              MR. McDONNELL:  Your Honor, just briefly.  I was

7    leaving the courtroom.  If there could be an amended jury

8    charge with those extra charges, I think it's important the

9    jury see all the charges.

10             THE COURT:  So you want me to tell them now they have

11   to take lunch because I have to go retype it?

12             MR. McDONNELL:  No, Your Honor, maybe we can just

13   either handwrite it or --

14             THE COURT:  They are already copied and on the jury

15   chairs.

16             MR. McDONNELL:  Okay.

17             THE COURT:  I think these are just simple additions.

18   I'm ad libbing.  If you really want me to do that, then I will

19   tell them that they can follow along but we have made some

20   changes.

21             Ms. Dominguez can go up and type it in but then you

22   are both going to have to look at it and tell me you agree with

23   what it says, and they are going to wait longer.

24             I don't think these are huge issues or stray much from

25   what I was already going to tell them; I'm simply emphasizing a

 1  little bit more.

 2          MR. McDONNELL:  I understand, Your Honor.

 3          THE COURT:  But it's your case.  What do you want me

 4  to do?  We are already at 1:39 and I told them that we would be

 5  done by 12:30.

 6          MR. McDONNELL:  Your Honor, can we send them back with

 7  the charge and instructions and say you are just going to send

 8  the other part in within a few minutes?

 9          THE COURT:  I am not sending two instructions.  So you

10  can see the Realtime of what I said I'm going to charge.  So

11  can you go upstairs, type it in, just print those pages out

12  that we made changes to, let them look at it.  You can do it

13  while I am doing the charge.  If they both are in agreement

14  with it, then you can go up and print eight new copies.  Okay?

15          MR. McDONNELL:  Thank you, Your Honor.  I appreciate

16  that.

17          THE COURT:  All right.  Bring them in.

18          Just for the record, the jury instructions, when they

19  are the final, will be marked as C-1 and all the evidence that

20  counsel has moved into evidence is already loaded on the iPads.

21          (Exhibit C-1 was received in evidence.)

22          THE COURT:  Counsel, I prefer if you think I misread

23  something or skip reading something you interrupt me rather

24  than me having to go back because I think that's disjointed for

25  the jury.  So if I skip a sentence, I try not to, or if I read

1    something incorrectly or forgot a word that you think is of

2    consequence, speak up.

3            THE COURTROOM DEPUTY:  All rise.

4            (The jury enters the courtroom at 1:40 p.m.)

5            THE COURT:  Okay.  Please be seated.

6            So we are ready to charge, Mr. Jean?

7            MR. JEAN:  Yes, Your Honor.

8            THE COURT:  Mr. McDonnell?

9            MR. McDONNELL:  Yes, Your Honor.

10           (JURY INSTRUCTIONS BY THE COURT)

11           THE COURT:  Okay.  Ladies and gentlemen, this is the

12   final part of the case before you deliberate.  On your chairs

13   when you came back should be two things:  One is the jury

14   instructions, which I am going to review with you now, and then

15   the smaller few pages is the verdict sheet which I will review

16   with you in terms of how to make your decision.

17           I know your lunch is here.  We have a microwave.  Ms.

18   Minix can assist you with that.  We've gone a little bit

19   longer.  I apologize.

20           I will also tell you, as I go through these jury

21   instructions, just while you were waiting, which happens often

22   when we have closing arguments, the lawyers agreed and I agreed

23   to add certain things, so you will get a new copy before you

24   actually go in the jury room.  We will take that one from you

25   because I have added a few things that you will hear me read.

 1  So if you follow along, I will point that out to you.  Okay?

 2  All right.

 3        These are the jury instructions.  Some of them are

 4  similar to what you heard in the beginning just to remind you,

 5  but I am required to go through and go through all of them.

 6        Charge No. 1:  You've heard the evidence and you will

 7  now be asked to decide what the facts are and then apply those

 8  facts to the law that I will give to you.

 9        You, and only you, are the judges of the facts.  You

10  have to decide what happened and I play no role in judging the

11  facts.  You should not take anything I said or did during the

12  trial as indicating what I think the evidence or what your

13  verdict should be.  My role is to be the judge of the law.  I

14  made whatever legal decisions had to be made during the course

15  of the trial and I will explain to you now the legal principles

16  that must guide your decisions, and you must follow the law as

17  I give it to you whether you agree with it or not.

18        Charge No. 2:  As you saw, during the trial it was

19  necessary for me to talk with the lawyers out of your hearing

20  by having a sidebar conference.  These conferences are

21  necessary for me to fulfill my responsibility, which is to make

22  sure that the evidence is presented correctly to you under the

23  law.

24        I may not always grant a request for a conference and

25  you should not consider me granting or denying any request for

1   a conference, or asking for one on my own, as any indication of

2   my opinion of the case or what your verdict should be.

3          Charge No. 3:  Evidence.

4          As you deliberate, you must consider the evidence that

5   was presented to you in this case.  The evidence from which you

6   are able to find facts consists of the following:

7          1, the testimony of witnesses;

8          2, documents and other things received as exhibits,

9   and they will be loaded on an iPad and given back for you to

10  take to the jury room;

11         3, any facts that are stipulated, that is, formally

12  agreed to by the parties, and we have one stipulation which is

13  the amount of medical bills, which I will discuss later.

14         The following things are not evidence:

15         Statements, arguments or questions of lawyers for the

16  parties in the case;

17         Objections by lawyers;

18         Any testimony that I might have told you to disregard;

19  and.

20         Anything that you may have seen or heard about the

21  case outside the courtroom.

22         You must make your decision based on the evidence that

23  you saw and heard in court.  Do not let rumors, suspicions, or

24  anything else that you have seen or heard outside of the court

25  influence your decision in any way.

1        You should use your common sense in weighing the

2   evidence.  Consider it in light of your everyday experience

3   with people and events and give it whatever weight you believe

4   it deserves.  If your experience tells you that certain

5   evidence reasonably leads to a conclusion, you are free to

6   reach that conclusion.

7        There are rules that control what can be received into

8   evidence.  When a lawyer asks a question or offers an exhibit

9   into evidence, and a lawyer on the other side thinks that it is

10  not permitted by the rules of evidence, the lawyer may object.

11  This simply meant that the lawyer is asking that I make a

12  decision on a particular rule of evidence.  You should not be

13  influenced by the fact that an objection was made.  Objections

14  to questions are not evidence.  Lawyers have an obligation to

15  their clients to make objections when they believe that

16  evidence offered is improper under the rules.  You should not

17  be influenced by the objection or by the Court's ruling on it.

18  If the objection is sustained, you should have ignored the

19  question; and if it's overruled, you treat that answer like any

20  other answer.  If you were instructed that some item of

21  evidence was received for a limited purpose only, then you

22  should have followed whatever the instruction was I gave at the

23  time.

24        Also, certain testimony or other evidence that I may

25  have ordered struck from the record, you were instructed to

1    disregard this evidence.  Do not consider any testimony or

2    other evidence that I struck or was excluded.  Do not speculate

3    about what a witness might have said or what an exhibit might

4    have shown.

5          So this is an area where I am going to add just a few

6    things.

7          We will talk about burden of proof but I want to

8    emphasize to you that the plaintiff has the burden of proof and

9    there was some comment but there's been no evidence that

10   Walmart hid evidence or witnesses in this case, and you should

11   draw no adverse inference from Walmart not presenting evidence.

12   Defendant has a right to not present any evidence.  I told you

13   that during jury selection.

14         As part of this litigation, both parties have the

15   opportunity to discover and present any evidence -- in this

16   case, plaintiff from Walmart and Walmart from plaintiff -- that

17   they believe will support their claim.

18         Plaintiff cannot meet its burden of proof by arguing

19   or suggesting that you draw an adverse inference because

20   Walmart has not presented any evidence.  That is a defendant's

21   right.

22         Charge 4:  Direct and Circumstantial Evidence.

23         There are two types of evidence that you may use in

24   reaching your verdict.  One type is called "direct evidence."

25   An example of direct evidence is when a witness testifies about

1    something the witness knows through their own senses, something

2    the witness has seen, felt, touched, or heard, or did.  If a

3    witness testified that he saw it raining outside, and you

4    believed him, that would be direct evidence that it was

5    raining.  Another form of direct evidence is an exhibit where

6    the fact to be proved is its existence or current condition.

7         The other type of evidence is circumstantial evidence.

8    Circumstantial evidence is proof of one or more facts from

9    which you find another fact or you could find another fact.  If

10   someone walked into the courtroom wearing a raincoat covered

11   with drops of water and carrying a wet umbrella, that would be

12   circumstantial evidence from which you could conclude that it

13   was raining.

14        You should consider both kinds of evidence that was

15   presented to you.  The law makes no distinction in the weight

16   to be given to direct or circumstantial evidence, and you are

17   to decide how much weight to give to any evidence.

18        Number 5:  Credibility of Witnesses.

19        In deciding what the facts are, you may have to decide

20   what testimony you believe and what testimony you do not

21   believe.  You are the sole judges of the credibility of the

22   witnesses.  "Credibility" means whether a witness is worthy of

23   belief.  You maybe believe everything a witness says or only

24   part of it or none of it.  In deciding what to believe, you may

25   consider a number of things, a number of factors, including the

1  following:

2          The opportunity and ability of the witness to see or

3  hear or know the things the witness testifies to;

4          The quality of the witness's understanding and memory;

5          The witness's manner while testifying;

6          Whether the witness has an interest in the outcome of

7  the case or any motive, bias or prejudice;

8          Whether the witness is contradicted by anything the

9  witness said or wrote before trial or by other evidence;

10          How reasonable the witness's testimony is when

11  considered in light of all of the other evidence that you

12  believe; and

13          Any other factors that bear on believability.

14          The weight of the evidence to prove a fact does not

15  necessarily depend on the number of witnesses who testify.

16  What is more important is how believable the witnesses were and

17  how much weight you think their testimony deserves.

18          Number 6:  Preponderance of the Evidence.

19          This is a civil case.  The plaintiff is the party who

20  brought the lawsuit and the defendant is the party against whom

21  the lawsuit was filed.  Plaintiff has the burden of proving his

22  case by what is called the preponderance of the evidence.  That

23  means plaintiff has to prove to you, in light of all the

24  evidence, that what he claims is more likely so than not.

25          To say it differently, if you were to put the evidence

1  favorable to plaintiff and the evidence favorable to defendant

2  on both sides of the scales, plaintiff would have to make the

3  scales tip somewhat on his side.  If plaintiff fails to meet

4  this burden, the verdict must be for the defendant.

5          If you find, after considering all the evidence, that

6  a claim or fact is more likely so than not, then that claim or

7  fact has been proved by a preponderance of the evidence.

8          In determining whether any fact has been proved by a

9  preponderance of the evidence in this case, you may, unless I

10  otherwise instructed, consider the testimony of all witnesses,

11  regardless of who may have called them, and all exhibits

12  received into evidence, regardless of who may produce them.

13          You may have heard the term "proof beyond a reasonable

14  doubt."  That's a stricter standard of proof that applies only

15  to criminal cases.  It does not apply to civil cases such as

16  this and you should put it out of your mind.

17          I also will add, and I wanted to emphasize here, that

18  Walmart only has the burden of proof by the same standard,

19  preponderance of the evidence, as to their claim that Peter

20  Pataki was comparatively negligent.  So when we get to that

21  portion, that's the only time that Walmart has the burden of

22  proof.

23          Charge No. 7:  Number of Witnesses and Fairness to a

24  Corporation.

25          This case should be considered and decided by you as

1   an action between parties of equal standing in the community.

2   A corporation is entitled to the same fair trial at your hands

3   as is a private individual.  Do not let prejudice, bias, or

4   sympathy play any part in your deliberations.  Corporations,

5   like Walmart, and individuals like plaintiff, are equal before

6   the law and must be treated as equals in a court of justice.

7          So you should disregard any argument that may have

8   been made by either of the attorneys differently, such as

9   references to the resources of a corporation versus an

10  individual.  They are treated equally in a court of law.

11         The weight of evidence to prove a fact does not

12  necessarily depend on the number of witnesses who testify.

13  What is more important is how believable the witnesses are and

14  how much weight you think their testimony should receive.

15         Charge No. 8:  Negligence and Ordinary Care.

16         Negligence may be defined as a failure to exercise, in

17  the given circumstances, that degree of care for the safety of

18  others which a person of ordinary prudence would exercise under

19  similar circumstances.  It may be the doing of an act which the

20  ordinary prudent person would not have done or the failure to

21  do that which the ordinary prudent person would have done under

22  the circumstances then existing.

23         Negligence is the failure to use that degree of care,

24  precaution, and vigilance which a reasonably prudent person

25  would use under the same or similar circumstances.  It includes

1  both affirmative acts which a reasonably prudent person would

2  not have done and the omission of acts or precautions which a

3  reasonably prudent person would have done or taken in the

4  circumstances.

5         "A reasonably prudent person" does not mean the most

6  cautious person nor one who is unusually bold but rather one of

7  reasonable vigilance, caution and prudence.  In order to

8  establish negligence, it is not necessary that it be shown that

9  the defendant had an evil heart or an intent to do harm.

10        To summarize, every person is required to exercise the

11 foresight, prudence, and caution which a reasonably prudent

12 person would exercise under the same or similar circumstances.

13 Negligence then is a departure from that standard of care.

14        Charge No. 9:  Foreseeability.

15        In determining whether reasonable care has been

16 exercised, you will consider whether the defendant ought to

17 have foreseen, under the attending circumstances, that the

18 natural and probable consequence of the defendant's act or

19 omission to act would have been some injury.  It is not

20 necessary that the defendant anticipated the very occurrence

21 which resulted from the defendant's wrongdoing.  But it is

22 sufficient that it was within the realm of foreseeability that

23 some harm might occur thereby.  The test is the probable and

24 foreseeable consequences that may reasonably be anticipated

25 from the performance or the failure to perform a particular

1    act.  If an ordinary person under similar circumstances, by the

2    use of ordinary care, could have foreseen the result that some

3    injury or damage would probably result, and either would not

4    have acted or if the person did act would have taken precaution

5    to avoid the result, then the performance of the act or the

6    failure to take such precautions would constitute negligence.

7         Specifically as to this case, Charge No. 10:  Invitee.

8         An invitee is one who is invited or permitted to enter

9    or remain on a premises for a purpose of the occupier.  In this

10   case, the invitee would be Mr. Pataki and the occupier of the

11   premises would be Walmart, the Walmart store.  The invitee, Mr.

12   Pataki, enters by invitation expressed or implied.  The

13   occupier of the premises, Walmart, who by invitation, expressed

14   or implied, induced persons to come upon the premises, is under

15   a duty to exercise ordinary care to render the premises

16   reasonably safe for the purposes embraced in the invitation.

17   Thus, the occupier must exercise reasonable care for the

18   invitee's safety.  The occupier must take such steps as are

19   reasonable and prudent to correct or give warning of hazardous

20   conditions or defects actually known to the occupier or its

21   employees and of hazardous conditions or defects which the

22   occupier or its employees, by the exercise of reasonable care,

23   could discover.

24        The basic duty of a proprietor of premises to which

25   the public is invited for business purposes of the proprietor

1    is to exercise reasonable care to see that one who enters the

2    premises upon that invitation has a reasonably safe place to do

3    that which is within the scope of the invitation.

4            Charge 11:  Duty.

5            The duty of the occupier of a premises to make the

6    place reasonably safe for the proper use of an invitee requires

7    the occupier to make reasonable inspection of the premises to

8    discover hazardous conditions.

9            Number 12:  Duty of a Retail Store.

10           One who owns or operates a business establishment,

11   such as a supermarket, and invites members of the public to

12   enter for business purposes, has a duty to exercise reasonable

13   care for the safety of its customers.  That duty includes the

14   duty to use reasonable care to see to it that the premises are

15   in reasonably safe condition for use of its customers.

16           If you find that the premises was not in a reasonably

17   safe condition because of the failure to exercise such care,

18   that is, subjected the customer to an unreasonable risk of

19   harm, and defendant did not exercise reasonable care, then the

20   defendant was negligent.

21           On the other hand, if you find that the condition of

22   the premises was reasonably safe, that is, did not subject the

23   customer to an unreasonable risk of harm, then the defendant

24   was not negligent.

25           Number 13:  Notice of Particular Danger as Condition

1    of Liability.

2         If you find that the premises was not in a reasonably

3    safe condition, then in order to recover, the plaintiff must

4    show either:

5         A, actual notice for a period of time before

6    plaintiff's injury to permit the occupier in the exercise of

7    reasonable care to have corrected it; or

8         B, constructive notice.

9         When the term "actual notice" is used, we mean that

10   the occupier or its employees actually knew about the unsafe

11   condition.  When the term "constructive notice" is used, we

12   mean that the particular condition existed for such a period of

13   time that an occupier of the premises, in the exercise of

14   reasonable care, should have discovered its existence.  That is

15   to say, constructive notice means that the person having a duty

16   of care to another is deemed to have notice of unsafe

17   conditions which exist for such a period of time that a person

18   of reasonable diligence would have discovered them.

19        Number 14:  Proximate Cause.

20        If you find Walmart was negligent, you must find that

21   Walmart's negligence was a proximate cause of the accident

22   before you can find that Walmart was responsible for

23   plaintiff's claimed injuries and losses.  It is the duty of the

24   plaintiff to establish by the preponderance of the evidence

25   that the negligence of Walmart was a proximate cause of the

1   accident and of the injuries and losses allegedly to have

2   resulted from Walmart's negligence.

3        The basic question for you to resolve is whether

4   plaintiff's injury is so connected with the negligent actions

5   or inactions of Walmart that you decide it is reasonable, in

6   accordance with the instructions that I will give you now, that

7   Walmart should be held wholly or partially responsible for the

8   injury and losses incurred by the plaintiff.

9        Number 15:  More Proximate Cause.

10        By proximate cause, I refer to a cause that in a

11   natural and continuous sequence produces the accident and the

12   resulting injury and losses without which the resulting

13   accident or injuries and losses would not have occurred.  A

14   person who is negligent is held responsible for any accident or

15   injuries or losses that results in the ordinary course of

16   events from its negligence.  This means that you must find that

17   the resulting accident or injuries or losses to plaintiff would

18   not have occurred but for the negligent conduct of Walmart.

19        If you find that but for Walmart's negligence the

20   accident or injury and losses would not have occurred, then you

21   should find that Walmart was a proximate cause of plaintiff's

22   injury and losses.

23        Charge No. 16:  Comparative Fault.

24        Because Defendant Walmart has charged the Plaintiff

25   Peter Pataki with negligence, Walmart has the burden to

1    prove -- and this is the only time Walmart has the burden --

2    that the plaintiff was negligent and that such negligence was a

3    proximate cause of the accident.  Defendant also must prove his

4    charge by a preponderance of the evidence or greater weight of

5    the credible evidence.

6         If you find that the plaintiff and Walmart were both

7    negligent and proximately caused the accident, then you must

8    compare the negligent conduct of the plaintiff and Walmart in

9    terms of percentages.  You will attribute to each of them that

10   percentage that you find describes or measures their negligent

11   contribution in proximately causing the accident.  The

12   percentages must add up to a hundred.  That might seem silly

13   that I tell you but sometimes I get crazy verdicts back and it

14   doesn't add up to a hundred.  It has to add up to a hundred.

15   You should not allocate any percentage to any individual or

16   entity who you have found was not both negligent and a

17   proximate cause of the accident.

18        So I will explain to you, though, the effect of the

19   percentages if you choose to do this.

20        In order for the plaintiff to recover against any

21   defendant, plaintiff's percentage of fault must be 50 percent

22   or less.  If the plaintiff's percentage is more than 50

23   percent, the plaintiff will not recover damages at all and your

24   deliberations are concluded and you should not make any

25   determination as to damages.  A plaintiff whose percentage of

1    fault is 50 percent or less will recover from any defendant

2    whose fault you have found was a proximate cause of the

3    accident.

4         Charge No. 17:  Damages.

5         I will now instruct you on the law governing damages

6    in the event that you decide liability in favor of the

7    plaintiff.

8         The fact that I instruct you on damages should not be

9    considered as suggesting any view of mine about which party is

10   entitled to prevail in the case.  Instructions on damages are

11   given for your guidance in the event that you find the

12   plaintiff is entitled to a verdict.  I am required to provide

13   instructions on damages in all cases in which the trial

14   includes a claim for damages.

15        Charge No. 18:  Medical Expenses.

16        A plaintiff who is awarded a verdict is entitled to

17   payment for medical expenses which were reasonably required for

18   the examination, treatment, and care of injuries proximately

19   caused by the defendant's negligence or other wrongdoing.

20        Medical expenses are the costs of doctors' services,

21   hospital services, medicines, medical supplies, and medical

22   tests, any other charges for medical services.

23        In this case, the plaintiff is seeking the sum of

24   $38,500 in medical expenses.  The parties have agreed that that

25   amount -- I left out a word.  The parties have agreed to that

1  amount of medical bills that plaintiff alleges he incurred as a

2  result of this accident.  And the total again is 38,500.  You

3  must, therefore, treat this fact as having been proved for

4  purposes of the case.  So, in other words, the parties have

5  stipulated, as I explained to you earlier, as to the amount of

6  the medical bills, solely as to the amount.

7         As a result, the upper limit of the award which you

8  may make for medical expenses is 38,500, since you may not

9  award more than the plaintiff is seeking or the parties have

10 stipulated.

11        Charge 19:  Disability, Impairment and Loss of

12 Enjoyment of Life, Pain and Suffering.

13        If you find for plaintiff, he is entitled to recover

14 fair and reasonable compensation for the full extent of harm

15 and losses caused, no more and no less.

16        Fair and reasonable compensation means to make the

17 plaintiff whole for any permanent or temporary injury and the

18 consequences of that injury caused by the defendant's

19 negligence.

20        The law on compensation recognizes that a plaintiff

21 may recover for any disability or impairment that he suffers as

22 a result of his injuries.  Disability or impairment means

23 worsening, weakening, or loss of faculties, health, or ability

24 to participate in activities.  The law also permits a plaintiff

25 to recover for the loss of enjoyment of life, which means the

1    inability to pursue one's normal pleasure and enjoyment.  You

2    must determine how the injury has deprived plaintiff of his

3    customary activities as a whole person.  This measure of

4    compensation is what a reasonable person would consider to be

5    adequate and just under all the circumstances of the case to

6    make the plaintiff whole for his injury and his consequent

7    disability, impairment, and the loss of enjoyment of life.  The

8    law also recognizes as proper items for recovery the pain,

9    physical and mental suffering, discomfort and distress that a

10   person may endure as a natural consequence of an jury.  Again,

11   the item of recovery is what a reasonable person would consider

12   to be adequate and just under all the circumstances to

13   compensate the plaintiff.

14         Here are some factors you may want to consider or take

15   into account when fixing the amount of the verdict for

16   disability, impairment, loss of enjoyment of life, and pain and

17   suffering.

18         You may consider the plaintiff's age, usual

19   activities, occupation, family responsibilities, and similar

20   relevant facts in evaluating the probable consequences of any

21   injuries you find he has suffered.  You are to consider the

22   nature, character and seriousness of any injury, discomfort, or

23   disfigurement.  You must also consider their duration, as any

24   verdict you make must cover the harms and losses suffered by

25   the plaintiff since the accident to the present time and even

1   into the future, if you find plaintiff's injury and its

2   consequences have continued to the present time or can

3   reasonably be expected to continue into the future.

4          The law does not provide you with any table, schedule

5   or formula by which a person's pain and suffering, disability,

6   impairment, and loss of enjoyment of life may be measured in

7   terms of money.  That amount is left to your sound discretion.

8   You are to use your sound discretion to attempt to make the

9   plaintiff whole so far as money can do so based upon reason and

10  sound judgment, without any passion, prejudice, bias, or

11  sympathy.  You each know from your common experience the nature

12  of pain and suffering, disability, impairment, and loss of

13  enjoyment of life, and you also know the nature and function of

14  money.  The task of equating the two so as to arrive at a fair

15  and reasonable award of compensation requires a high order of

16  human judgment.  For this reason, the law can provide no better

17  yardstick for your guidance other than your own impartial

18  judgment and experience.

19         You are to exercise sound judgment as to what is fair,

20  just, and reasonable under all the circumstances.  You should,

21  of course, consider the testimony of the plaintiff on the

22  subject of discomfort.  You should also scrutinize all the

23  other evidence presented by both parties on this subject,

24  including the testimony of doctors.

25         After considering the evidence, you shall award a lump

1    sum that will fairly and reasonably compensate the plaintiff

2    for his pain and suffering, disability, impairment, and loss of

3    enjoyment of life proximately caused by defendant's negligence.

4         Charge 20:  Life Expectancy.

5         If you make an award for future pain and suffering,

6    disability, and impairment, loss of enjoyment of life -- and

7    there is no future claim for medical expenses, so when I go

8    over the sheet, the verdict sheet, you will see there is no

9    line for that -- you may consider the plaintiff's life

10   expectancy.  Plaintiff's life expectancy today is 33.2 years.

11   That is an estimation of his probable length of life based on

12   statistical data.  Since it is a general estimate, you should

13   use it with caution in any individual case.  The plaintiff may

14   live a longer or shorter period of time than the estimated

15   figure.  You should exercise your sound judgement in applying

16   this life expectancy figure without treating it as a necessary

17   and fixed rule.

18        Charge 21:  Time Unit.

19        As I indicated right before closings, counsel is

20   permitted to argue to the jury the appropriateness of applying

21   a time-unit calculation in determining damages for pain and

22   suffering, disability, impairment, and loss of enjoyment of

23   life.  Counsel are not permitted to mention specific amounts of

24   money for the calculation of such damages.  They are permitted,

25   however, to argue that you may employ a time-unit calculation,

1    that is, to consider an amount of money in relation to the

2    amount of time when determining such damages.

3        I charge you, the jury, that the argument of counsel

4    with reference to the calculation of damages on a time-unit

5    basis is argument only and is not to be considered by you as

6    evidence.  Counsel's statements are merely a suggestion to you

7    as to how you might determine the damages for pain and

8    suffering, disability, impairment, and loss of enjoyment of

9    life.  You are free to accept or reject the argument as you

10    deem appropriate, and I remind you that you are to make a

11    determination on the amount of damages based on the evidence

12    presented and the instructions I have given to you.

13        Charge 22:  Tax Consequences.

14        A personal injury damage award is not subject to

15    federal or state income tax.  Therefore, if you decide to award

16    the plaintiff damages for his personal injury, you should not

17    add nor subtract any tax from fixing the amount.

18        Charge 23:  Expert Testimony.

19        You have heard testimony containing opinions from

20    Dr. Vizzone, Brooks, and DeFalco.  In weighing this opinion

21    testimony, you may consider their qualifications, their reasons

22    for their opinions, and the reliability of the information

23    supporting those opinions, as well as the factors I've

24    previously mentioned for weighing the testimony of any other

25    witness.  The opinion of these witnesses should receive

1  whatever weight and credit, if any, you think appropriate,

2  given all of the other evidence in the case.  In deciding

3  whether to accept or rely on the opinion of these witnesses,

4  you may consider any bias that these witnesses may have,

5  including any bias that may arise from evidence that these

6  witnesses have been or will be paid for reviewing the case and

7  testifying or evidence that these witnesses regularly testify

8  and make a large portion of their income from testifying in

9  court.

10        Now we are going to talk about deliberations.  This is

11  a procedural logistic charge.  Okay?  24.

12        When you retire to the jury room to deliberate, you

13  will take with you the revised copy of these instructions and

14  the exhibits which the Court has admitted into evidence, which

15  will be on the iPads, and you should select one member of the

16  jury to be your foreperson.  So that's for you all to decide.

17  That person will preside over deliberations and speak for you

18  here in open court.  So when we first started I told you two of

19  you would be alternates.  I always prefer, and in this case the

20  parties have agreed, when you all sit for three days or four

21  days or however long you are, to have all the jurors deliberate

22  and the parties have agreed to do that.  So all eight of you

23  will deliberate in this case.  Okay?

24        You have two main duties as jurors.  The first one is

25  to decide what the facts are from the evidence that you saw and

1    heard here in court.  Deciding what the facts are is your job,

2    not mine, and nothing that I have said or done during this

3    trial was meant to influence your decision about the facts in

4    any way.

5         Your second duty is to take the law that I give to

6    you, apply it to the facts and decide if, under the appropriate

7    burden of proof, the parties have established their claims.  It

8    is my job to instruct you about the law and you are bound by

9    the oath that you took at the beginning of the trial to follow

10   the instructions that I give to you even if you personally

11   disagree with them.  This includes the instructions I gave to

12   you before and during the trial and these instructions now.

13   All of the instructions are important and you should consider

14   them together.

15        Perform these duties fairly.  Do not let any sympathy,

16   bias, or prejudice that you may feel toward one side or the

17   other influence your decision in any way.

18        As jurors, you have a duty to consult with each other

19   and deliberate with the intention of reaching a verdict.  Each

20   of you must decide the case for yourself but only after full

21   and fair impartial consideration of all the evidence with your

22   fellow jurors.  Listen to each other carefully.  In the course

23   of your deliberations, you should feel free to re-examine your

24   own views or to change your opinion based upon the evidence,

25   but you should not give up your honest convictions about the

1  evidence just because of the opinions of some of your fellow

2  jurors, nor should you change your mind just for purposes of

3  obtaining enough votes for a verdict.  And in this case your

4  verdict has to be unanimous.  So you all must agree on a

5  verdict.  You will see on the verdict form there is a line for

6  a vote.  It must say 8-0 for you to have a verdict.

7       When you start deliberating, do not talk to the jury

8  officer, Ms. Minix, who is going to assist you logistically, to

9  me or anyone else but each other about the case.  During

10  deliberations, you must not communicate with or provide any

11  information to anyone by any means about the case.  You may not

12  use any electronic device or media, such as a cell phone, other

13  than the iPad, other than that which we give you, or computer

14  of any kind, the internet or any internet service or text or

15  instant messaging like Twitter or any chat room, blog, website

16  or social networking service, such as Facebook, My Space,

17  LinkedIn, You Tube, et cetera, to communicate to anyone any

18  information about the case or conduct any research and that

19  rule applies until I take your verdict in open court.

20       You may not use these electronic means to investigate

21  or communicate about the case because it is important, as I've

22  told you over and over, that you decide the case based solely

23  on the evidence presented in the courtroom.  Information on the

24  internet or through social media could be wrong, incomplete, or

25  inaccurate, and information you might see on the internet or

 1  social media has not been admitted into evidence and the

 2  parties have not had a chance to discuss it with you.  You

 3  should not seek or obtain such information and it must not

 4  influence your decision in this case.

 5       If you have any questions or messages for me, you must

 6  write them down on a piece of paper, have the foreperson sign

 7  them, and give them to the jury officer who will be outside the

 8  jury room.  The officer will give the questions to me and I

 9  will respond as soon as I can.  I may have to talk to the

10  lawyers about what you have asked, so it may take some time to

11  get back to you.

12       One more thing about messages.  If you ask a question,

13  never write down or tell anyone where you stand on your votes.

14  For example, do not write down or tell anyone that a certain

15  number is voting one way or another.  Your votes should stay

16  secret until you are finished.

17       Your verdict must represent the considered judgment of

18  each juror and in order to return a verdict and reach a

19  verdict, each juror must agree to the verdict.  Your verdict

20  must be unanimous.

21       A form of verdict sheet has been prepared for you.

22  It's a series of questions for you to answer.  You will take it

23  into the jury room.  And I will give you each a questionnaire

24  so you can fill out or you can follow along but only one of the

25  forms should be filled out, and that will be the one that the

1    foreperson has and signs.  Okay?  The others are for you to

2    follow.

3         You will take the form to the jury room and when you

4    have reached unanimous agreement as to the verdict, you will

5    fill it in and the foreperson will date and sign one form.  You

6    will then return to the courtroom and your foreperson will give

7    the verdict in open court.  Unless I direct you otherwise, do

8    not reveal your answers until I discharge you as jurors.  After

9    you reach a verdict, you are not required to talk to anyone

10   about the case unless I order you to do so.

11        Once again, I want to remind you that nothing about my

12   instructions and nothing about the verdict form is intended to

13   suggest or convey in any way or manner what I think your

14   verdict should be.  It is your sole and exclusive duty to

15   determine what the verdict should be.

16        So if you can look at the verdict sheet, I will go

17   over it with you.  And it's important that you answer the

18   questions in order because they are in order for a particular

19   way with directions as to what to do depending upon whether you

20   answer yes or no.

21        Question No. 1:  Do you find the Plaintiff Peter

22   Pataki has proven by a preponderance of the evidence that

23   Defendant Walmart was negligent on June 7, 2015?

24        You will check yes or no and the vote, which again

25   should be eight to zero.

1    If your answer to Question No. 1 is no, then you don't

2    answer any further questions.  You sign the verdict sheet,

3    return to the courtroom.  But if your answer is yes, then you

4    will proceed to Question 2.

5    Do you find that the Plaintiff Peter Pataki has proven

6    by a preponderance of the evidence that Walmart's negligence

7    was a proximate cause of harm to the plaintiff?

8    If your answer is no, you will answer no further

9    questions; and if it's yes, you will proceed to Question 3.

10    Question 3:  Do you find that the Defendant Walmart

11    has proven by a preponderance of the evidence that Plaintiff

12    Peter Pataki was negligent?

13    Same thing.  If you answer no, you're told to skip to

14    Question 6.  If you answer yes, you will proceed to Question 4.

15    So it's important that you follow the steps in the order that

16    we have them.

17    Question 4:  Do you find that Defendant Walmart has

18    proven by a preponderance of the evidence that Plaintiff Peter

19    Pataki's negligence was a proximate cause of the harm to the

20    plaintiff?

21    If your answer is no, you will skip to Question 6; and

22    if it's yes, you will proceed to Question 5.

23    Taking the combined negligence that was a proximate

24    cause of any harm to the plaintiff as 100 percent, what

25    percentage of that causal negligence was attributable to each

1    of the parties that you have found causally negligent?

2           And there is a line for Mr. Pataki and a line for

3    Walmart and we've already put the 100 percent in there to make

4    sure you remember and a vote line.

5           If you find the plaintiff's causal negligence to be

6    greater than 50 percent, then do not answer any further

7    questions.  Sign the verdict sheet and return it.

8           If you find the causal negligence was 50 percent or

9    lower, you go to Question 6, which is the final question.

10          State the amount of damages, if any, that would

11   reasonably and fairly compensation Peter Pataki for any

12   injuries that were proximately caused by the incident.

13          1, pain, suffering, disability, impairment, and loss

14   of enjoyment of life.

15          And, separately, past medical expenses, which, as I

16   said, the parties have stipulated in the event you determine to

17   award them, what the amount is.

18          I just want to reference, we spent an inordinate

19   amount of time trying to get the instructions and the verdict

20   sheets right and we have had multiple versions.  I want to make

21   sure I just emphasize one of the lawyers referenced future

22   medical expenses.  There is no claim for future medical

23   expenses.  So the only medical expenses you can award are the

24   past and only in the amount the parties stipulate, if you

25   choose to make that award.  Okay?

1          Again, you need to indicate your vote for damages.

2  You all need to agree on a damages number.  It has to be

3  unanimous.

4          And then if you are finished at whatever question you

5  finish, this last page needs to be signed by the jury

6  foreperson.  I ask you to put your name and then print your

7  name.  So sign it and print your name and date it.  Okay?

8          So that is the procedure we will follow.

9          Counsel, any objections or exceptions to the charge or

10  the verdict sheet?

11          MR. JEAN:  None.

12          THE COURT:  Mr. McDonnell?

13          MR. McDONNELL:  None, Your Honor.

14          THE COURT:  So at this time, ladies and gentlemen, I

15  will finally let you have your lunch break.  Again, I apologize

16  but I like to give you the choice of plowing through or taking

17  a break.

18          Ms. Minix will take you back to the jury room.  She

19  can assist you with heating anything up that you want to do.

20  And then we will bring back the iPads and we will give you the

21  final copies of these two.  So for now, you can take -- they

22  are in the jury room already.  So leave what you have on your

23  chair, okay, or on the ledge, and there is a clean copy of

24  revised jury instructions and the clean verdict sheet in the

25  jury room.  Just take your verdict sheet.  Okay?  So take your

1    iPad and take your verdict sheet.  And there are corrected

2    instructions in there for you.  Okay?  If at any time you need

3    anything, you can simply ask Ms. Minix and she will communicate

4    with me, okay, but in writing.

5         THE COURTROOM DEPUTY:  Please raise your right hand.

6         Do you solely swear to keep this jury together in some

7    private and convenient place and not to permit any person to

8    speak to or communicate with them nor to do so yourself unless

9    by order of the Court or to ask whether they have agreed on a

10   verdict and to return them into court when they have agreed or

11   when ordered by the Court so help you God?

12        COURT SECURITY OFFICER SALVATORE PAPA:  I do.

13        THE COURT:  Thank you, ladies and gentlemen.  We will

14   wait to hear from you.

15        (The jury leaves the courtroom at 2:24 p.m. to

16   deliberate.)

17        THE COURT:  On the record.

18        Before we do motions or anything, we need to take a

19   break because I have been going since 8:30 and I took no break

20   between my order to show cause and starting.  So I want to take

21   at least a half-hour lunch.  If by some reason the jury comes

22   back in a half an hour, I doubt it, but if they do, we will

23   talk about the motions after.  You've reserved your rights to

24   make the motions.  Okay?  I just think we all need a break.

25   And my court reporter is entitled to a break too.

1          Just so the record's clear, Ms. Dominguez gave you the

2    revised portions and you were all in agreement with that before

3    they were given back to the jury?

4          MR. JEAN:  Yes.

5          MR. McDONNELL:  Yes, Your Honor.

6          THE COURT:  I did not personally review them.  I asked

7    her to do that to be as efficient as possible and get it back

8    to them.

9          I just realized that there is one thing I did not do,

10   which is I did not talk to them about the MRIs and the doubles.

11   I hesitate to bring them back out here.  I can do that if you

12   want to.  My suggestion would be simply on my way out tell them

13   I forgot to give them this charge and this is how the evidence

14   is coming back, consistent with what we discussed, that they

15   are duplicates but they are marked Ds and Ps.

16         Does anyone have any objection to me doing that as

17   opposed to bringing them back in open court?

18         MR. JEAN:  None.  I just want to -- I don't know, the

19   exhibits that I have are they identical?  For example, the

20   cervical screws, I don't know whether -- I called them by P

21   exhibit so they are not all identical.

22         THE COURT:  I am going to say some of them may be

23   duplicative but it's because of the way the parties

24   individually marked them at the time of the depositions.  I

25   know they are not all duplicative.  So that is what I intended

1  to tell them.  Is that okay?

2          MR. JEAN:  That's fine, so long as they look at

3  everything.

4          THE COURT:  Mr. McDonnell?

5          MR. McDONNELL:  No objection.

6          THE COURT:  Okay.  So I will tell them that rather

7  than traipsing them back out here.  We will recess and if I

8  hear from them with a verdict or a question, I will hear from

9  you.  Please make sure if you are going to go further than the

10 hallway you give Ms. Minix your cell phone number so that she

11 can reach you so if we have a verdict, I can come out and do it

12 timely.  Okay?

13         I will come back at 3:00, if nothing else happens

14 before then, and we will address your motions.  Okay?

15         THE COURTROOM DEPUTY:  All rise.

16         (Brief recess taken from 2:27 p.m. until 3:22 p.m.)

17         THE COURT:  So we are back on the record.

18         The jury is deliberating.

19         I did give them the instruction about the MRIs that we

20 talked about just before they started deliberating.  And I

21 wanted to take the time, while they are doing that, to hear you

22 on your motions.

23         So, Mr. McDonnell, I understand and I reserved your

24 right to make a motion.

25         MR. McDONNELL:  Yes, Your Honor.  We'd make a motion

1    under Rule 50 of the Federal Rules of Civil Procedure for

2    judgment as a matter of law.

3         Based upon the evidence that's been elicited -- I'm

4    sorry, Camille, I'll slow down.

5         Based upon the evidence that was introduced at trial,

6    no reasonable juror could determine that there was an

7    unreasonable risk of harm since the plastic or item which

8    Mr. Pataki allegedly slipped upon was not described in any way,

9    fashion, or given any kind of properties that would suggest

10   that it was hazardous or even that he fell on it.  There was no

11   evidence that that condition, whatever it was, was on property

12   long enough for Walmart to either have actual or constructive

13   notice.  There was no evidence of actual notice outright and

14   there is no evidence as to how long whatever condition it was,

15   if any, that caused Mr. Pataki to fall was on the floor.

16        THE COURT:  We know it was at least four minutes,

17   right?

18        MR. McDONNELL:  That's the plaintiff's allegations but

19   it's --

20        THE COURT:  Well, I mean, it's on the video so we at

21   least have four minutes of video that show something allegedly

22   on the floor, right?  So if a jury was to believe the

23   plaintiff's testimony that there was something on the floor,

24   which Ms. Gardner appeared to corroborate, at worst for you or

25   at best for plaintiff, it was four minutes.  Isn't that for a

1  jury to decide whether or not that's a reasonable amount of

2  time?  You think, as a matter of law, I can decide that?

3          MR. McDONNELL:  Yes, I don't think four minutes,

4  Your Honor -- even assuming it was four minutes, and, again, we

5  don't really know what it was or even if that glare spot on the

6  floor did cause the fall because it didn't move after he fell

7  through it, even assuming arguendo, though, that that was the

8  spot, I don't believe four minutes is sufficient to hold a

9  retailer as to have constructive notice of a condition.

10          THE COURT:  What about actual notice that there is a

11  video that undoubtedly shows at least one or I think two

12  employees pushing a very large cart in the very direction of

13  where the plastic was on the floor?  I think they could argue

14  that there is sufficient evidence from which a jury could find

15  actual notice because those employees -- it was looking them in

16  the face.  I am not saying I find it credible, but I am saying

17  that argument has certainly been made.  It seems to me to be a

18  jury question, at least at this point, because I do think,

19  although I think it's not substantial, there is some evidence

20  in the record on the video, and it's not just plaintiff's

21  saying it, that there were employees in the area within minutes

22  of him falling, right?

23          MR. McDONNELL:  I understand, Your Honor.

24          Just moving on.

25          THE COURT:  Okay.

 1          MR. McDONNELL:  We're going to move for a matter of

 2   law on the issue of proximate cause of the injury.  There is no

 3   causation.  Dr. Vizzone said that his basis of causation was he

 4   didn't have these problems before and now he claims he has

 5   these problems.

 6          So other than the plaintiff, there is no basis for any

 7   kind of finding to a reasonable degree of medical certainty

 8   that the findings that were discussed or that the surgeries are

 9   related to the fall.

10          I can -- I'm sorry.  Your Honor, I think we made it

11   previously in the context of a jury instruction.  We don't

12   believe that Dr. Vizzone provided any evidence from which a

13   reasonable juror could decide anything with respect to

14   prognosis or future pain and suffering.  There was no testimony

15   he was disabled, that he was impaired.

16          So, Your Honor, we would say that, as a matter of law,

17   Walmart is not responsible for any sort of kind of claim for

18   any sort of future disability, impairment, loss of enjoyment of

19   life.  There was no evidence as to his current medical status

20   or prognosis.

21          Your Honor, further we would argue that he was

22   comparatively negligent, as a matter of law, which is assuming

23   arguendo that this object was visible to those gentlemen from

24   Walmart pushing it from further away, they turned up the aisle

25   closer to Mr. Pataki at the time of the accident and that

 1    Mr. Pataki failed to exercise due care for his safety and was

 2    comparatively negligent, as a matter of law.

 3              I will just ask my partner, is that it?

 4              Your Honor, that would be our motion.

 5              THE COURT:  Mr. Jean, I will hear you.

 6              MR. JEAN:  Your Honor, if I may be heard.  The

 7    evidence supports the issue of proximate cause.  Dr. Vizzone,

 8    who is the treating doctor and the only doctor provided by the

 9    plaintiff during this trial, established, and I did this and I

10    recall raising my fingers one, two, three to illustrate the

11    point that there were many things that he used in formulating

12    his opinion which he said within a reasonable degree of

13    certainty in the field of orthopedic surgery.  He concluded

14    that, one, it was causally related; and, two, it was a

15    permanent injury.

16              The objective -- the credible objective evidence that

17    he used was, number one, he had an X-ray; number two, he had at

18    least 50 exams where he conducted objective tests on the

19    plaintiff; number 3, there were MRI films that he used.  In

20    addition, he saw the herniated disc up close when he did the

21    actual surgery.

22              So based upon those credible objective evidence that

23    supports the issue of proximate cause, the motion by the

24    defendant should be denied.

25              THE COURT:  So I am going to reserve on the issue.  I

1    will say that I do not believe, as a matter of law, that I

2    could -- partially I am going to reserve.  I do not believe, as

3    a matter of law, that I can decide whether or not a jury could

4    find an unreasonable risk.  I think no one disputes that

5    something is on the floor and there's been disputed testimony,

6    at least one person described it as a Ziploc bag, plaintiff

7    described it as some kind of plastic.  That's a jury question

8    to me.  It's not as if we have no one knows what he slipped on,

9    he just fell.

10            With respect to whether it was actual or constructive

11    notice, the video undisputedly shows it on the floor for a

12    period of time.  A jury could decide from that alone that it

13    was unreasonable.

14            (Brief interruption.)

15            THE COURT:  A jury could decide from that alone that

16    it was unreasonable.  And there is also evidence on the video

17    of employees in or around the area, and I think a jury could

18    make the inference or the determination within reason that the

19    employees could have or should have seen it.  So for that

20    reason certainly on that prong of it.

21            As to proximate cause, I think the combination of

22    Dr. Vizzone saying it was permanent, coupled with the plaintiff

23    giving testimony as to what he can no longer do, provides some

24    basis for the jury to make determinations about future issues,

25    although, admittedly, Dr. Vizzone didn't give an opinion on

1 prognosis or future medical care.  But they are not giving an

2 award under any circumstances for future medical bills.  So I

3 am not as concerned about that.

4          So for that reason, I am going to deny it, as I said,

5 and reserve as to the other argument that you made.  Okay?

6          So do you want to see what the CSO wants?  Is he

7 asking for me or is he saying he has a note?

8          THE COURTROOM DEPUTY:  We have a verdict.

9          THE COURT:  Bring them in.

10          THE COURTROOM DEPUTY:  All rise.

11          (The jury enters the courtroom at 3:30 p.m.)

12          THE COURT:  You can all be seated.

13          I have been advised that you have reached a verdict,

14 is that correct?

15          Who is the jury foreperson?

16          Ms. Minix, can you get the form from the juror,

17 please?  It's Juror No. 7.

18          Can you please hand it back to the foreperson?

19          Sir, I am going to ask you to stand and I will read

20 the questions and if you could tell me the jury's verdict.

21          Question No. 1:  Do you find that the Plaintiff Peter

22 Pataki has proven by a preponderance of the evidence that

23 Defendant Walmart was negligent on June 7, 2015?

24          THE FOREPERSON:  No, Your Honor.

25          THE COURT:  And what was your vote?

```
 1          THE FOREPERSON:  Eight to zero.

 2          THE COURT:  And you did not consider any further

 3  questions, correct?

 4          THE FOREPERSON:  No.

 5          THE COURT:  Okay.  You can be seated, sir.

 6          One of the things I do is I poll the jury.  So I am

 7  going to ask each of you, when I call your juror number, to

 8  just simply affirm that that is your verdict and that was your

 9  vote.

10          Juror No. 1?

11          JUROR NO. 1:  Yes.

12          THE COURT:  Juror No. 2?

13          JUROR NO. 2:  Yes.

14          THE COURT:  Juror No. 3?

15          JUROR NO. 3:  Yeah.

16          THE COURT:  Juror No. 4?

17          JUROR NO. 4:  Yes.

18          THE COURT:  Juror No. 5?

19          JUROR NO. 5:  Yes.

20          THE COURT:  Juror No. 6?

21          JUROR NO. 6:  Yes.

22          THE COURT:  Juror No. 7?

23          JUROR NO. 7:  Yes.

24          THE COURT:  Juror No. 8?

25          JUROR NO. 8:  Yes, ma'am.
```

```
 1              THE COURT:  Anything further from counsel?

 2              MR. JEAN:  Nothing.

 3              MR. McDONNELL:  No, Your Honor.

 4              THE COURT:  Ladies and gentlemen, I want to thank you

 5    immensely for your time and attention for these days.  I am

 6    going to discharge you from jury service.  I will come back to

 7    the jury room just to have a few words with you before I let

 8    you go completely.  So just give me a few moments and I will be

 9    right back in.

10              Thank you very much on behalf of the court and all the

11    parties for your time and attention.

12              THE COURTROOM DEPUTY:  All rise.

13              (The jury is excused at 3:33 p.m.)

14              THE COURT:  Okay.  You can all be seated.

15              Counsel, anything before we adjourn?  Mr. Jean?

16              MR. JEAN:  Nothing.

17              THE COURT:  Mr. McDonnell?

18              MR. McDONNELL:  No, Your Honor.

19              THE COURT:  Okay.  Mr. Pataki, I know this was not the

20    result that you wanted but you had a full trial and a very

21    zealous advocate on your behalf and eight members of the

22    community decided in favor of Walmart.  I wish you the best,

23    sir.

24              We are adjourned.

25              We can go off the record.
```

1          (Off-the-record discussion.)

2          THE COURTROOM DEPUTY:  All rise.

3          (Proceedings concluded at 3:34 p.m.)

4          - - - - - - - - - - - - - - - -

5          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

6           - - - - - - - - - - - - - - - -

7

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11    */S/ Camille Pedano, CCR, RMR, CRR, CRC, RPR    January 30, 2025*
      *United States Official Court Reporter            Date*
12

13

14

15

16

17

18

19

20

21

22

23

24

25